# TABLE OF CONTENTS

| EXHIBIT | PAGE RANGE |
|---------|------------|
| A | 1-127 |
| B | 128-129 |
| C | 130-136 |
| D | 137-138 |
| E | 139 |

# EXHIBIT A

SUM-100

# SUMMONS
## *(CITACION JUDICIAL)*

**FOR COURT USE ONLY**
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

A10 Capital, LLC; A10 Capital Holding Company, LLC; A10 Permanent Asset
Financing 2017-B, LLC; A10 REIT HOLDINGS, LLC; & Does 1-20

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

E-Z Living LLC, a State of California Limited Liability Company

**ELECTRONICALLY FILED**
Superior Court of California,
County of San Diego

**06/01/2021** at 03:10:09 PM

Clerk of the Superior Court
By Emily Schilawski, Deputy Clerk

---

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is: <br> *(El nombre y dirección de la corte es):* SAN DIEGO SUPERIOR COURT <br> 330 W. Broadway, San Diego, California 92101 | CASE NUMBER: <br> *(Número del Caso):* <br> 37-2021-00023914-CU-BT-CTL |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
F. Bari Nejadpour, Esq., LA Law Inc., 8383 Wilshire Blvd., Ste 630, Beverly Hills CA 90211, (310) 954-9595

| | | | |
|---|---|---|---|
| DATE: <br> *(Fecha)* 06/02/2021 | Clerk, by <br> *(Secretaria)* E. Schilawski | , Deputy <br> *(Adjunto)* |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☑ on behalf of *(specify):* A10 CAPITAL, LLC

under: ☑ CCP 416.10 (corporation)     ☐ CCP 416.60 (minor)
☐ CCP 416.20 (defunct corporation)     ☐ CCP 416.70 (conservatee)
☐ CCP 416.40 (association or partnership)     ☐ CCP 416.90 (authorized person)
☐ other *(specify):*
4. ☑ by personal delivery on *(date):* 6/15/21

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

Exhibit A
Page 1

ELECTRONICALLY FILED
Superior Court of California,
County of San Diego

**06/01/2021** at 03:10:09 PM
Clerk of the Superior Court
By Emily Schilawski,Deputy Clerk

1  F. BARI NEJADPOUR, ESQ. SBN 216925
   LA LAW INC APC
2  8383 Wilshire Blvd., Suite 630
   Beverly Hills, California 90211
3  Ph: (310) 954-9595
   Fx: (800) 760-1107
4  Em: admin@lalawinc.com

5

6  Attorneys for Plaintiff
   **E-Z LIVING LLC**

7

8  # SUPERIOR COURT OF THE STATE OF CALIFORNIA

9  ## FOR THE COUNTY OF SAN DIEGO

10

11  E-Z LIVING LLC, a state of California
    Limited Liability Company

12      Plaintiff,

13  A10 CAPITAL, LLC; A10 CAPITAL

14  HOLDING COMPANY, LLC; A10
    PERMANENT ASSET FINANCING

15  2017-II, LLC; A10 REIT

16  HOLDINGS, LLC; and DOES 1-20

17      Defendants.

18

19

CASE NO. 37-2021-00023914-CU-BT-CTL

**COMPLAINT FOR DAMAGES**

1. **Fraud and Deceit**
2. **Breach of Fiduciary Duty**
3. **Negligent Misrepresentation**
4. **Violation of California Business and Professions Code § 17200 et seq.**
5. **Declaratory Relief re: Recission of Contract**

**DEMAND FOR JURY TRIAL**

[Unlimited Civil Case]

20

21    Plaintiff E-Z LIVING LLC (hereinafter "Plaintiff"), by and through its attorneys, brings

22  this Complaint against Defendants A10 CAPITAL, LLC; A10 CAPITAL HOLDING

23  COMPANY, LLC; A10 PERMANENT ASSET FINANCING 2017-II, LLC; A10 REIT HOLDINGS, LLC;

24  and DOES 1-20 (hereinafter "Defendants") for (i) Fraud and Deceit, (ii) Breach of Fiduciary

25  Duty, (iii) Negligent Misrepresentation, (iv) Violation of California Business and Professions

26  Code Section 17200 et seq, and (v) Declaratory Relief in the form of judicial Recission of

27  Contract.

28

PARTIES

**PLAINTIFF E-Z LIVING LLC**

1.      Plaintiff is a California Limited Liability Company.

2.      Plaintiff is the "Borrower" in the December 21, 2018 loan agreement (hereinafter the "Agreement") entered into between the Plaintiff and the Defendants.

**DEFENDANT A10 CAPITAL, LLC**

3.      Defendant A10 CAPITAL, LLC is a Delaware State Limited Liability Company.

4.      Defendant A10 CAPITAL, LLC is registered to do business in California.

5.      Defendant A10 CAPITAL, LLC is the "Lender" in the Agreement.

**DEFENDANT A10 CAPITAL HOLDING COMPANY, LLC**

6.      Defendant A10 CAPITAL HOLDING COMPANY, LLC is a Delaware State Limited liability Company. Defendant A10 CAPITAL HOLDING COMPANY, LLC is an assignee of the rights and obligations of Defendant A10 Capital, LLC's stemming from the Agreement.

**DEFENDANT A10 PERMANENT ASSET FINANCING 2017-II, LLC**

7.      Defendant A10 PERMANANET ASSET FINANCING 2017-II, LLC is a Delaware State Limited Liability Company. Defendant A10 PERMANANET ASSET FINANCING 2017-II, LLC is an assignee of the rights and obligations of Defendant A10 Capital, LLC's stemming from the Agreement.

**DEFENDANT A10 REIT HOLDINGS, LLC**

8.      Defendant A10 REIT HOLDINGS, LLC is a Delaware State Limited liability Company. Defendant A10 REIT, LLC is an assignee of the rights and obligations of Defendant A10 Capital, LLC's stemming from the Agreement entered into between the parties herein.

**DOE ALLEGATIONS**

9.      Plaintiff is ignorant of the true names and capacities of the Defendants sued as Does 1 through 20, inclusive, and, therefore, sues said Defendants by such fictitious names. Plaintiffs will amend this Complaint when the true names and capacities of said defendants are ascertained.

2
COMPLAINT

**JOINT LIABILITY ALLEGATIONS**

10.     Upon information and belief, Plaintiff alleges that each Defendant (hereinafter collectively referred to as the "Defendants") was the agent, servant, employee, joint venturer, and/or partner of each Co-Defendant, and at all times acted within the course and scope of said agency, employment, venture, and/or partnership pursuant to the policies, practices, procedures, written or otherwise, and with the advance knowledge, acquiescence, or subsequent ratification of each Co-Defendant.

**JURISDICTION AND VENUE**

11.     The Court has jurisdiction over the causes of action asserted.

12.     The acts alleged occurred, in part, in San Diego County, California. Furthermore, Code of Civil Procedure § 410.10 permits the exercise of jurisdiction over out-of-state actors up to the U.S Constitutional limits so long as such minimum contacts are established.

13.     On information and belief, at all relevant times herein, Defendants were registered to do business within the state of California and did conduct such business with agents in California.

14.     Venue is proper in San Diego County under Code of Civil Procedure § 395.5 based on the facts, without limitation, that this Court is a court of competent jurisdiction, that the Parties entered into the Agreement in San Diego County, and that all of the events and business conducted by the Defendants were through agents within California.

**ALLEGATIONS COMMMON TO ALL COUNTS**

15.     In November 2018, Plaintiff, by and through the actions of Tony Biahaghy, the Manager of E-Z LIVING LLC, and a resident of Carlsbad California, identified the "Cheyenne Fountain" shopping center located at 7440-7450 W. Cheyenne Ave, Las Vegas (hereinafter known as the "Subject Property") in Las Vegas for an exchange replacement for which Plaintiff needed a loan of $3,100,000.00.

16.     On November 13, 2018, Alisha Hill Koontz (hereinafter "Ms. Koontz"), then Executive Vice President of Defendant A10 Capital, LLC, contacted Plaintiff with a loan

Exhibit A
Page 4

1  proposal which contained most of the general terms of the Agreement.  A true and correct copy
2  of the letter is attached hereto as **Exhibit "A"**.

3      17.     While the proposal mentioned "prepayment," it never states that there is a
4  penalty for such prepayment, and it never states what that penalty would be in anything
5  resembling dollar amounts or terms that are understandable to an average person.  The only
6  terms associated with the prepayment in the proposal were cryptic at best and simply said "24-
7  month lockout followed by yield maintenance."  The term "yield maintenance" is not defined in
8  the proposal.  The proposal instead broadly defines the term "Prepayment Period" thusly: *"On*
9  *any Monthly Payment Date after the Lockout Period ends but prior to the date that is three*
10 *months prior to the maturity date (the "Open Prepayment Date"), Borrower may prepay the*
11 *Loan in whole, but not in part, upon payment to Lender of the greater of (a) the Present Value*
12 *of the Loan, less the amount of principal being prepaid, calculated as of the prepayment date or*
13 *(b) one percent (1 %) of the outstanding principal amount of the Loan. The "Present Value of*
14 *the Loan" shall be determined, as of any date, by discounting all scheduled payments of*
15 *principal and interest remaining from such prepayment date until the Maturity Date at a*
16 *discount rate equal to the annual yield on the U.S. Treasury with maturity equal to the*
17 *remaining weighted average life of the Loan, for the week prior to the prepayment date, as*
18 *determined by Lender on the prepayment date. The rate will be determined by linear*
19 *interpolation between the yields, if necessary."* (See Exhibit A, Page 7)

20      18.     On November 13, 2018, Ms. Koontz emailed Plaintiff a loan application and
21 wiring instructions for a "good faith deposit" which she indicated would cover "third party
22 reports, legal and underwriting costs, as well as title."  A true and correct copy of this email is
23 attached hereto as **Exhibit "B"**.

24      19.     On November 14, 2018, Plaintiff received an email from Koontz informing
25 Plaintiff that "rates are on the rise," and urging Plaintiff to hurry up and "get your loan funded
26 before the end of the year."  A true and correct copy of that email is attached hereto as **Exhibit**
27 **"C"**.

28

4
COMPLAINT

20.     On November 16, 2018, Plaintiff received another email from Koontz again urging him to hurry up in signing the Agreement.  This time Koontz stated that "rates came in [higher] again today slightly."  A true and correct copy of that email is attached hereto as **Exhibit "D."**

21.     On November 19, 2018, Plaintiff (suffering under the aforementioned pressure for time put on him by Defendants) signed the "Revised Loan Proposal." A true and correct copy of the signed loan proposal is attached hereto as **Exhibit "E"**.

22.     On November 26, 2018, Plaintiff received an email from Koontz confirming the "good-faith" deposit.  Moreover, November 26, 2018 was the start of daily conferences and exchanges of documents of information between the Plaintiff and Defendants.  A true and correct copy of an email from Cori Neser, A10 Capital. LLC's Transaction and Legal Manager (hereinafter "Ms. Neser") referencing "weekly status conferences" is attached hereto as **Exhibit "F"**.

23.     On December 5, 2018, Plaintiff received yet another email putting pressure on him, this time from Ms. Neser stating that she needed the loan documents "as soon as possible if we were going to make the December 21, 2018, closing date." A true and correct copy of the December 5 email from Ms. Nesser is attached hereto as **Exhibit "G"**.

24.     On December 6, 2018, a conference call was held between Plaintiff and Defendants wherein Plaintiff again asked for clarification on the loan terms, especially the prepayment penalty.  A true and correct copy of a December 6, 2018, email from Plaintiff to Plaintiff's Counsel (Mr. Burt Dezendorf, Esq.) referencing the conference call and the fact that Plaintiff was still waiting on answers for the terms discussed, is attached hereto as **Exhibit "H"**.

25.     On December 6, 2018, Ms. Koontz emailed Plaintiff and requested that $165,000.00 be deposited with A10 Capital so the funds could be spent for "immediate repairs and deferred maintenance." It was never explained to Plaintiff that despite this fund, Plaintiff would be required to pay for any repairs out of pocket first and then submit reimbursement claims to Defendant.  A true and correct copy of the email is attached as **Exhibit "I"**.

Exhibit A
Page 6

26.     On December 12, 2018, Plaintiff received an email from Ms. Neser with seventeen proposed loan documents attached which Plaintiff was again placed under pressure to review, approve, and sign as soon as possible. A true and correct copy of the email is attached as **Exhibit "J"**.

27.     On December 18, 2018, Plaintiff received another email from Ms. Koontz expressing extreme urgency that Plaintiff sign all documents and return them to Defendant by 10:00 am the next day. A true and correct copy of the email is attached as **Exhibit "K"**.

28.     On December 21, 2018, Plaintiff and Defendants signed the final version of the Agreement, allowing for the Defendants to provide the loan to the Plaintiff in order to purchase and repair the Property. A copy of the Agreement is attached hereto as **Exhibit "L"**.

29.     On February 21, 2019, Plaintiff and Defendants executed a "Second Amendment to Agreement Regarding Post-Closing Item" which assigned rights and obligations from A10 Capital, LLC to the other named Co-Defendants. A true and correct copy of the Second Amendment is attached as **Exhibit "M"**.

30.     On April 28, 2020, Plaintiff submitted to Defendants a request for a refund of the $165,000.00 deposit money. Plaintiff received a response from Victoria Fitzgerald, Defendant's Sr. Asset Manager, (hereinafter "Ms. Fitzgerald") requesting that Plaintiff fill out more forms and pointing Plaintiff to Section 5.1 without further explanation. A true and correct copy of Ms. Fitzgerald's email is attached as **Exhibit "N"**.

31.     On June 6, 2020, Plaintiff once again asked Ms. Koontz to explain the "prepayment penalty." Ms. Koontz responded by emailing Plaintiff a weblink to Chatham Financials and again leaving Plaintiff to figure it out on his own. A true and correct copy of the email from Ms. Fitzgerald is attached as **Exhibit "O"**.

32.     On June 8, 2020, Plaintiff submitted the requested forms for repair reimbursement and forwarded them to Defendants for payment. For the first time and without any warning, Defendants told Plaintiff that they only disburse funds "for work completed." A true and correct copy of the email is attached as **Exhibit "P"**.

33.    On September 21, 2020, Plaintiff again emailed Defendants and indicated that the link to calculate the prepayment penalty was unclear and required inputs which Plaintiff did not possess. He again inquired as to the amount of any prepayment penalty and for the first time and without warning, Defendants told Plaintiff that the prepayment penalty would be "$1,028,917 or 33.82% of the outstanding balance." A true and correct copy of the email is attached as **Exhibit "Q"**.

## FIRST CAUSE OF ACTION
## FRAUD AND DECEIT

34.    Plaintiff incorporates the allegations of Paragraphs 1 through 33 of this Complaint as if fully set forth herein.

35.    As codified in California Civil Code Section 1710(3); A deceit includes "the suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact."

36.    In the case at hand, Defendants suppressed the negative terms and consequences of the Agreement, with the intent of, and in fact successfully, misleading Plaintiff for want of communication of those facts.

37.    Prior to entering into the Agreement, Defendants falsely and fraudulently represented to the Plaintiff that Defendants did not know the prepayment penalty amount of $1,028,917.00.

38.    Additionally, Defendants falsely and fraudulently represented the characterization and true nature of the $165,000.00 deposit from Plaintiff.

39.    The above fraudulent representations and concealments were material inducements for Plaintiff to enter into the Agreement with Defendants. Had Plaintiff known the true facts, namely that the prepayment penalty was more than 33 percent of the total loan and that he would not be reimbursed for the $165,000.00 he deposited with Defendants, Plaintiff would not have entered into the Agreement.

7
COMPLAINT

40.     At the time Defendants made their representations and/or omissions to Plaintiff as above alleged, they knew, or had reason to know, that said representations and/or omissions were in fact false, and nevertheless made them, with the intent to defraud Plaintiff and/or to induce Plaintiff to enter into the Agreement.  Defendants knew that the Agreement contained terms unfavorable to Plaintiff, including the large prepayment penalty, and that the deposit restrictions, and further knew that if the actual terms of the Agreement were disclosed, Plaintiff would not have accepted the loan as offered.  Defendants purposefully hid the terms as to ensure that Plaintiff accepted the Agreement.

41.     At the time the representations and/or omissions were made, Plaintiff was ignorant of the falsity of the representations and/or omissions and believed them to be true facts.  Plaintiff reasonably relied on Defendants' representations and/or omissions and was thereby induced to enter into the Agreement.

42.     During his preliminary discussions with Defendants, Plaintiff specifically addressed his desire to have a limited prepayment penalty.  Thus, had Plaintiff known the true facts, Plaintiff would not have taken such action and would not have entered into the Agreement.

43.     By reason of the acts and conduct of Defendants as alleged above, Plaintiff entered into the Agreement, thus sustaining damages, including, but not limited to, unnecessary costs, significant prepayment penalties, excessive interest accumulation, loss of equity, destruction of credit standing, pain, suffering, and emotional distress, in an amount to be shown at trial.

44.     By reason of the fraudulent, malicious, and oppressive conduct of said Defendants, undertaken with conscious and reckless disregard of Plaintiff's rights and Defendants' obligations, Plaintiff is entitled to punitive and exemplary damages in an amount sufficient to punish and make an example of said Defendants and to deter such conduct in the future.

8
COMPLAINT

## SECOND CAUSE OF ACTION
## BREACH OF FIDUCIARY DUTY

45.   Plaintiff repeats and re-alleges the allegations in paragraphs 1 through 44 of this Complaint as if fully set forth herein.

46.   Pursuant to California Civil Code §2923.1(a) "a mortgage broker providing mortgage brokerage services to a borrower is the fiduciary of the borrower, and any violation of the broker's fiduciary duties shall be a violation of the mortgage broker's license law." This relationship required that Defendants place the economic interest of Plaintiff ahead of their own economic interest.

47.   A fiduciary relationship and the corresponding fiduciary duties may arise in two ways: a person must either knowingly undertake to act on behalf of and for the benefit of another or enter into a relationship, such as a partnership, joint venture, or agency, which imposes that undertaking as a matter of law. See *Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 221; *Pelligrini v. Weiss* (2008) 165 Cal.App.4th 515, 524 (joint venture or partnership); *Duffy v. Cavalier* (1989) 215 Cal.App.3d 1517, 1531 (agency).

48.   Parties can owe a fiduciary duty to each other without being partners or joint venturers.  They can simply be an Agent or have knowingly undertaken to act on another's behalf and for his or her benefit.  "The key factor in the existence of a fiduciary relationship lies in control by a person over the property of another." *Apollo Capital Fund, LLC v. Roth Capital Partners LLC* (2007) 158 Cal.App.4th 226, 246.

49.   A relationship of trust and confidence existed between Plaintiff and Defendants. Among other things, Plaintiff entrusted Defendants with a myriad of confidential information with regard to the Agreement, including, without limitation, Plaintiff's social security numbers and/or tax ID numbers, tax returns, W2's, pay stubs, bank statements, other income information and/or verification, financial statements, information with regard to Plaintiff's debt, work history, credit history, and net worth.

1   50.   A common law fiduciary relationship existed between Plaintiff and Defendants.

2   Plaintiff and Defendants were parties to a transaction wherein Defendants were duty bound to

3   act with the utmost good faith for the benefit of Plaintiffs because a confidence was reposed by

4   Plaintiff in the integrity of Defendants.

5   51.   In their responsibilities as a fiduciary to Plaintiff, it was incumbent upon

6   Defendants to evaluate, explain, and recommend to Plaintiff all appropriate conditions of the

7   Agreement, including fully explaining the prepayment penalty and deposit restrictions. Further,

8   Defendants were obligated to place the financial welfare of their client, the Plaintiff, ahead of

9   their own.

10   52.   Defendants willfully and/or negligently breached their fiduciary duties to

11   Plaintiff by acts and omissions including, but not limited to:

12   a.   Knowingly making false representations and/or omissions of fact and law,

13   including but not limited to, incorrectly articulating the size of the prepayment

14   penalty associated with the Agreement, failing to disclose the true size of the

15   prepayment penalty, and/or failing to disclose the true nature and restrictions of

16   the Deposit.

17   b.   Acting on behalf of own interests without disclosing this fact to the Plaintiff.

18   53.   By reason of the acts and conduct of Defendants as alleged above, Plaintiff has

19   entered into the Agreement, thus sustaining damages, including, but not limited to, significantly

20   higher than anticipated prepayment penalties, excessive interest accumulations, loss of equity,

21   destruction of credit standing, pain, suffering, and emotional distress, in an amount to be shown

22   at trial.

23   54.   By reason of the fraudulent, malicious, and oppressive conduct of Defendants,

24   undertaken with conscious and reckless disregard of Plaintiff's rights and Defendants'

25   obligations, Plaintiff is entitled to punitive and exemplary damages in an amount sufficient to

26   punish and make an example of Defendants, and to deter such conduct in the future.

27

28

## THIRD CAUSE OF ACTION
### NEGLIGENT MISREPRESENTATION

55.     Plaintiff repeats and re-alleges the allegations in paragraphs 1 through 54 of this Complaint as if fully set forth herein.

56.     The elements of a cause of action for negligence are well established. They are "(a) a legal duty to use due care; (b) a breach of such legal duty; [and] (c) the breach as the proximate or legal cause of the resulting injury." *Ladd v. County of San Mateo* (1996) 12 Cal.4th 913, 917 [50.Cal.Rptr.2d 309, 911 P.2d 496].

57.     Plaintiff sues Defendants for the negligent misrepresentations as alleged herein. The representations and/or omissions made by Defendants as alleged herein were false.

58.     Defendants misrepresented to Plaintiff that Defendants did not know the prepayment penalty amount under the Agreement when they in fact knew and later provided the exact calculation of the prepayment penalty. Defendants further misrepresented to Plaintiff the true characterization of, and restrictions involved with, the $165,000.00 deposit.

59.     At time Defendants made their representations and/or omissions to Plaintiff as above alleged, Defendants had no reasonable grounds to believe that the misrepresentations were true and made them to Plaintiff negligently and/or recklessly with the intent to induce Plaintiff to enter into the Agreement. The Defendants knew the penalty calculation formula for the prepayment and knew the true nature of, and restrictions involved with, the $165,000.00 deposit and chose not to provide the Plaintiff with that information before entering the Agreement. It was only after the Agreement was entered into that Plaintiff was finally given the prepayment penalty amount and told that that he would not be reimbursed for the $165,000.00 payment and that there were numerous restrictions on using the deposit for repairs.

60.     Defendants knew that the Agreement contained an exorbitant prepayment penalty and that if Plaintiff knew the terms of the penalty, Plaintiff would not agree to the loan. Defendants further knew that there were numerous restrictions on using the Deposit and that Plaintiff would not be reimbursed for the $165,000.00. Defendants intended to induce Plaintiff to rely upon the misrepresentations. Defendants knew that by not providing Plaintiff with the

1  true prepayment penalty figure or the full restrictions placed on the $165,000.00 Deposit,
2  Plaintiff would be more willing to enter into the Agreement. Defendant purposefully hid the
3  terms as to ensure that Plaintiff would accept the Agreement.

4      61.    At the time the representations and/or omissions were made, Plaintiff was
5  ignorant of the falsity of the statements and/or omissions and believed them to be true. Plaintiff
6  reasonably relied on the representations and/or omissions and was justified on relying upon
7  Defendants' misrepresentations that the penalty was too complicated to figure out because
8  Plaintiff was given the formula by Defendants and could not figure out how to make the
9  calculation work. Had Plaintiff known the true facts, Plaintiff would not have entered into the
10 Agreement.

11     62.    Plaintiff has been harmed by Defendants' misrepresentations and/or omissions
12 because now Plaintiff owes $1,028,917.00 to get out of the Agreement instead of the one
13 percent that Plaintiff believed he would have to pay.

14     63.    By reason of the acts and conduct of Defendants as above alleged, Plaintiff
15 entered into the Agreement, thus sustaining damages, including, but not limited to, unnecessary
16 costs, prepayment penalties, excessive interest accumulations, loss of equity, destruction of
17 credit standing, pain, suffering, and emotional distress, in an amount to be shown at trial.

18     64.    By reason of the fraudulent, malicious, and oppressive conduct of Defendants,
19 and with conscious and reckless disregard of Plaintiff's rights and Defendants' obligations,
20 Plaintiff is entitled to punitive and exemplary damages in an amount sufficient to punish and
21 make an example of Defendant, and to deter such conduct in the future.

22

23                     **FOURTH CAUSE OF ACTION**
24 **VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE § 17200 et seq.**

25     65.    Plaintiff repeats and re-alleges the allegations in paragraphs 1 through 64 of this
26 Complaint as if fully set forth herein.

27     66.    As alleged herein above, Plaintiff has standing to pursue this claim as he has
28 suffered injury in fact and has lost money or property as a result of the Defendants' actions as

1  set forth herein.  Specifically, as a result of Defendants' actions, Plaintiff is now forced to pay

2  excessive prepayment penalties of approximately $1,028,917.00.

3      67.    Defendants knowingly engaged in false representations through statements, acts,

4  and/or omissions, including but not limited to the following: (i) the prepayment penalty would

5  not be more than 1% and there was no way to calculate it prior to signing the loan, (ii) the

6  $165,000.00 would be held for expenses and could be used for repairs etc., (iii) failing to fully

7  disclose to Plaintiff the true nature and negative consequences of the terms of the Agreement,

8  which prevented Plaintiff from making an informed and intelligent decision.

9      68.    At the time Defendants made their representations and/or omissions to Plaintiff

10  as above alleged, they knew, or had reason to know, that said representations and/or omissions

11  were in fact false, and nevertheless made them, with the intent to defraud Plaintiff and/or induce

12  Plaintiff to enter into the Agreement.  Defendants knew that the Agreement contained terms

13  unfavorable to Plaintiff, and further knew that if the actual terms of the Agreement were

14  discussed, Plaintiff would not have accepted the loan.  Defendants purposefully hid the terms to

15  ensure Plaintiff accepted the Agreement.

16      69.    At the time the representations and/or omissions were made, Plaintiff was

17  ignorant of the falsity of the representations and/or omissions and believed them to be true.

18  Plaintiff reasonably relied on the representations and/or omissions and was induced to enter into

19  the Agreement.  Had Plaintiff known the true facts, Plaintiff would not have taken such action

20  and would not have entered into the Agreement.

21      70.    Defendants engaged in unlawful, unfair, and fraudulent business practices in

22  violation of California's Unfair Competition Law ("UCL").

23      71.    Defendants engaged in practices such as failing to provide requisite disclosures,

24  charging excessive prepayment penalties, and as set forth above, are likely to commit such

25  violations against the general public, and therefore constitute unfair and/or illegal business acts

26  and practices within the meaning of California Business & Professions Code § 17200, et seq.

27

28

Exhibit A
Page 14

72.     Defendants engaged in unfair business practices which offended established public policy, and were immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers like Plaintiff.

73.     Defendants engaged in fraudulent business practices which were likely to deceive the public, and which did deceive Plaintiff, who is a reasonable consumer.

74.     As a result of the conduct described above, Defendants have been and will continue to be unjustly enriched at the expense of Plaintiff.   Wherefore, Plaintiff requests judgment as hereinafter stated.

## FIFTH CAUSE OF ACTION
## DECLARATORY RELIEF: RECISSION OF THE AGREEMENT

75.     Plaintiff repeats and re-alleges all of the allegations contained in Paragraphs 1 through 74 of this complaint, inclusive, as if fully set forth herein.

76.     Pursuant to Civil Code section 1691 the filing of this action constitutes notice of rescission.

77.     Plaintiff performed everything required of it under the Agreement except for any performance that was excused by reason of Defendants' breaches, fraud, and/or mistake.

78.     California Civil Code section 1689(b) provides: A party to a contract may rescind the contract if the consent of the party rescinding, or of any party jointly contracting with him, was given by mistake, or obtained through duress, menace, fraud, or undue influence, exercised by or with the connivance of the party as to whom he rescinds, or of any other party to the contract jointly interested with such party.

79.     Defendants, with the intent to deceive Plaintiff, induced Plaintiff to enter into the Agreement by making misrepresentations and/or omissions to Plaintiff alleged above.

80.     The misrepresentations and/or omissions alleged above, were false. At the time that Defendants made the representations alleged above, they knew the representations were false.

81.     Defendants intended that Plaintiff rely upon their false statements of fact.

14
COMPLAINT

Exhibit A
Page 15

82.     At the time that Plaintiff executed the Agreement it was unaware that Defendants' representations were false.

83.     Plaintiff relied upon Defendants' false representations.

84.     Defendants' false representations were material to Plaintiff's decision to enter into the Agreement, and it relied to its detriment, upon Defendants' misrepresentations in entering into the Agreement. Plaintiff would not have entered into the Agreement had it known the true facts.

85.     Plaintiff relied to its detriment upon the representations alleged above, in deciding to enter into the Agreement.

86.     Thus, Plaintiff is entitled to rescind the Agreement under California Civil Code section 1689(b)(1).

87.     An actual controversy has arisen and now exists between Plaintiff and Defendants, with respect to rescission of the Agreement. Plaintiff contends that the Agreement is rescinded by the filing of this Complaint pursuant to Civil Code section 1691 without any requirement to offer to restore or to restore any consideration that Plaintiff received pursuant to the Agreement.

88.     Plaintiff is informed and believes and thereon alleges that Defendants dispute that the Agreement is rescinded.

89.     Thus, the Parties require a judicial declaration from this Court to resolve this controversy.

90.     As a result of the above-stated facts, the Plaintiff should be able to rescind the Agreement and be placed back into its pre-Agreement position. Wherefore, Plaintiff requests judgment as hereinafter stated.

## DEMAND FOR JURY TRIAL AND PRAYER FOR DAMAGES

Plaintiff hereby demands a trial by jury.

WHEREFORE, Plaintiff prays for judgment and Order against Defendants as follows:

1.     That Judgment be entered for Plaintiff against Defendants, and each of them.

2.     For general damages for all injuries resulting from the fraud, breach of fiduciary duty, negligent misrepresentations, breach of contract, violations of California Business and Professions Code §§17200 *et seq.*, according to proof at trial.

3.     For punitive and/or exemplary damages in an amount sufficient to punish Defendants' wrongful conduct and deter future misconduct.

4.     For compensatory damages, according to proof at trial.

5.     For consequential damages, according to proof at trial.

6.     For a judicial declaration by this Court that the Agreement has be rescinded.

7.     For an accounting from Defendants of all monies received by them by and through the Agreement.

8.     For disgorgement and restitution of all earnings, profits, compensation, and benefits received by Defendants as a result of their unlawful acts and practices.

9.     Prejudgment interest.

10.    Costs and disbursements of the action.

11.    Attorney's fees.

12.    For declaratory relief concerning the relative rights, responsibilities, obligations, and interest as to each of the parties hereto with respective to the subject real estate; and,

12.    For such other and further relief as this Court deems just and proper

DATED:  _5 - 14 -_ , 2021

LA Law Inc APC

F. BARI NEJADPOUR
Attorneys for Plaintiff
E-Z LIVING LLC

16
COMPLAINT

# EXHIBIT "A"



November 13, 2018

Tony and Patricia Baihaghy
EZ Living, LLC

Delivered via email

Dear Mr. and Mrs. Baihaghy;

Thank you for your interest in obtaining a first priority loan from A10 Capital, LLC ("*A10 Capital*" or "*Lender*"). Based upon our preliminary review, the following term sheet represents a proposal regarding a possible loan, subject to the Exhibits attached hereto and incorporated herein by this reference, but does not constitute a commitment to provide such loan.

| Applicant | EZ Living, LLC |
|---|---|
| Principal(s) of Applicant | Tony Baihaghy, Patricia Baihaghy, Mike Fahr, Shiva Farmani |
| Property Name | Cheyenne Fountains |
| Property Type | Retail Center |
| Property Square Footage | 28,355 |
| Property Address | 7440-7450 W Cheyenne Ave, Las Vegas, NV |
| Intermediary | None |

| General Loan Terms | |
|---|---|
| **Loan Amount** | $3,150,000 |
| **Maximum Loan-To-Value** | 50% as determined by an MAI appraiser |
| **Recourse** | Non-recourse except for limited bad act carveouts (detailed in Exhibit B). |
| **Interest Rate** | Fixed at 2.20% plus the greater of UST or Swaps. |
| **Loan Term** | 15 Years |
| **Amortization** | Monthly amortization based on a 25-year schedule. |
| **Origination Fee** | .25% to be collected at the time of closing |
| **Prepayment** | 24 month lockout followed by yield maintenance. Open at par during the final 3 months of loan term. |
| **Tax/Insurance Escrow** | Either (a) monthly deposits or (b) an amount equal to one year's annual tax and insurance premium for life of the loan |
| **Loan Assumption** | Loan is eligible for one-time assumption upon satisfaction of conditions (see Exhibit B) including payment of an assumption fee equal to 1% of the Loan Amount |
| **Good Faith Deposit** | $30,000 |

| Reserves | Amount | Details |
|---|---|---|
| CapEx Reserve | $TBD | A holdback at closing will be required based upon an amount equal to 125% of immediate repairs over the 1st year of the Loan Term as determined in the Lender-engaged Property Condition Report |

| Rollover Reserve | Annual collection of $1.00 per square foot | Annual amount shall be funded in equal monthly installments throughout the Loan Term Aggregate average release price TBD per square foot |
| Replacement Reserve | TBD | Annual amount shall be an amount equal to that determined in the Lender-engaged Property Condition Report and shall be funded to Lender in equal monthly installments throughout the Loan Term |

| **In-house Legal** | A10's in-house legal and closing team significantly reduces involvement of outside counsel, which lowers closing costs and translates into a meaningful reduction in the effective interest rate on an average middle-market permanent loan. |
| **A10 Loan Servicing** | A10 services its loans in-house from closing to maturity, providing a better experience than having your loan transferred to a disinterested 3rd party servicer. A10 does not have hidden servicing fees that are common with 3rd party CMBS servicers. |
| **On Balance Sheet** | A10 is an on-balance-sheet lender, providing flexibility to make changes to your loan over the life, if warranted. |

**Other Conditions:**

- The terms of this proposal are only valid if Lender receives a signed acceptance and Good Faith Deposit within 5-business days of the date of the term sheet. Furthermore, the terms of this proposal are only valid if the proposed loan closes within 75 days of the date of the term sheet.
- The terms of this proposal were derived based on the assumptions outlined in Exhibit A.
- *Early Rate Lock Option:* At Applicant's request, Interest Rate can be locked after receipt of executed term sheet and Good Faith Deposit. Rate lock will require industry standard early rate lock agreement and rate lock deposit, which deposit would be credited back to Applicant less costs incurred at loan closing. Interest Rate would be locked within three (3) business days following the receipt of the executed early rate lock agreement and the rate lock deposit.

If the terms set forth in this proposal meet with your acceptance, please sign, scan, and return via email.

We look forward to working with you.

Sincerely,

*AHK*

Alisha Hill Koontz, EVP
A10 Capital, LLC

**ACCEPTANCE**

The undersigned Applicant hereby applies for approval under the terms indicated above, and acknowledges that this proposal does not constitute a commitment to lend by A10 Capital.

By:_____

Name:_____

Title:_____

Date:_____

## EXHIBIT A: Lender's Understanding of Applicant's Business Plan

The Loan Amount will be provided to complete the acquisition of the Property. A portion of tenant improvement and leasing commissions may be provided from the Rollover Reserve to address any tenants whose leases expire during the Loan Term. The projected assumptions are as follows:

|  | In-Line | Restaurants |
|---|---|---|
| Lease Rate | $16.51 | $20.62 |
| Reimbursement Type | NNN | NNN |
| Lease Term | 5 Years | 5 Years |
| TI Allowance (new) | $10.00 psf | $10.00 psf |
| TI Allowance (renewal) | $5.00 psf | $5.00 psf |

| Minimum Underwritten In-Place Net Operating Income | $455,679 |
|---|---|
| Minimum Underwritten In-Place Net Cash Flow | $421,673 |
| Current Occupancy | 95% |

### Major Tenants*

| Tenant Name | Square Feet | Expiration |
|---|---|---|
| CareMore Health System / Nifty After Fifty | 3,400 | 2/28/2021 |
| Paradigm Cleaners dba Dry Clean Vegas | 2,400 | 9/30/2020 |
| Las Pupusas Restaurant | 2,400 | 2/28/2022 |
|  |  |  |
|  |  |  |
|  |  |  |

*Major Tenants shall also include any new tenants at the property that occupy over 10% of the net rentable area

## EXHIBIT B: Terms and Conditions

**Applicant:**

Applicant will provide copies of all organizational documents, as amended, which must satisfy Lender's requirements set forth above. In addition, Applicant's operating agreement must include a satisfactory capital call provision to ensure there is a mechanism in place to provide for additional equity if the need should arise. Applicant's use of a "recycled" single purpose entity shall be subject to Lender's review and satisfaction of additional legal and underwriting requirements. Applicant's counsel shall provide an opinion regarding authority, enforceability and such other matters as required by Lender's counsel.

**Collateral:**

A10 Capital will have a First Lien on all real property, improvements and personal property owned by Applicant located at the Property Address set forth above (collectively, the "*Property*").

**Disbursement of Loan Amount:**

Lender will disburse up to the Loan Amount, not to exceed any of the listed constraints, at closing of the loan, which proceeds will be used to cover loan fees and costs and fund reserve / escrow accounts as set forth herein, with the remaining net loan proceeds being used to fund a portion of the payoff, acquisition or recapitalization, as applicable. Lender reserves the right to decrease the Loan Amount as necessary if any of the following, which are set forth above, are not achieved: (i) Minimum Underwritten In-Place Net Operating Income, (ii) Maximum Loan-To-Value, (iii) Current Occupancy or (iv) Minimum Underwritten In-Place Net Cash Flow. Lender also reserves the right to decrease the Loan Amount as necessary if the applicable swap rate that is equivalent to the Loan Term, or interpolated applicable swap rate, as applicable, increases by more than 10 basis points from the time of application.

**Disbursement of Immediate Repairs Reserve:**

As applicable, the Immediate Repairs Reserve will be disbursed in increments of not less than $25,000 upon receipt by Lender of satisfactory evidence that immediate repairs have been completed at the Property in accordance with the Lender-approved immediate repairs budget (the "*Immediate Repairs Budget*"). Costs eligible for disbursement shall not exceed the lesser of (i) funds available in the Immediate Repairs Reserve, (ii) the actual cost of each immediate repairs project or (iii) the budgeted amount for such immediate repairs as set forth in the Immediate Repairs Budget. All Immediate Repairs Reserve disbursement requests shall be for one disbursement upon completion of each project and must be accompanied by supporting invoices, lien releases, updated title searches and date-down endorsements, and such other matters as Lender may require, and will be subject to Lender's approval, in its sole discretion, of all supporting documentation. Disbursements shall occur not more than once per month.

**Disbursement of Rollover Reserve:**

As applicable, the Rollover Reserve will be disbursed in increments of not less than $25,000 upon receipt by Lender of satisfactory evidence that tenant improvements and leasing commissions have been completed at the Property as

existing tenants are renewed and extended or acceptable replacement tenants are secured. Costs eligible for disbursement shall not exceed the lesser of (x) funds available in the Rollover Reserve, (y) the actual aggregate cost of tenant improvements and leasing commissions for each project, or (z) an aggregate average release price calculated on the Disbursement Provision stated above. All Rollover Reserve disbursement requests shall be for one disbursement upon completion of each project and must be accompanied by supporting invoices, lien releases, updated title searches and date-down endorsements, tenant acceptance letters, certificates of occupancy, and such other matters as Lender may require, and will be subject to Lender's approval, in its sole discretion, of all supporting documentation. Disbursements shall occur not more than once per month.

**Disbursement of**
**Replacement Reserve:** As applicable, the Replacement Reserve will be disbursed in increments of not less than $25,000 upon receipt by Lender of satisfactory evidence that capital improvements have been completed at the Property in accordance with the Lender-approved capital expenditures budget (the "*CapEx Budget*"). Costs eligible for disbursement shall not exceed the lesser of (i) funds available in the Replacement Reserve, (ii) the actual cost of each capital improvements project or (iii) the budgeted amount for such capital improvements as set forth in the CapEx Budget. All Replacement Reserve disbursement requests shall be for one disbursement upon completion of each project and must be accompanied by supporting invoices, lien releases, updated title searches and date-down endorsements, and such other matters as Lender may require, and will be subject to Lender's approval, in its sole discretion, of all supporting documentation. Disbursements shall occur not more than once per month.

**Cash Management:** All rents and other payments and deposits relating to the Property shall be held in Applicant's deposit account, which deposit account shall be subject to a Cash Collateral Agreement between Applicant and Lender (the "CCA"). Upon the occurrence and during the continuance of a Reduced Performance Period, all excess cash shall be collected by Lender pursuant to the CCA and held by Lender in reserve in a non-interest bearing account as additional security for the Loan; upon the earlier to occur of (A) payment in full of the Loan or (B) (x) at such time as any Reduced Performance Period arising under the following clauses (i) and (iii) shall end or (y) with regard to a Reduced Performance Period arising under the following clause (ii), at such time as the Property shall achieve the Initial DSCR, such excess cash held by Lender in reserve shall be returned to Borrower. A "Reduced Performance Period" shall occur upon the occurrence and continuation of (i) an event of default under the loan documents (including any bankruptcy action of Applicant or Principal), or (ii) DSCR drops below 75% of the DSCR at closing of the Loan or below 1.15:1, or (iii) the occurrence of a Major Tenant Event.

**Major Tenant**
**Event:** A Major Tenant Event shall be deemed to have occurred if (i) any Major Tenant (as defined in Exhibit A) gives notice of its intention to not extend or renew its lease, (ii) on or prior to six (6) months prior to the then applicable expiration date under its lease, Major Tenant fails to give notice of its election to renew its lease, (iii) on or prior to the date by which Major Tenant is required under its lease to notify the landlord of its election to renew its lease, Major Tenant fails to give such

notice, (iv) an event of default under the Major Tenant lease beyond any applicable notice and cure period therein (a) by Applicant, which default gives Major Tenant the right to terminate the lease, or (b) by Major Tenant, relating to its obligation to pay rent or reimbursements, if any, (v) the bankruptcy or insolvency of Major Tenant, or (vi) if Major Tenant ceases to occupy or discontinues its normal operations at its leased premises located on the Property.

**Interest Rate:** Unless Applicant elects the Early Rate Lock Option, the fixed Interest Rate will be set based on the applicable Interest Rate in effect three (3) business days prior to the anticipated close date as established and agreed upon by Applicant and Lender. The fixed Interest Rate will be set via a free three-day rate lock; provided, should the transaction not close on such anticipated close date, the previously locked Interest Rate will be the floor and the fixed Interest Rate may be increased with corresponding increases to the applicable Interest Rate Swap yield rate.

**Costs:** Applicant will pay for Lender's third party costs of the loan including, but not limited to, appraisal, a $7,500 underwriting fee per property, environmental due diligence, site inspections, title, legal fees, documentation, public record searches, escrow, credit reports, and all other customary closing costs.

**Repayment:** Principal and Interest payments are due in arrears and payable on the 1st business day of each month (each a "*Monthly Payment Date*"). At maturity, all unpaid principal and accrued but unpaid interest shall be due and owing in full. Monthly principal and interest payments will be collected via ACH debit.

**Prepayment:** Lockout Period. The Loan shall be closed to prepayment through the last day of the 24th full calendar month following the closing date of the Loan (the "*Lockout Period*").

Prepayment Period. On any Monthly Payment Date after the Lockout Period ends but prior to the date that is three months prior to the maturity date (the "*Open Prepayment Date*"), Borrower may prepay the Loan in whole, but not in part, upon payment to Lender of the greater of (a) the Present Value of the Loan, less the amount of principal being prepaid, calculated as of the prepayment date or (b) one percent (1%) of the outstanding principal amount of the Loan. The "*Present Value of the Loan*" shall be determined, as of any date, by discounting all scheduled payments of principal and interest remaining from such prepayment date until the Maturity Date at a discount rate equal to the annual yield on the U.S. Treasury with maturity equal to the remaining weighted average life of the Loan, for the week prior to the prepayment date, as determined by Lender on the prepayment date. The rate will be determined by linear interpolation between the yields, if necessary.

Open Period. From and after the Open Prepayment Date, Borrower may prepay the Loan, in whole, at par.

**Tax Escrow:** Lender will require that real estate taxes are paid current at time of funding of the loan. Applicant will (a) deposit with Lender at closing an amount equal to (i) the annual real estate tax obligation for the Property, as estimated by Lender, less (ii) the number of monthly escrow payments occurring prior to the next tax due date, and (b) deposit with Lender on each monthly loan payment due date, an

amount equal to 1/12th of the annual real estate tax obligation for the Property, as estimated by Lender, to be held by Lender in a non-interest bearing reserve account. So long as no event of default has occurred under the loan documents, Lender shall pay, on Applicant's behalf, the real estate taxes when due, for as long as the Loan is outstanding, from funds available in the Tax Escrow. In lieu of the cushion and monthly collection, Applicant may elect to deposit with Lender at closing, and maintain in escrow with Lender at all times while the loan is outstanding, an amount equal to one year's tax assessments relating to the Property.

**Insurance Escrow:**  Applicant will cause its insurance agent to provide Lender with a satisfactory evidence of insurance reflecting that Applicant is in compliance with the minimum insurance requirements set forth in the loan documents. Applicant will (a) deposit with Lender at closing an amount equal to (i) the annual insurance premium for the Property, as estimated by Lender, less (ii) the number of monthly escrow payments occurring prior to the next insurance renewal date, and (b) deposit with Lender on each monthly loan payment due date, an amount equal to 1/12th of the annual insurance premium for the Property, as estimated by Lender, to be held by Lender in a non-interest bearing reserve account. So long as no event of default has occurred under the loan documents, Lender shall pay, on Applicant's behalf, the annual insurance premium for the Property when due, for as long as the Loan is outstanding, from funds available in the Insurance Escrow. In lieu of the cushion and monthly collection, Applicant may elect to deposit with Lender at closing, and maintain in escrow with Lender at all times while the loan is outstanding, an amount equal to one year's annual insurance premiums relating to the Property.

**Additional Reserves:**  Additional reserves for capital improvements or environmental issues may be required as determined by Lender during the due diligence / underwriting process.

**Reserves / Escrows:**  Monies deposited with Lender at funding of the loan for the reserves and escrows described herein, shall be held by Lender in a non-interest bearing account.

**Bad Act Carve-outs:**  To ensure that Lender gets unfettered access to the Collateral in the event of default, the Principal(s) listed above must sign a conditional springing guaranty. The conditional springing guaranty springs into effect upon the occurrence of standard carveouts, including fraud, intentional misrepresentation, misappropriation of funds, willful misconduct, material waste, failure to pay taxes and insurance, bankruptcy, prohibited transfers, SPE violations, environmental matters and other non-recourse carveout items customarily required by Lender for transactions of the type described herein. By complying with the terms of the conditional springing guaranty, the Principal(s) avoid the further risk of being personally responsible for loan loss. Any Principal that is an entity (and not an individual) will be subject to minimum net worth, liquidity and financial reporting requirements during the loan term in accordance with the terms of the loan documents, including, minimum net worth of 50% of the Loan Amount and minimum liquidity of 10% of the Loan Amount.

| | |
|---|---|
| **Environmental Indemnity:** | Applicant and the Principal(s) listed above, collectively as indemnitors, must sign a standard commercial Environmental Indemnity Agreement in form and substance acceptable to Lender. |
| **Loan Assumption:** | The Loan include a one-time assumption provision, in whole only, subject to conditions set forth in the loan documents, including, but not limited to, Lender's consent, delivery of a replacement carveout guaranty from an affiliate of assignee satisfactory to Lender, payment of a non-refundable underwriting fee of $7,500 as well as related costs and expenses, and payment of an assumption fee in amount set forth above. |
| **Governing Law:** | This term sheet shall be governed by, and construed in accordance with, the laws of the State of Nevada, without regard to principles of conflicts of laws. |
| **Deposit:** | Applicant accepts the terms and conditions of this proposal and has herewith submitted the Good Faith Deposit stated above. If this proposal is approved and accepted by Lender, the Good Faith Deposit will be applied to Lender's third party costs and the above referenced Loan Fee at closing. The Good Faith Deposit is not refundable except in the event that the transaction represented by this proposal and any amendment to it is not approved on conditions materially similar to this proposal. In such case, the Good Faith Deposit shall be returned promptly to Applicant, less any costs incurred by Lender. |
| **Third Party Reports:** | By signing below, Applicant hereby authorizes any appraisal firm, environmental firm, or such other third party provider as may be retained by Lender in connection with the proposed loan (collectively, the "*Third Party Providers*"), to conduct inspections and perform other due diligence on the proposed collateral as Lender may request. Applicant understands and agrees that any and all work product and reports prepared for and delivered to Lender by such Third Party Providers will not be released to Applicant until the earlier of (a) funding of a loan by Lender, or (b) Lender's denial of the loan request set forth herein. |
| **Additional Financing:** | Other than in conjunction with the Bifurcation of the Loan as stated above, subordinate loans, whether a second deed of trust of a mezzanine loan, are not allowed. |
| **Proposal Only:** | THIS PROPOSAL IS NOT A COMMITMENT OR AN OFFER TO LEND AND DOES NOT CREATE ANY OBLIGATION ON THE PART OF A10 CAPITAL. The proposal is subject to additional Lender due diligence including, but not limited to, satisfactory Collateral evaluation, credit references, title review and title insurance policy, property insurance, and environmental assessment. A10 Capital will not be deemed to extend any commitment to Applicant unless and until a formal commitment letter is issued or definitive loan documents are executed for this loan. This proposal is subject to Lender's final approval, as determined by Lender in its sole discretion in accordance with its current credit policy and credit approval process following completion of Lender's confirmatory due diligence, execution and delivery to Lender of its standard loan documentation. This outline is only a brief description of the principal terms of a possible loan and is intended |

**EXHIBIT A - Page 10 of 10**

for discussion purposes only. Lender shall have no obligation to fund the Loan contemplated in this proposal if, in Lender's sole and absolute discretion, Lender determines that there has been a material adverse change with respect to the financial condition or prospects of the Property, Borrower, Borrower's sponsor, Principal(s), carveout guarantor(s) or tenants of the Property, or with respect to the overall financial, political or economic conditions of the market which make it impracticable or inadvisable to proceed with the Loan.

**Confidentiality:** This proposal is delivered to Applicant on the condition that it remain confidential and not be shown, disclosed, or discussed with any third party (including any financial institution or other lender) without the express written consent of A10 Capital. Applicant may, however, discuss this proposal with its equity partners and advisors (attorney, CPA, etc.) as long as they have been made aware of the confidential nature of the term sheet and agree to keep the information confidential as well.

**Advertising:** Applicant acknowledges and agrees, without further notice or permission, that Lender may use images of the building and general loan terms/structuring of this transaction in its various media advertising campaigns. Lender agrees not to use Applicant's, or its Principals', name(s) in said advertisements and will use reasonable care and discretion not to divulge individual tenant names or operating performance of the Property.

**EXHIBIT A - Page 10 of 10**

# EXHIBIT "B"

1/6/2021                                    Workspace Webmail :: Print          **EXHIBIT B - Page 1 of 1**

Print  |  Close Window

Subject: Cheyenne Fountains Loan Application
   From: "Alisha Hill Koontz" <ahill@A10Capital.com>
   Date: Tue, Nov 13, 2018 11:25 am
     To: Tony Baihaghy <tonyzre@gmail.com>
 Attach: image001.jpg
           image001.jpg
           Signed Loan Proposal.pdf

**From:** Alisha Hill Koontz
**Sent:** Tuesday, November 13, 2018 11:25 AM
**To:** 'tonyzre@gmail.com' <tonyzre@gmail.com>
**Cc:** 'Farhad Navazi' <farhadnavazi@gmail.com>
**Subject:** Cheyenne Fountains Loan Application

Hello Tony and Patricia,

Please see attached loan application. My goal is to make things as simple as possible for you throughout this process. Please sign, scan and return the application in its entirety. The wiring instructions are below for the good faith deposit which will cover third party reports, legal and underwriting costs, as well as title. Please have your bank reference Cheyenne Fountains. The remainder of the deposit is credited at close.

My full contact info is below, including my mobile number. Call anytime with questions. I look forward to working with the two of you!!

Best regards,

**Alisha Hill Koontz**

cid:image005.jpg@01D1CCA9.A0C8F980

800 W. Main St., Suite 1100 | Boise, ID 83702
Office:  208.577.5052 Mobile: 208.608.1659
website | email | vCard | linkedin | twitter | instagram | youtube

**Wire Instructions – A10 Operating Account**

*Executive Vice President*

**EXHIBIT B - Page 1 of 1**

Exhibit A
Page 30



1/6/2021                                    Workspace Webmail :: Print                    **EXHIBIT C - Page 1 of 2**

Print  |  Close Window

Subject: Rate Uncertainty and Year End Close
From:  "Alisha Hill Koontz" <ahill@a10capital.com>
Date:  Wed, Nov 14, 2018 7:03 am
To:  tonyzre@gmail.com

 CAPITAL.

# Why A10 Now?

**Rates are on the rise, rate lock with A10 Capital and get your loan funded before the end of the year.**



## For Both Bridge & Perm Loans

- **Non-Recourse** – Bridge and Perm Loans

- **Rate Lock Now** – for both short-term bridge & longer-term perm loans

- **Accelerated Process** – with in-house underwriting & legal

- **Improved Pricing** – with recent investment by large institutional investor

- **Common Sense Servicing** – we service all loans for the life of the loan

- **Bridge to Perm** – hassle free transition with same underwriting & servicing team

- **Secondary & Tertiary markets** – with MSA's 100,000+

- **$3 to $30 Million** – Office, Industrial, Retail, Multi-Family, Self-Storage, Mixed Use, Student Housing, Mobile Home Communities (4 star+)

**EXHIBIT C - Page 1 of 2**

## Bridge Loans

- 2-5 Years
- No Minimum DSCR Required
- Interest Only
- Fixed or Floating options
- Flexible Prepayment, payoff at any time
- Good News & CapEx future funding facilities
- We have never had to foreclose on a borrower's property
- Inquire about our special allocation for $35M-$65M loans with incentive pricing!

## Perm Loans

- Fixed Rates 7-20 Years
- Flat Yield Curve – great opportunity to lock in for long-term
- No Defeasance torture
- Step down prepay for longer term loans
- Assumable loans

**Call or email me with your loan request today. All signed applications and deposits must be received by November 30, 2018 for December 31 closing.**

**Alisha Hill Koontz**
*Executive Vice President*



Office:  208.577.5052
ahill@a10capital.com | www.a10capital.com

© 2018 A10 Capital All Rights Reserved.
To be removed from our list, please unsubscribe.

Copyright © 2003-2021. All rights reserved.

# EXHIBIT "D"

1/6/2021                                        Workspace Webmail :: Print         **EXHIBIT D - Page 1 of 1**

<u>Print</u>  |  <u>Close Window</u>

Subject:  Re: EZ Living PFS
   From:  "Alisha Hill Koontz" <ahill@A10Capital.com>
   Date:  Fri, Nov 16, 2018 10:37 am
     To:  Tony Baihaghy <tonyzre@gmail.com>

Hi Tony, rates came in again today slightly. I am on the road today but available to speak around noon your time if you need to.

Alisha Hill Koontz, EVP
A10 Capital
208.577.5052

> On Nov 15, 2018, at 2:30 PM, Tony Baihaghy <tonyzre@gmail.com> wrote:
>
> Hello Alisha,
> Attached is Shiva Farmani's PFS.
> Thanks,
> Tony
>
>
> <Shiva <u>PFS.pdf</u>>

Copyright © 2003-2021. All rights reserved.

**EXHIBIT D - Page 1 of 1**

Exhibit A
Page 35

# EXHIBIT "E"

 CAPITAL

November 13, 2018

Tony and Patricia Baihaghy
EZ Living, LLC

Delivered via email

Dear Mr. and Mrs. Baihaghy:

Thank you for your interest in obtaining a first priority loan from A10 Capital, LLC (*"A10 Capital"* or *"Lender"*).  Based upon our preliminary review, the following term sheet represents a proposal regarding a possible loan, subject to the Exhibits attached hereto and incorporated herein by this reference, but does not constitute a commitment to provide such loan.

| Applicant | EZ Living, LLC |
|---|---|
| Principal(s) of Applicant | Tony Baihaghy, Patricia Baihaghy, Mike Fahr, Shiva Farmani |
| Property Name | Cheyenne Fountains |
| Property Type | Retail Center |
| Property Square Footage | 28,355 |
| Property Address | 7440-7450 W Cheyenne Ave, Las Vegas, NV |
| Intermediary | None |

| General Loan Terms | |
|---|---|
| **Loan Amount** | $3,150,000 |
| **Maximum Loan-To-Value** | 50% as determined by an MAI appraiser |
| **Recourse** | Non-recourse except for limited bad act carveouts (detailed in Exhibit B). |
| **Interest Rate** | Fixed at 2.20% plus the greater of UST or Swaps. |
| **Loan Term** | 15 Years |
| **Amortization** | Monthly amortization based on a 25-year schedule. |
| **Origination Fee** | .25% to be collected at the time of closing |
| **Prepayment** | 24 month lockout followed by yield maintenance. Open at par during the final 3 months of loan term. |
| **Tax/Insurance Escrow** | Either (a) monthly deposits or (b) an amount equal to one year's annual tax and insurance premium for life of the loan |
| **Loan Assumption** | Loan is eligible for one-time assumption upon satisfaction of conditions (see Exhibit B) including payment of an assumption fee equal to 1% of the Loan Amount. |
| **Good Faith Deposit** | $30,000 |

| Reserves | Amount | Details |
|---|---|---|
| CapEx Reserve | $TBD | A holdback at closing will be required based upon an amount equal to 125% of immediate repairs over the 1ˢᵗ year of the Loan Term as determined in the Lender-engaged Property Condition Report |

| Rollover Reserve | Annual collection of $1.00 per square foot | Annual amount shall be funded in equal monthly installments throughout the Loan Term Aggregate average release price TBD per square foot |
| Replacement Reserve | TBD | Annual amount shall be an amount equal to that determined in the Lender-engaged Property Condition Report and shall be funded to Lender in equal monthly installments throughout the Loan Term |

| In-house Legal | A10's in-house legal and closing team significantly reduces involvement of outside counsel, which lowers closing costs and translates into a meaningful reduction in the effective interest rate on an average middle-market permanent loan. |
| A10 Loan Servicing | A10 services its loans in-house from closing to maturity, providing a better experience than having your loan transferred to a disinterested 3rd party servicer. A10 does not have hidden servicing fees that are common with 3rd party CMBS servicers. |
| On Balance Sheet | A10 is an on-balance-sheet lender, providing flexibility to make changes to your loan over the life, if warranted. |

**Other Conditions:**

- The terms of this proposal are only valid if Lender receives a signed acceptance and Good Faith Deposit within 5-business days of the date of the term sheet. Furthermore, the terms of this proposal are only valid if the proposed loan closes within 75 days of the date of the term sheet.
- The terms of this proposal were derived based on the assumptions outlined in Exhibit A.
- **Early Rate Lock Option:** At Applicant's request, Interest Rate can be locked after receipt of executed term sheet and Good Faith Deposit. Rate lock will require industry standard early rate lock agreement and rate lock deposit, which deposit would be credited back to Applicant less costs incurred at loan closing. Interest Rate would be locked within three (3) business days following the receipt of the executed early rate lock agreement and the rate lock deposit.

If the terms set forth in this proposal meet with your acceptance, please sign, scan, and return via email.

We look forward to working with you.

Sincerely,

*AHK*

Alisha Hill Koontz, EVP
A10 Capital, LLC

ACCEPTANCE

The undersigned Applicant hereby applies for approval under the terms indicated above, and acknowledges that this proposal does not constitute a commitment to lend by A10 Capital.

By: _____

Name: Tony Bauhaug for EZ Living LLC

Title: Chief Executive Manager

Date: 11-19-2018

# EXHIBIT "F"

1/6/2021 · Workspace Webmail :: Print

**EXHIBIT F - Page 1 of 1**

Print | Close Window

Subject: Re: E-Z Living, LLC / updated punchlist
From: "Farhad Navazi" <farhadnavazi@gmail.com>
Date: Mon, Dec 03, 2018 3:52 pm
To: cneser@a10capital.com
Cc: Tony Balhaghy <Tonyzre@gmail.com>, Mike Fahr <mikeFahr57@gmail.com>, shivafarmani <shivafarmani@yahoo.com>, Alisha Hill Koontz <ahill@a10capital.com>, jthomas@a10capital.com, omccarthy@a10capital.com, LSpendlove@perkinscoie.com
Attach: image001.jpg
image001.jpg

Received, thank you.

Kind Regards,

Farhad Navazi, MBA

Broker at First Capital Investment Realty
A  445 S. Robertson Blvd. Beverly Hills, CA 90211
P  (909) 380-4780
W www.FirstCapRealty.com

On Mon, Dec 3, 2018 at 3:08 PM Cori Neser <cneser@a10capital.com> wrote:

Good afternoon:

Attached please find the updated punchlist for discussion tomorrow during our weekly status call.

Thank you.

Cori

Cori Neser

*Transaction & Legal Manager*

cid:image005.jpg@01D1CCA9.A0C8F980

800 W. Main St., Suite 1100 | Boise, ID 83702

Office:  208.577.5006

website | email | linkedin | twitter | instagram | youtube

Copyright © 2003-2021. All rights reserved.

**EXHIBIT F - Page 1 of 1** 1/1

# EXHIBIT "G"

1/6/2021                                     Workspace Webmail :: Print                    **EXHIBIT G - Page 1 of 2**

**From:** Tony Baihaghy <tonyzre@gmail.com>
**Sent:** Wednesday, December 5, 2018 10:41 AM
**To:** cneser@a10capital.com
**Cc:** Mike Fahr <mikeFahr57@gmail.com>; Shiva Farmani <shivafarmani@yahoo.com>; Farhad Navazi
<farhadnavazi@gmail.com>; Burton Dezendorf <burt@dezendorf-law.com>; Alisha Hill Koontz <ahill@a10capital.com>
**Subject:** Re: Cheyenne Capital LV, LLC / physical address

Hi Cori,

The physical address for Cheyenne Capital LV, LLC is;

7343 El Fuerte St.

Carlsbad CA 92009


The Mailing address for Cheyenne Capital LV, LLC is;

P.O. Box 131446

Carlsbad, CA 92013


As for the draft operating agreement, Atty. Burt Dezendorf is working on the creation of the LLC.
He will be able to give you an anticipated date.

Thank you,

Tony


On Wed, Dec 5, 2018 at 10:19 AM Cori Neser <cneser@a10capital.com> wrote:

Hi Tony:

I need to start loan documents for this transaction as soon as possible if we are going to make the December 21 close date.

Are able to provide an estimated date as to when I will receive the draft operating agreement for Cheyenne Capital LV, LLC?
Also, what is the physical address for the headquarters location?

Thank you.

Cori


**Cori Neser**

*Transaction & Legal Manager*

**EXHIBIT G - Page 1 of 2**
                                                                            2/3

1/6/2021                                    Workspace Webmail :: Print

**EXHIBIT G - Page 2 of 2**

cid:image005.jpg@01D1CCA9.A0C8F980

800 W. Main St., Suite 1100 | Boise, ID 83702

Office:  208.577.5006

website | email | linkedin | twitter | instagram | youtube

Copyright © 2003-2021. All rights reserved.

**EXHIBIT G - Page 2 of 2**

Exhibit A
Page 44

EXHIBIT "H"

1/6/2021                                           Workspace Webmail :: Print          **EXHIBIT H - Page 1 of 1**

<u>Print</u>  |  <u>Close Window</u>

Subject: Re: Cheyenne Capital LV, LLC / physical address
From: "Tony Baihaghy" <tonyzre@gmail.com>
Date: Thu, Dec 06, 2018 12:44 pm
To: burt@dezendorf-law.com
Attach: image001.jpg

Hi Burt,
The conference call went well. You addressed all the significant issues. We'll need to wait until we hear back from A10
Capital on the terms which were discussed.
Thank you, Tony

On Thu, Dec 6, 2018 at 12:31 PM Burton Dezendorf <burt@dezendorf-law.com> wrote:

Hi Tony,


Please give me a call if you want to discuss the Loan Proposal or any other issues that came out of our
conference call this morning.  I am planning on working on the Operating Agreement for Cheyenne LV
Capital tomorrow.


Burt


Burton E. Dezendorf, Jr., Esq.

Law Office of B. E. Dezendorf

1835 Village Center Circle

Las Vegas, NV 89134

Office: 702-385-5533

Cell: 480-433-0017

burt@dezendorf-law.com


Law Office of
**B.E. DEZENDORF**

*CONFIDENTIALITY NOTE: This email and any attachments hereto are confidential and may be protected by legal privilege. The
information contained herein is intended only for the use of the individual(s) or entity(ies) named above. If you are not the intended
recipient, please be aware that any disclosure, copying, distribution, or other use of this email or any attachment hereto is strictly
prohibited. If you received this email in error, please notify us immediately via telephone or email, and then delete or discard this
copy from your system.  Thank you for your cooperation.*

**EXHIBIT H - Page 1 of 1**

# EXHIBIT "I"

Print | Close Window

**EXHIBIT I - Page 1 of 1**

Subject: Preliminary report-IMMEDIATE REPAIRS & DEFERRED MAINTENANCE COST OPINION
From: Alisha Hill Koontz <ahill@a10capital.com>
Date: Thu, Dec 6, 2018 1:27 pm
To: tonyzre@gmail.com
Attach: image001.jpg
18-230102.2 Finance Cost Table v1.pdf

From: Alisha Hill Koontz <ahill@a10capital.com>
Date: Thu, Dec 6, 2018 at 1:27 PM
Subject: Preliminary report-IMMEDIATE REPAIRS & DEFERRED MAINTENANCE COST OPINION
To: Tony Balhaghy <tonyzre@gmail.com>, Farhad Navazi <farhadnavazi@gmail.com>
Cc: Jeff Thomas <jthomas@a10capital.com>, Owen McCarthy <omccarthy@a10capital.com>

Tony and Farhad,

Please see the **preliminary** cost estimate for repairs and deferred maintenance on Cheyenne Fountains for your review. Please keep in mind that this is subject to change.

Thanks,

**Alisha Hill Koontz**

*Executive Vice President*



800 W. Main St., Suite 1100 | Boise, ID 83702

Office: 208.577.5052

website | email | vCard | linkedin | twitter | instagram | youtube

Copyright © 2003-2021. All rights reserved.

**EXHIBIT I - Page 1 of 1**

# EXHIBIT "J"

Workspace Webmail :: Print

**EXHIBIT J - Page 1 of 3**

Print   |   Close Window

Subject: Re: Cheyenne LV Capital, LLC / loan documents
From: "Cori Neser" <cneser@A10Capital.com>
Date: Wed, Dec 12, 2018 2:21 pm
To: Tony Baihaghy <tonyzrg@gmail.com>
Cc: Mike Fahr <mikefahr57@gmail.com>, Shiva Farmani <shivafarmani@yahoo.com>, "burt@dezendorf-law.com" <burt@dezendorf-law.com>
Attach: image001.jpg

On Wed, Dec 12, 2018 at 2:21 PM Cori Neser <cneser@a10capital.com> wrote:

Good afternoon:

Attached hereto for your review are the following proposed loan documents prepared inlconnection with the proposed loan from A10 Capital, LLC (the "*Lender*") to Cheyenne LV Capital, lLLC (the "*Borrower*"):

1. Promissory Note in the amount of $3,150,000.00, from Borrower, made payable to Lender;
2. Deed of Trust from Borrower, as grantor, to Lender, as beneficiary;
3. Environmental Indemnity Agreement from Borrower, Tony Baihaghy, Patricia Baihaghy, Mike Fahr and Shiva Farmani, for the benefit of Lender;
4. Conditional Springing Guaranty from Tony Baihaghy;
5. Conditional Springing Guaranty from Patricia Baihaghy;
6. Conditional Springing Guaranty from Mike Fahr;
7. Conditional Springing Guaranty from Shiva Farmani;
8. Cash Collateral Agreement;
9. Loan Agreement by and among Borrower and Lender*;*
10. UCC-1 Financing Statement -- *forthcoming once Borrower's HQ address is confirmed*;
11. UCC Fixture Filing- *forthcoming once Borrower's HQ address is confirmed*;
12. Subordination, Non-Disturbance and Attornment Agreement regarding Allstate lease -- *previously provided under separate email;*
13. Subordination, Non-Disturbance and Attornment Agreement regarding SalonCentric lease -- *previously provided under separate email*
14. Recycled Special Purpose Entity Certificate from Borrower to Lender;
15. ACH Form;
16. Borrowing Resolution- *forthcoming upon operating agreement*; and

**EXHIBIT J - Page 1 of 3**
1/3

Exhibit A
Page 50

**EXHIBIT J - Page 2 of 3**

17. Resolution of Sole Member *-may not be needed based on the revised operating agreement*.

PLEAE NOTE: THE SIGNATURE BLOCK PROVIDED IN DOCUMENTS MAY BE INCORRECT. WAITING FOR CORRECT OPERATING AGREEMENT TO CONFIRM SIGNATURE BLOCK.

Also attached is an example of the Tenant Notice Letter. I have prepared a letter for each tenant. Once the signature block is confirmed for Borrower, I will insert the correct signature block and send these to Borrower. Upon receipt by Borrower, Borrower will have to print the letters on Borrower's letter head, execute where indicated and return the original executed letters to my attention, along with the original signed loan documents. Lender will hold the notice letters in trust and will only be sent to tenant upon a reduced performance period and Lender exercises its right under the Cash Collateral Agreement.

As a friendly reminder, the following items must be received, reviewed and approved by Lender by **12:00 Noon, Wednesday, December 19, 2018** if we are going to close on December 21, 2018:

1. Evidence of insurance in form approved by Lender;
2. Correct, fully executed operating agreement for Borrower;
3. EIN letter from IRS for Borrower;
4. Good standing certificate from Nevada Secretary of State for Borrower;
5. Depending on the corrected operating agreement, Lender may need a good standing certificate from California Secretary of State for E-Z Living, LLC;
6. Please provide copies of the conveyance documents from Seller in favor of Borrower for Lender's review and approval; and
7. Original loan document signature pages (I do not need the entire document -- just signature page to each document).

Feel free to contact me with any questions.

Thank you.

Cori

**Cori Neser**

*Transaction & Legal Manager*

 CAPITAL.

800 W. Main St., Suite 1100 | Boise, ID 83702

Office:  208.577.5006

website | email | linkedin | twitter | instagram | youtube

--
*Tony Balhaghy*
*P.O. Box 131446*
*Carlsbad CA, 92013*
*(760) 525-8669 Phone*
*(760) 438-2003 Fax*

**EXHIBIT J - Page 2 of 3**

Exhibit A
Page 51

1/6/2021

Workspace Webmail :: Print

**EXHIBIT J - Page 3 of 3**

*tonyzre@gmail.com*

Copyright © 2003-2021. All rights reserved.

**EXHIBIT J - Page 3 of 3** 3/3

Exhibit A
Page 52

# EXHIBIT "K"

Workspace Webmail :: Print

**EXHIBIT K - Page 1 of 1**

Print  |  Close Window

Subject: Re: Rate lock and closing
From: "Alisha Hill Koontz" <ahill@A10Capital.com>
Date: Tue, Dec 18, 2018 9:39 am
To: Tony Balhaghy <tonyzre@gmail.com>
Cc: "farhadnavazi@gmail.com" <farhadnavazi@gmail.com>
Attach: image001.jpg
image001.jpg

On Tue, Dec 18, 2018 at 9:39 AM Alisha Hill Koontz <ahill@a10capital.com> wrote:

Tony,

We have reached our deadline.  Please respond that you agree to lock the rate based on the following:

| | |
|---|---|
| 10 year swap rate: | 2.864% (per the attached) |
| Spread: | 2.200% (per the Term Sheet) |
| Coupon: | 5.064% |

As such, please confirm the following:

- Evidence of insurance (Cori has indicated she still doesn't have anything)
- Sign-off on the documents- there are no other material open items (signature pages are being scanned/e-mailed now)
- Borrower is in position to close the loan on Friday
- Borrower agrees to the interest rate stated above

**Please confirm ASAP.**

**Alisha Hill Koontz**

*Executive Vice President*



800 W. Main St., Suite 1100 | Boise, ID 83702

Office:  208.577.5052

https://email21.godaddy.com/view_print_multi.php?uidArray=30649|INBOX&aEmlPart=7

**EXHIBIT K - Page 1 of 1**

1/3

EXHIBIT "L"

**EXHIBIT L - Page 1 of 58**

 CAPITAL

Loan #AP-NV-AK-18-049-0359-001

## LOAN AGREEMENT

**THIS LOAN AGREEMENT** (this "*Agreement*") is entered into as of December 21, 2018 (the "*Closing Date*"), by and among **Cheyenne LV Capital, LLC,** a Nevada limited liability company ("*Borrower*"), and **A10 Capital, LLC,** a Delaware limited liability company (together with its successors and/or assigns, the "*Lender*"), on the following terms and conditions.

## RECITALS

A.      Lender intends to make a loan to Borrower in the principal amount of $3,150,000.00, to be disbursed at funding as follows: $2,978,331.76 will be disbursed in accordance with a closing statement approved by Borrower and Lender, $8,652.91 will be disbursed for deposit into the Account for Real Property Taxes, $765.33 will be disbursed for deposit into the Account for Insurance Premiums, and $162,250.00 will be disbursed for deposit into the Account for Capital Expenditures described below.

B.      The Loan will be evidenced by that certain Promissory Note dated of even date herewith in the maximum principal amount of $3,150,000.00, made by Borrower and payable to Lender (together with all modifications, restatements, extensions, renewals and replacements thereof, the "*Note*").

C.      Lender is willing to make the loan to Borrower solely under the terms and conditions specified in this Agreement and in the Loan Documents.

## AGREEMENT

NOW, THEREFORE, for and in consideration of the approval and making of a loan by Lender to Borrower, and other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, Borrower and Lender hereby agree as follows:

## ARTICLE 1
## DEFINITIONS

As used herein, the following words and terms shall have the following meanings when used in this Agreement:

"*Account*" means an FDIC-insured account in the name of Lender held at a financial institution of Lender's choice which financial institution's long-term unsecured debt obligations are rated at least "A" or its equivalent by one or more nationally recognized statistical rating organization.

"*Agreement*" means this Loan Agreement, as may be amended or modified from time to time, together with all exhibits and schedules attached to this Loan Agreement from time to time.

**EXHIBIT L - Page 1 of 58**

EXHIBIT L - Page 2 of 58

"*Annual Budget*" shall mean the operating budget, including all planned Capital Expenditures, for the Mortgaged Property prepared by Borrower in accordance with Section 6.39 hereof for the applicable fiscal year or other period.

"*Appraisal*" means an M.A.I. (or equivalent) appraisal obtained by Lender from an appraiser selected and engaged by Lender.

"*Architect's Contract*" means the architect's contract between Borrower and the architect for the Project.

"*Award*" shall mean any compensation paid by any Governmental Authority in connection with a condemnation in respect of all or part of the Mortgaged Property.

"*Bankruptcy Action*" shall mean with respect to any Person (a) such Person filing a voluntary petition under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law; (b) the filing of an involuntary petition against such Person under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law, or soliciting or causing to be solicited petitioning creditors for any involuntary petition against such Person; (c) such Person filing an answer consenting to or otherwise acquiescing in or joining in any involuntary petition filed against it, by any other Person under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law, or soliciting or causing to be solicited petitioning creditors for any involuntary petition from any Person; (d) such Person consenting to or acquiescing in or joining in an application for the appointment of a custodian, receiver, trustee, assignee, sequestrator (or similar official), liquidator, or examiner for such Person or any portion of the Mortgaged Property; (e) the filing of a petition against a Person seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under the Bankruptcy Code or any other applicable law, (f) under the provisions of any other law for the relief or aid of debtors, an action taken by any court of competent jurisdiction that allows such court to assume custody or Control of a Person or of the whole or any substantial part of its property or assets or (g) such Person making an assignment for the benefit of creditors, or admitting, in writing or in any legal proceeding, its insolvency or inability to pay its debts as they become due.

"*Bankruptcy Code*" shall mean Title 11 of the United States Code, 11 U.S.C. § 101, et seq., as the same may be amended from time to time, and any successor statute or statutes and all rules and regulations from time to time promulgated thereunder, and any comparable foreign laws relating to bankruptcy, insolvency or creditors' rights or any other Federal or state bankruptcy or insolvency law.

"*Borrower*" means Cheyenne LV Capital, LLC, a Nevada limited liability company, and its successors and assigns.

"*Borrower Party*" means, collectively or individually, (i) any Person with any beneficial ownership in Borrower and (ii) Guarantor.

"*Business Day*" means a day other than a Saturday, a Sunday, or a legal holiday on which national banks located in the state of New York are not open for general banking business.

EXHIBIT L - Page 2 of 58

EXHIBIT L - Page 3 of 58

"*Capital Expenditures*" means property repairs and capital improvement projects for the Real Property (i) identified on Exhibit A attached hereto or (ii) as otherwise approved by Lender in its Permitted Discretion.

"*Cash Collateral Agreement*" means that certain Cash Collateral Agreement dated of even date herewith, by and between Borrower and Lender, as the same may hereafter be amended or restated.

"*Cash Flow*" has the meaning ascribed to such term in the Cash Collateral Agreement.

"*Completion Date*" means, (A) with respect to Capital Expenditures, the date of completion as set forth in the applicable Construction Contract, and (B) with respect to Rollover Improvements, the earlier of (i) the date of completion as set forth in the applicable Construction Contract or (ii) the date by which such Rollover Improvements are required to be completed pursuant to the terms of the applicable Lender approved lease.

"*Construction Contract*" means each contract between Borrower and Contractor, and any subcontracts with subcontractors, materialmen, laborers, or any other person or entity for performance of work on the Project or the delivery of materials to the Project.

"*Contractor*" means the general contractor for each Project.

"*Control*" shall mean, with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management, policies or activities of such Person, whether through ownership of voting securities, by contract or otherwise. "*Controlled*" and "*Controls*" shall have correlative meanings.

"*Controlling Person*" means Guarantor and any Person that Controls the Borrower.

"*Debt Service*" means, with respect to any particular period of time, scheduled principal and interest payments calculated on a 25-year amortization period at the Interest Rate.

"*DSCR*" means, as of any date, the ratio calculated by Lender of (i) the Net Operating Income for any twelve (12) month period ending with the most recently completed calendar quarter to (ii) the Debt Service with respect to such period, plus the debt service on all other indebtedness secured or to be secured by a lien on all or any part of the Mortgaged Property or on any direct or indirect interests in Borrower.

"*Default Rate*" means four percent (4%) per annum.

"*Disbursement*" means a disbursement of Reserve Funds from the Account, for Capital Expenditures and Rollover Improvements, as applicable, made to Borrower or on Borrower's behalf, on a multiple advance basis under the terms and conditions of this Agreement.

EXHIBIT L - Page 3 of 58

Exhibit A
Page 58

"*Event of Default*" has the meaning ascribed to such term in Article 7 of this Agreement.

"*Extraordinary Expense*" means an extraordinary operating expense or Capital Expenditure not set forth in the Annual Budget.

"*Force Majeure*" means fire, earthquake, or other acts of God, acts of public enemies, riot, insurrection, governmental regulation of the sale of materials and supplies or the transportation thereof, strikes directly affecting the work of construction, shortages of material or labor resulting directly from general market shortages, governmental control or diversion and other causes beyond Borrower's control other than shortage of funds. Circumstances that can be remedied or mitigated through the payment of money shall not constitute Force Majeure hereunder to the extent such remedy or mitigation is deemed reasonable by Lender in its sole discretion.

"*Governmental Authority*" shall mean any court, board, agency, commission, office or other authority of any nature whatsoever for any governmental unit (Federal, state, county, district, municipal, city or otherwise) whether now or hereafter in existence.

"*Gross Income from Operations*" shall mean, for any period, all income, computed in accordance with GAAP derived from the ownership and operation of the Mortgaged Property from whatever source during such period, including, but not limited to, Rents from tenants that are in occupancy, open for business and paying full contractual rent without right of offset or credit, utility charges, escalations, forfeited security deposits, interest (if any) on credit accounts, business interruption or other loss of income or rental insurance proceeds, service fees or charges, license fees, parking fees, and other pass-through or reimbursements paid by tenants under the Leases of any nature but excluding (i) Rents from Non-Participating Tenants, (ii) sales, use and occupancy or other taxes on receipts required to be accounted for by Borrower to any Governmental Authority, (iii) refunds and uncollectible accounts, (iv) any Straight Line Adjustment related to any future, scheduled rental rate increase or increases, (v) proceeds from the sale of furniture, fixtures and equipment, (vi) insurance proceeds and condemnation proceeds (other than business interruption or other loss of income insurance), and (vii) any disbursements to Borrower from any of the Reserve Funds.

"*Guarantor*" collectively, means (i) Tony Baihaghy, an individual; (ii) Patricia Baihaghy, an individual; (iii) Shiva Farmani, an individual; and (iv) Mike Fahr, an individual.

"*Guaranty*" collectively, means that (i) certain Conditional Springing Guaranty dated of even date herewith, executed by Tony Baihaghy in favor of Lender, as the same may hereafter be amended or restated; (ii) certain Conditional Springing Guaranty dated of even date herewith, executed by Patricia Baihaghy in favor of Lender, as the same may hereafter be amended or restated; (iii) certain Conditional Springing Guaranty dated of even date herewith, executed by Shiva Farmani in favor of Lender, as the same may hereafter be amended or restated; and (iv) certain Conditional Springing Guaranty dated of even date herewith, executed by Mike Fahr in favor of Lender, as the same may hereafter be amended or restated.

EXHIBIT L - Page 4 of 58

Exhibit A
Page 59

"*Improvements*" means all buildings, structures, facilities, fixtures, additions, and other improvements, now or at any time hereafter situated, placed or constructed upon the Real Property.

"*Indebtedness*" means the sum of all (1) principal, interest and other amounts due under or secured by the Loan Documents, (2) principal, interest and other amounts which may hereafter be loaned by Lender, its successors or assigns, to or for the benefit of the owner of the Mortgaged Property, when evidenced by a promissory note or other instrument which, by its terms, is secured hereby, (3) all other indebtedness, obligations and liabilities now or hereafter existing of any kind of Borrower to Lender, including, without limitation, any amounts advanced by Lender under the terms of this Agreement, and (4) any and all renewals, increases, extensions, modifications, rearrangements or restatements of the Loan Documents, together with all costs, expenses and attorneys' fees incurred in connection with the enforcement or collection thereof.

"*Indemnity*" means that certain Environmental Indemnity Agreement dated of even date herewith, executed by Borrower and Guarantor, in favor of Lender, as the same may hereafter be amended or restated.

"*Initial DSCR*" means 1.90:1.

"*Insurance Premiums*" means, collectively, the annual premiums due and payable for all applicable policies of insurance relating to Borrower and the Mortgaged Property as required to evidence the minimum insurance requirements set forth in Section 6.42 below.

"*Lender*" means A10 Capital, LLC, a Delaware limited liability company, its successors and assigns.

"*Loan*" means the loan or loans made to Borrower under this Agreement and the Loan Documents.

"*Loan Documents*" means, collectively, (1) the Note, (2) this Agreement, (3) the Mortgage, (4) the Indemnity, (5) UCC financing statements, (6) the Guaranty, (7) the Cash Collateral Agreement, (8) such assignments of management agreements, contracts and other rights as may be required by Lender, (9) all other documents now or hereafter executed by Borrower, Guarantor, or any other person or entity, to evidence or secure the payment of the Indebtedness or the performance of the Obligations, and (10) all modifications, restatements, extensions, renewals and replacements of the foregoing.

"*Loan-to-Value Ratio*" means the ratio, as determined by Lender, of the aggregate principal balance of the Loan and all undisbursed advances thereunder (if any) and all other indebtedness secured by liens or encumbrances against the Mortgaged Property or against the direct or indirect ownership interests in Borrower to the fair market value of the Mortgaged Property. At Lender's option, such fair market value shall be determined by an Appraisal.

"*Lockbox Account*" has the meaning ascribed to such term in the Cash Collateral Agreement.

EXHIBIT L - Page 5 of 58

Exhibit A
Page 60

EXHIBIT L - Page 6 of 58

"*Lockout Expiration Date*" is the first Business Day of the 25th full calendar month from and after the first day of the first full calendar month following the date of the Note.

"*Major Tenant Event*" shall occur if (i) any tenant with a Major Lease (each, a "*Major Tenant*") gives notice of its intention to not extend or renew its lease, (ii) on or prior to six (6) months prior to the then applicable expiration date under its lease, Major Tenant fails to give notice of its election to renew its lease, (iii) on or prior to the date by which Major Tenant is required under its lease to notify the landlord of its election to renew its lease, Major Tenant fails to give such notice, (iv) an event of default under the Major Tenant lease beyond any applicable notice and cure period therein (a) by Borrower, which default gives Major Tenant the right to terminate the lease, or (b) by Major Tenant, relating to its obligation to pay rent or reimbursements, if any, (v) the bankruptcy or insolvency of Major Tenant, or (vi) if Major Tenant ceases to occupy or discontinues its normal operations at its leased premises located on the Real Property.

"*Management Agreement*" shall mean the management agreement entered into by and between Borrower and Manager, pursuant to which Manager is to provide management and other services with respect to the Mortgaged Property, or, if the context requires, the Replacement Management Agreement.

"*Manager*" shall mean Ali Bubba, Inc., a Nevada corporation doing business as The Equity Group, or, if the context requires, a Qualified Manager who is managing the Mortgaged Property in accordance with the terms and provisions of this Agreement pursuant to a Replacement Management Agreement.

"*Mortgage*" means that certain Deed of Trust With Assignment of Leases and Rents, Security Agreement and Fixture Filing dated of even date herewith, from Borrower, as grantor, to Rita L. Ricks, Esq., as trustee, for the benefit of Lender, as beneficiary, together with all modifications, restatements, extensions, renewals and replacements thereof.

"*Mortgaged Property*" has the meaning ascribed to such term in the Mortgage.

"*Net Operating Income*" means, for any period, the amount obtained by subtracting Operating Expenses for such period from Gross Income from Operations for such period; provided, however, for purposes of calculating Net Operating Income, Operating Expenses and Gross Income from Operations shall be calculated:

(i) assuming an occupancy rate equal to the lesser of (a) the market occupancy rate, (b) the Mortgaged Property's actual occupancy rate, and (c) 91.5%;

(ii) assuming a management fee equal to the greater of the actual management fee (as approved by Lender, if Lender's approval is required under this Agreement) and four percent (4%) of Gross Income from Operations;

(iii) assuming increases in Operating Expenses estimated to occur during the twelve (12) month period following the date of calculation due to, among other things, inflation, projected increases in the Mortgaged Property's assessed value, projected

EXHIBIT L - Page 6 of 58

Exhibit A
Page 61

**EXHIBIT L - Page 7 of 58**

increases in occupancy, and the Borrower's purchase of required insurance coverage pursuant to this Agreement, each as determined by Lender;

(iv)     excluding any interest income received or owed from any source (except that Gross Income from Operations shall include payments received from tenants that are in the nature of rent even if such payments are structured as interest payments for tax or other reasons);

(v)     excluding Net Proceeds (other than proceeds from rental or business interruption insurance);

(vi)     excluding any other extraordinary or non-recurring revenue items;

(vii)     excluding revenue from tenants (A) that are not physically occupying their leased premises, (B) that are delinquent in the payment of their monetary obligations, or that are otherwise in default in a manner that entitles the landlord to terminate their tenancy, (C) under month-to-month tenancies, (D) who are the subject of any voluntary or involuntary bankruptcy, insolvency, liquidation, reorganization or similar proceeding (to the extent that such tenant has not assumed such lease in bankruptcy), (E) then in a free rent period; provided, however, if any tenant's lease has a remaining free rent period of six (6) months or less as of the date of calculation, Gross Income from Operations shall include the rent actually payable under such lease during the twelve (12) month period following the date of calculation, (F) that are Affiliates of Borrower or Guarantor, (G) Rent from leases that expire within six (6) months following the date as of which Net Operating Income is to be calculated, or (H) who have sublet more than 50% of the rentable area of their leased premises (any and all such tenants collectively referred to in (A)-(H) in this section being *"Non-Participating Tenants"*);

(viii)     excluding the portion of any tenant's rental payments that exceeds the then-current market rents for properties that are similar in size and quality to the Mortgaged Property and that are located in the Mortgaged Property's geographic market or sub market area, all as determined by Lender;

(ix)     excluding recovery from tenants of any amounts expended or reimbursed by Borrower for tenant improvements, whether in the form of rent, loan repayment, or otherwise;

(x)     excluding lease termination fees or payments; and

(xi)     including such other adjustments deemed necessary by Lender based upon Lender's underwriting criteria.

Lender's calculation of Net Operating Income shall be final absent manifest error.

*"Net Proceeds"* means (i) the net amount of all insurance proceeds received by Lender pursuant to Section 6.42 as a result of such damage or destruction, after deduction of Lender's reasonable costs and expenses (including, but not limited to, reasonable counsel costs and fees), if any, in collecting same (*"Insurance Proceeds"*), or (ii) the net amount of the Award,

**EXHIBIT L - Page 7 of 58**

EXHIBIT L - Page 8 of 58

after deduction of Lender's reasonable costs and expenses (including, but not limited to, reasonable counsel costs and fees), if any, in collecting same ("***Condemnation Proceeds***"), whichever the case may be.

"***Note***" means that certain Promissory Note dated of even date herewith in the maximum principal amount of $3,150,000.00, made by Borrower and payable to Lender, together with all modifications, restatements, extensions, renewals and replacements thereof.

"***Obligations***" means all of the agreements, promises, covenants, conditions, warranties, representations and other obligations made or undertaken by Borrower or any other person or entity to Lender or others as set forth in the Loan Documents.

"***Open Period***" means the period beginning on the Monthly Payment Date in the month which is three (3) months prior to the Maturity Date and ending on the Maturity Date.

"***Operating Expenses***" shall mean, for any period, the total of all expenditures, computed in accordance with GAAP of whatever kind relating to the operation, maintenance and management of the Mortgaged Property, which expenditures are incurred on a regular monthly or other periodic basis, including without limitation, utilities, ordinary repairs and maintenance, insurance, license fees, Taxes, Other Charges, advertising expenses, management fees, payroll and related taxes, computer processing charges, operational equipment or other lease payments as approved by Lender, and other similar costs, but excluding depreciation, debt service, Capital Expenditures, and contributions to any of the Reserve Funds. For purposes herein, Operating Expenses shall be no less than an assumed expense per month equal to the underwritten stabilized expense amount of $12,617, unless otherwise approved by Lender.

"***Other Charges***" shall mean all ground rents, maintenance charges, impositions other than Taxes, and any other charges, including, without limitation, vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Mortgaged Property, now or hereafter levied or assessed or imposed against the Mortgaged Property or any part thereof.

"***Permitted Discretion***" means a determination made in the exercise of Lender's reasonable (from the perspective of a secured commercial mortgage lender) business judgment, provided that, if a default or Event of Default has occurred, then "Permitted Discretion" shall mean a determination made in the exercise of the sole and absolute discretion of Lender.

"***Person***" means any individual, corporation, partnership, joint venture, association, joint stock company, trust, trustee, business trust, estate, limited liability company, unincorporated organization, real estate investment trust, department, or a government, foreign country or regime (or any agency, agent, instrumentality or political subdivision thereof), or any other form of entity (whether incorporated or unincorporated).

"***Plans and Specifications***" mean all plans, specifications, shop drawings, and other technical descriptions prepared for construction, repair or alteration of the Project, which have been submitted to and approved by Lender in writing, together with all amendments, modifications and additions thereof as may be approved by Lender in writing.

EXHIBIT L - Page 8 of 58

**EXHIBIT L - Page 9 of 58**

"*Prepayment Premium*" means an amount equal to the Present Value of the Loan, less the amount of principal being prepaid, calculated as of the prepayment date; provided, however, in no event shall the Prepayment Premium be less than one percent (1%) of the outstanding principal amount of the Loan. The "*Present Value of the Loan*" with respect to any prepayment of the Loan, as of any date, shall be determined by discounting all scheduled payments of principal and interest remaining to the Maturity Date, attributed to the amount being prepaid, at the Discount Rate. If prepayment occurs on a date other than a Monthly Payment Date, the actual number of days remaining from the prepayment date to the next regularly scheduled payment date will be used to discount within such period. The "*Discount Rate*" is the annual yield on the Constant Maturity Treasury (CMT) with maturity equal to the remaining weighted average life of the Loan, as of the date one week prior to the prepayment date (or if the date one week prior to the prepayment date is not a Business Day, then as of the Business Day immediately preceding such date), as determined by Lender on the prepayment date. The rate will be determined by linear interpolation between the yields, if necessary. Lender shall not be obligated actually to reinvest the amount prepaid in any treasury obligations as a condition precedent to receiving any Prepayment Premium.

"*Project*" means (i) the construction and completion of certain Capital Expenditures associated or in any way connected to the building(s) or structure(s) currently located on the Real Property, or (ii) as to each lease renewal or lease extension entered into between Borrower, as landlord, and any current tenant as of the date of this Agreement for all or any portion of the Rollover Space, or as to any new lease entered into between Borrower, as landlord, and any replacement tenant for all or any portion of the Rollover Space, the construction and completion of future Rollover Improvements, and all other work necessary to complete the Rollover Improvements as required under each such lease renewal, lease extension or new lease.

"*Project Documents*" mean the Plans and Specifications, all studies, data and drawings relating to the Project, if any, whether prepared by or for Borrower, the Construction Contract, the Architect's Contract, the lease agreement, and all other contracts and agreements relating to the Project or the construction of the Improvements.

"*Qualified Manager*" shall mean either (a) Manager or (b) in the reasonable judgment of Lender, a Person which is reputable and experienced management organization (which may be an Affiliate of Borrower) possessing experience in managing properties similar in size, scope, use and value as the Mortgaged Property, provided, that such Person shall have entered into a Replacement Management Agreement.

"*Real Property*" means the real property located at 7440 and 7450 W. Cheyenne Avenue, Las Vegas, Nevada, as further described in Exhibit B attached hereto and incorporated herein by this reference, together with any greater estate therein which may be hereafter acquired by Borrower.

"*Real Property Taxes*" means the annual ad valorem property taxes due and payable relating to the Mortgaged Property.

"*Reduced Performance Period*" shall be deemed to (**a**) commence upon: (i) the

**EXHIBIT L - Page 9 of 58**

occurrence of any default or Event of Default; (ii) any Bankruptcy Action of Borrower, Guarantor or Manager has occurred; (iii) DSCR drops below 65% of the Initial DSCR or below 1.15:1; (iv) the occurrence of any Major Tenant Event; or (v) if total occupancy of the Mortgaged Property falls below 70% (excluding Non-Participating Tenants in the calculation of total occupancy); and **(b)** have terminated, if ever, as: (i) in the case of the foregoing clause (a)(i), Lender accepts a cure of the default or Event of Default giving rise to such Reduced Performance Period and no other default or Event of Default has occurred which is continuing; (ii) in the case of a Bankruptcy Action of Manager only, if Borrower replaces the Manager with a Qualified Manager under a Replacement Management Agreement; (iii) in the case of the foregoing clause (a)(iii), the DSCR meets or exceeds the greater of 65% of the Initial DSCR or 1.15:1; (iv) in the case of the foregoing clause (a)(iv), a Major Tenant Event no longer exists and the DSCR meets or exceeds the Initial DSCR; or (v) in the case of the foregoing clause (a)(v), if total occupancy of the Mortgaged Property meets or exceeds 70% (excluding Non-Participating Tenants in the calculation of total occupancy).

"*Replacement Management Agreement*" shall mean, collectively, (a) either (i) a management agreement with a Qualified Manager substantially in the same form and substance as the Management Agreement, or (ii) a management agreement with a Qualified Manager which is reasonably acceptable to Lender in form and substance; and (b) an assignment of management agreement and subordination of management fees substantially in the form then used by Lender (or of such other form and substance reasonably acceptable to Lender), executed and delivered to Lender by Borrower and such Qualified Manager at Borrower's expense.

"*Reserve Funds*" means, collectively, the Tax Escrow Funds, the Insurance Escrow Funds, the Rollover Reserve Funds, and the CapEx Reserve Funds together with any equity funds or other deposits required from Borrower under this Agreement.

"*Rollover Improvements*" means any and all improvements (excluding any trade fixtures and equipment) made to the currently existing Improvements and as required of Borrower under any executed lease extension, lease renewal or new lease agreement relating to all or any portion of the Rollover Space and any and all leasing commissions paid in connection with any such executed lease extension, lease renewal or new lease agreement.

"*Rollover Space*" means that certain space within the Improvements located on the Real Property that has an executed tenant lease as of the date of this Agreement which expires during the Loan Term (as hereinafter defined).

"*Straight Line Adjustment*" means any difference between (x) lease income recognized in accordance with GAAP for a period and (y) the amount of lease payments actually paid by tenant for such period.

"*Taxes*" shall mean all taxes, assessments, water rates or sewer rents, now or hereafter levied or assessed or imposed against (a) the Mortgaged Property or part thereof, together with all interest and penalties thereon and (b) the rents, issues, income or profits thereof or upon the lien or estate hereby created, whether any or all of said taxes, assessments or charges be levied directly or indirectly or as excise taxes or ad valorem real estate or personal property taxes or as income taxes.

**EXHIBIT L - Page 10 of 58**

Exhibit A
Page 65

**EXHIBIT L - Page 11 of 58**

"*UCC*" means the Uniform Commercial Code as enacted and in effect in the state where the Borrower is organized (as it may from time to time be amended); provided, however, that to the extent that the UCC is used to define any term in this Agreement or in any other Loan Document and such term is defined differently in different Articles or Divisions of the UCC, the definition of such term contained in Article or Division 9 shall govern; provided further, however, that if, by reason of mandatory provisions of law, any or all of the attachment, perfection or priority of, or remedies with respect to, Lender's Lien on any Mortgaged Property is governed by the Uniform Commercial Code as enacted and in effect in a jurisdiction other than the state where the Borrower is organized, the term "UCC" shall mean the Uniform Commercial Code as enacted and in effect in such other jurisdiction solely for the purposes of the provisions thereof relating to such attachment, perfection, priority or remedies and for purposes of definitions related to such provisions.

Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Mortgage. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. The Recitals set forth above are material, true and correct and are incorporated by this reference into this Agreement as though fully set forth herein.

## ARTICLE 2
## INTEREST, PAYMENTS AND PREPAYMENTS

**Section 2.1**   Interest Rate. The interest rate to be applied to the unpaid principal balance of the Loan shall be (i) 5.064% per annum (the "*Interest Rate*") *plus* (ii) upon the occurrence of any Event of Default, the Default Rate. **NOTICE: Notwithstanding the foregoing, under no circumstances will the Interest Rate be more than the maximum rate allowed by applicable law.**

**Section 2.2**   Monthly Payments. Commencing on February 1, 2019, and continuing on the first Business Day of each calendar month thereafter (each, a "*Monthly Payment Date*"), until the Maturity Date, Borrower shall make consecutive monthly payments on the Loan, equal to the sum of: (A) the monthly principal amount determined by Lender to be required to fully amortize the Loan over an amortization schedule of twenty-five (25) years at the Interest Rate plus (B) accrued interest in arrears at the Interest Rate. Interest owing for each month shall be computed on the basis of a fraction, the denominator of which is three hundred sixty (360) and the numerator of which is the actual number of days elapsed from and including the first day of the calendar month immediately prior to the date such monthly interest payment is due (or, for the initial advance, from the date of such advance) through and including the last day in the calendar month immediately prior to the date such monthly interest payment is due. Any principal payments shall be applied to the Loan balance as and when actually received.

**Section 2.3**   Maturity Date. The Loan shall mature on January 1, 2029, or if such date is not a Business Day, then on the first Business Day thereafter (the "*Maturity Date*"). The term of the Loan shall be the period from the date of the Note through the Maturity Date (the "*Loan Term*"). Upon the Maturity Date or upon any prepayment of the Loan in whole, Borrower shall

**EXHIBIT L - Page 11 of 58**

Exhibit A
Page 66

**EXHIBIT L - Page 12 of 58**

pay to Lender all outstanding principal, accrued and unpaid interest up to and including the repayment date, and any other fees and amounts due under the Loan Documents.

Section 2.4    Prepayment.

   (a)     Prepayment During the Open Period. Borrower shall not have the right or privilege to prepay all or any portion of the unpaid principal balance of the Note until commencement of the Open Period unless otherwise specifically set forth herein. Upon commencement of the Open Period and continuing thereafter until the Maturity Date, the principal balance of the Note may be prepaid, at par, in whole but not in part, upon: (i) not less than thirty (30) days prior written notice to Lender specifying the date on which prepayment is to be made; (ii) payment of all accrued and unpaid interest on the outstanding principal balance of the Note (A) to and including the date on which prepayment is to be made if such prepayment date is on the last day of a calendar month or (B) if such prepayment date is not the last day of a calendar month, to and including the last day of the calendar month in which such prepayment is to be made; and (iii) payment of all other Indebtedness then due under the Loan Documents. Lender shall not be obligated to accept any prepayment of the principal balance of the Note unless made on a Business Day and accompanied by all sums due under the Loan Documents.

   (b)     Prepayment Prior to Open Period. In addition to the Loan prepayment rights set forth in Section 2.4(a), commencing on the Lockout Expiration Date and continuing thereafter until commencement of the Open Period, Borrower may prepay the principal balance of the Note in full, in accordance with the requirements of clauses (i)-(iii) of Section 2.4(a) hereof; provided, however, that such prepayment is accompanied by payment of the Prepayment Premium in addition to all other amounts due under the Loan Documents. Notwithstanding the foregoing, in the event a partial prepayment occurs as a result of application of Insurance Proceeds or Condemnation Proceeds, the Prepayment Premium shall be due and payable by Borrower.

   (c)     Acceleration. If Lender accelerates the Loan for any reason, then in addition to Borrower's obligation to pay the then outstanding principal balance of the Loan and all accrued but unpaid interest thereon, and any and all other sums due under the Loan Documents, Borrower shall pay an additional amount equal to the Prepayment Premium that would be due to Lender if Borrower were voluntarily prepaying the Loan at the time that such acceleration occurred.

   (d)     WAIVER OF PREPAYMENT RIGHT WITHOUT PREMIUM. BORROWER HEREBY EXPRESSLY WAIVES ANY RIGHT IT MAY HAVE UNDER APPLICABLE LAW TO PREPAY THE LOAN, IN WHOLE OR IN PART, WITHOUT PREPAYMENT PREMIUM, UPON ACCELERATION OF THE MATURITY DATE OF THE NOTE, AND AGREES THAT, IF FOR ANY REASON A PREPAYMENT OF ALL OR ANY PART OF THE NOTE IS MADE, WHETHER VOLUNTARILY OR FOLLOWING ANY ACCELERATION OF THE MATURITY DATE OF THE NOTE BY LENDER ON ACCOUNT OF THE OCCURRENCE OF ANY EVENT OF DEFAULT ARISING FOR ANY REASON, INCLUDING, WITHOUT LIMITATION, AS A RESULT OF ANY PROHIBITED OR RESTRICTED TRANSFER, FURTHER ENCUMBRANCE OR DISPOSITION OF THE MORTGAGED PROPERTY OR ANY PART THEREOF SECURING THE NOTE, THEN

**EXHIBIT L - Page 12 of 58**

Exhibit A
Page 67

BORROWER SHALL BE OBLIGATED TO PAY, CONCURRENTLY WITH SUCH PREPAYMENT, THE PREPAYMENT PREMIUM PROVIDED FOR HEREIN. BORROWER HEREBY DECLARES THAT LENDER'S AGREEMENT TO MAKE THE LOAN AT THE INTEREST RATE AND FOR THE TERM SET FORTH IN THIS AGREEMENT CONSTITUTES ADEQUATE CONSIDERATION, GIVEN INDIVIDUAL WEIGHT BY BORROWER, FOR THIS WAIVER.

(c)     In the event Borrower (or any escrow agent or representative of Borrower) asks Lender to prepare a Loan payoff calculation more than two (2) times during the Loan Term, then, in connection with each such request thereafter, Borrower shall pay to Lender, at Lender's option and in its discretion, an amount equal to $500 in connection with each such request for a payoff calculation and/or an updated payoff calculation, such amount to be paid by Borrower to Lender upon the earlier to occur of (i) the date which is fifteen (15) days after such request for a payoff calculation and/or an updated payoff calculation or (ii) the actual date on which the Loan is paid in full.

Section 2.5    Late Charges. If Borrower fails to pay any installment of interest or principal on the date on which the same is due, or if any amounts hereunder are accelerated by Lender due to the terms hereof, Borrower shall pay to Lender a late charge on such past-due or accelerated amount, as liquidated damages and not as a penalty, equal to five percent (5%) of such amount, but not in excess of the maximum amount of interest allowed by applicable law. The foregoing late charge is intended to compensate Lender for the expenses incident to handling any such late payment or accelerated amounts and for the losses incurred by Lender as a result of such late payment or acceleration. Borrower agrees that, considering all of the circumstances existing on the date this Agreement is executed, the late charge represents a reasonable estimate of the costs and losses Lender will incur by reason of late payment or acceleration. Borrower and Lender further agree that proof of actual losses would be costly, inconvenient, impracticable and extremely difficult to fix. Acceptance of the late charge shall not constitute a waiver of the default arising from the overdue installment, and shall not prevent Lender from exercising any other rights or remedies available to Lender.

Section 2.6    Method of Payment. All payments made by Borrower to Lender under this Agreement or any other Loan Document shall be made by Automated Clearing House ("*ACH*"), electronic funds transfer or other immediately available funds on the Monthly Payment Date without setoff, counterclaim or deduction of any kind; provided, however, no principal payments or other amounts (other than the required monthly payment hereunder) payable to Lender under the Loan Documents will be made through ACH. Borrower shall not be liable for a late charge due to a late payment which was solely the result of a malfunction in the ACH; provided, however, Borrower shall be liable for any late payment due to a failure to immediately wire funds to Lender once Borrower is notified or becomes aware of a malfunction in the ACH.

Section 2.7    Application of Payments. All payments received by Lender under this Agreement shall be applied to the following, in such order as Lender may elect, in its sole discretion: (a) to any fees and expenses due to Lender under this Agreement or any other Loan Document; (b) to any Default Rate interest and late charges; (c) to accrued and unpaid interest at the Interest Rate; (d) to amounts owed under any reserves or escrows required by Lender; and (e) to the principal sum and other amounts due under the Note or any Loan Document.

EXHIBIT L - Page 13 of 58

Exhibit A
Page 68

**Section 2.8**   Acceleration. At the election of Lender, all payments due hereunder may be accelerated, and the Note shall become immediately due and payable without notice or demand, upon the occurrence of any of the following events: (1) Borrower fails to pay on or before the date due, any amount payable under this Agreement or any other Loan Documents; or (2) any other Event of Default shall have occurred under any Loan Document. In addition to the rights and remedies provided herein, Lender may exercise any other right or remedy in any other document, instrument or agreement evidencing, securing or otherwise relating to the indebtedness evidenced hereby in accordance with the terms thereof, or under applicable law, either simultaneously or in such order as Lender shall deem in its best interest, all of which rights and remedies shall be cumulative, and may be exercised concurrently, consecutively or in such order as Lender may elect in its sole and absolute discretion.

**Section 2.9**   Usury. It is the intention of the parties hereto to conform strictly to applicable usury laws. Accordingly, all agreements between Borrower and Lender with respect to the Loan are hereby expressly limited so that in no event, whether by reason of acceleration of maturity or otherwise, shall the amount paid or agreed to be paid to Lender or charged by Lender for the use, forbearance or detention of the money to be lent hereunder or otherwise, exceed the maximum amount allowed by law. If the Loan would be usurious under applicable law, then, notwithstanding anything to the contrary in the Loan Documents: (1) the aggregate of all consideration that constituted interest under applicable law that is contracted for, taken, reserved, charged or received under the Loan Documents shall under no circumstances exceed the maximum amount of interest allowed by applicable law, and any excess shall be credited to the Borrower hereunder (or, if the Loan has been paid in full, refunded to Borrower by Lender); and (2) if maturity is accelerated by reason of an election by Lender, or in the event of any prepayment, then any consideration that constitutes interest may never include more than the maximum amount allowed by applicable law. In such case, excess interest, if any, provided for in the Loan Documents or otherwise, to the extent permitted by applicable law, shall be amortized, prorated, allocated and spread from the date of advance until payment in full so that the actual rate of interest is uniform through the term hereof. If such amortization, proration, allocation and spreading is not permitted under applicable law, then such excess interest shall be canceled automatically as of the date of such acceleration or prepayment and, if theretofore paid, shall be credited to the Borrower hereunder (or, if the Loan has been paid in full, refunded to Borrower). The terms and provisions of this paragraph shall control and supersede every other provision of the Loan Documents.

### ARTICLE 3
### LOAN; USE OF PROCEEDS; DEPOSIT OF RESERVE FUNDS

**Section 3.1**   Loan. The Loan shall be in the principal sum of $3,150,000.00 and shall bear interest on the principal sum in accordance with the terms of the Note and this Agreement. The Loan shall be subject at all times to all conditions set forth in this Agreement or in any of the Loan Documents. Any amounts repaid or prepaid may not be reborrowed. This Agreement is delivered in connection with a business or commercial loan transaction, and no portion of the Loan shall be used for any consumer, personal family or household purpose.

**Section 3.2**   Rollover Reserve Funds. Borrower agrees that, commencing on February 1, 2019 and continuing on each Monthly Payment Date thereafter until the Maturity Date,

EXHIBIT L - Page 14 of 58

Exhibit A
Page 69

Borrower will deposit with Lender to be held in the Account, with Borrower assuming all risk of loss, the sum of $2,363.00 (each a "*Monthly Rollover Reserve Deposit*" and, collectively referred to herein as the "*Rollover Reserve Funds*"). The Rollover Reserve Funds will be held in the Account, subject to Section 3.6 hereof, and will be disbursed pursuant to the terms and conditions of this Agreement for the purpose of Rollover Improvements only. If at any time the total balance of the Rollover Reserve Funds exceeds $50,000.00, then Borrower's Monthly Rollover Reserve Deposits will cease until the Rollover Reserve Funds drop below $50,000.00, at which time the Borrower's Monthly Rollover Reserve Deposits will resume and continue until the earlier of the Maturity Date or such time that the amount of Rollover Reserve Funds then on deposit in the Account equals $50,000.00. Any undisbursed Rollover Reserve Funds remaining after payment in full of the Loan will be returned to Borrower.

    **Section 3.3**   CapEx Reserve Funds. On the date hereof, Borrower shall deposit with Lender the sum of $162,250.00 (the "*Immediate Repairs CapEx Deposit*") in the Account, with Borrower assuming all risk of loss. In addition, Borrower agrees that, commencing February 1, 2019 and continuing on each Monthly Payment Date thereafter until the Maturity Date, Borrower will deposit with Lender to be held in the Account the sum of $591.00 (each a "*Monthly CapEx Reserve Deposit*" and, together with the Immediate Repairs CapEx Deposit, collectively referred to herein as the "*CapEx Reserve Funds*"). The CapEx Reserve Funds will be held in the Account, subject to Section 3.6 hereof, and will be disbursed pursuant to the terms and conditions of this Agreement for the purpose of Capital Expenditures only. Borrower covenants and agrees to complete any and all items identified as "Immediate Repairs" on Exhibit "A" attached hereto (the "*Immediate Repairs*") on or before December 21, 2019 (the "*Immediate Repairs Completion Deadline*") and to provide Lender satisfactory evidence that all such work has been completed. Any undisbursed CapEx Reserve Funds remaining after payment in full of the Loan will be returned to Borrower; provided, however, in the event the Immediate Repairs are completed on or before the Immediate Repairs Completion Deadline, and there are any remaining funds from the Immediate Repairs CapEx Deposit after payment of all Immediate Repairs, then Lender shall disburse to Borrower the remaining funds (if any) comprising the Immediate Repairs CapEx Deposit promptly following Lender's receipt of satisfactory documentation that all Immediate Repairs have been completed and paid in full.

    **Section 3.4**   Tax Escrow Funds. On the date hereof, Borrower shall deposit with Lender the sum of $8,652.91 (the "*Initial Tax Deposit*") in the Account, with Borrower assuming all risk of loss. In addition, Borrower agrees that, commencing February 1, 2019 and continuing on each Monthly Payment Date thereafter until the Maturity Date of the Loan, Borrower will deposit with Lender to be held in the Account an amount equal to one-twelfth [1/12th] of the then current annual Real Property Taxes (each a "*Monthly Tax Deposit*" and, together with the Initial Tax Deposit, collectively referred to herein as the "*Tax Escrow Funds*"). The Tax Escrow Funds will be held in the Account, subject to Section 3.6 hereof, and will be disbursed pursuant to the terms and conditions of this Agreement. Any undisbursed Tax Escrow Funds remaining after payment in full of the Loan will be returned to Borrower.

    **Section 3.5**   Insurance Escrow Funds. On the date hereof, Borrower shall deposit with Lender the sum of $765.33 (the "*Initial Insurance Deposit*") in the Account, with Borrower assuming all risk of loss. In addition, Borrower agrees that, commencing February 1, 2019 and

EXHIBIT L - Page 15 of 58

Exhibit A
Page 70

continuing on each Monthly Payment Date thereafter until the Maturity Date of the Loan, Borrower will deposit with Lender to be held in the Account an amount equal to one-twelfth [1/12th] of the then current Insurance Premiums relating to the Mortgaged Property (each a *"Monthly Insurance Deposit"* and, together with the Initial Insurance Deposit, collectively referred to herein as the *"Insurance Escrow Funds"*). The Insurance Escrow Funds will be held in the Account, subject to Section 3.6 hereof, and will be disbursed pursuant to the terms and conditions of this Agreement. Any undisbursed Insurance Escrow Funds remaining after payment in full of the Loan will be returned to Borrower.

**Section 3.6** <u>Investment of Funds</u>. All amounts disbursed by Lender for deposit in the Account shall be deemed disbursements of the Loan and shall begin bearing interest at the Interest Rate immediately upon deposit into the Account, even though such sums may not be disbursed on behalf of Borrower until a later date (or applied to the Loan following the occurrence of an Event of Default under the Loan Documents executed in connection with the Loan). Borrower hereby agrees that it shall have no right to direct the investment of the Account, withdraw from the Account, close the Account, or otherwise control the Account in any way. The funds in the Account shall be invested by Lender (such investments are referred to as the *"Investments"*), with any interest accruing thereon as a result of the Investments to be paid to Lender. Lender shall have no liability whatsoever for the loss of any Reserve Funds as a result of the failure of an investment or an institution into which the Reserve Funds have been placed.

**Section 3.7** <u>Security Interest in Account Funds</u>. Borrower hereby assigns to Lender, and grants to Lender a security interest in, all Borrower's right, title and interest in any and all funds deposited in the Account as additional security for all of Borrower's obligations under the Loan and the other Loan Documents, and all amendments, extensions, or renewals of all such documents, whether now existing or hereafter arising. Borrower instructs and directs Lender that all securities or other property in the form of an instrument or security underlying any financial asset credited to the Account shall, as applicable, be registered in the name of Lender, endorsed to Lender or in blank or credited to another securities account maintained in the name of Lender, and in no case shall any financial asset credited to the Account be registered in the name of Borrower, payable to the order of Borrower or specially endorsed to Borrower, except to the extent the foregoing have been subsequently specially endorsed to Lender in blank.

**Section 3.8** Lender and Borrower agree the financial assets, funds, and other items deposited into the Account shall not be subject to deduction, setoff, banker's lien, or other right in favor of any Person other than Lender (except that Lender may set off all amounts paid by Lender in respect of customary fees and expenses for the routine maintenance and operation of the Account).

**ARTICLE 4**
**CONDITIONS PRECEDENT TO EACH DISBURSEMENT**

Lender's obligation to make each Disbursement under this Agreement shall be subject to the fulfillment to Lender's satisfaction, in its Permitted Discretion, unless otherwise set forth herein, of all of the conditions set forth in this Agreement and the Mortgage.

**EXHIBIT L - Page 16 of 58**

Exhibit A
Page 71

**EXHIBIT L - Page 17 of 58**

**Section 4.1**    Lender shall make Disbursements from the Rollover Reserve Funds for Rollover Improvements incurred by Borrower in connection with Leases entered into in accordance with the terms hereof upon satisfaction by Borrower of each of the following conditions with respect to each such Disbursement: **(a)** Borrower shall submit Lender's standard form of draw request for payment to Lender at least ten (10) Business Days prior to the date on which Borrower requests such payment be made, which request shall specify the Rollover Improvements to be paid and shall be accompanied by copies of paid invoices for the amounts requested; **(b)** on the date such request is received by Lender and on the date such payment is to be made, no default or Event of Default shall exist and remain uncured; **(c)** Lender shall have reviewed and approved the Lease giving rise to the Rollover Improvements to be paid; and **(d)** Lender shall have received (i) a certificate from an officer of Borrower (A) stating that the items to be funded by the requested Disbursement are Rollover Improvements and a description thereof, (B) stating that all Rollover Improvements at the Mortgaged Property to be funded by the requested Disbursement have been completed in a good and workmanlike manner and in accordance with all applicable legal requirements and have been accepted by Borrower and any and all applicable tenant(s), (C) identifying each Person that supplied materials or labor and any broker entitled to leasing commissions relating to such Rollover Improvements to be funded by the requested Disbursement, (D) stating that each such Person has been paid in full or will be paid in full upon such Disbursement, (E) stating that the Rollover Improvements to be funded have not been the subject of a previous Disbursement, (F) stating that all previous Disbursements of Rollover Reserve Funds have been used to pay the previously identified Rollover Improvements, and (G) stating that all parties performing work have been paid, or will be paid, in full for such work relating to the Rollover Improvements (other than those to be paid from the requested Disbursement), (ii) a copy of the final certificate of occupancy and any license, permit or other approval by any Governmental Authority required in connection with the Rollover Improvements and not previously delivered to Lender, (iii) a written certification by an engineer, architect, or other qualified inspector acceptable to Lender, or by a construction progress inspector retained by Lender, at Borrower's expense, that such engineer, architect, other qualified inspector or construction progress inspector has inspected the Mortgaged Property, that the Rollover Improvements have been completed substantially in accordance with the Plans and Specifications and the Construction Contract and all required governmental permits and approvals, that all required approvals of such completion have been obtained, that direct connection has been made to all utilities set forth in the Plans and Specifications, and that the Project is ready for occupancy, (iv) lien waivers or other evidence of payment satisfactory to Lender and releases from all parties furnishing materials and/or services in connection with the requested payment, (v) photographs evidencing completion of the Project, (vi) an unconditional estoppel certificate from the tenant under the Lender-approved Lease giving rise to the Rollover Improvements to be paid, (vii) at Lender's option, a title search for the Mortgaged Property indicating that the Mortgaged Property is free from all liens, claims and other encumbrances not previously approved by Lender, and, if required by Lender in its Permitted Discretion, issuance of a Form 122 Future Advances endorsement to the ALTA loan policy of title insurance following the posting of the completion notice, as provided under applicable law, or such other endorsements to the existing ALTA loan policy of title insurance, and (viii) such other evidence as Lender shall reasonably request to demonstrate that the Rollover Improvements to be funded by the requested Disbursement have been completed and are paid for or will be paid upon such Disbursement to Borrower. Upon satisfaction of the conditions set forth herein, Lender shall

**EXHIBIT L - Page 17 of 58**

**EXHIBIT L - Page 18 of 58**

disburse Rollover Reserve Funds in accordance with the terms and conditions set forth in Article 5 hereof.

**Section 4.2**    Lender shall make Disbursements from the CapEx Reserve Funds for Capital Expenditures incurred by Borrower in accordance with the terms hereof upon satisfaction by Borrower of each of the following conditions with respect to each such Disbursement: **(a)** Borrower shall submit Lender's standard form of draw request for payment to Lender at least ten (10) Business Days prior to the date on which Borrower requests such payment be made, which request shall specify the Capital Expenditures to be paid and shall be accompanied by copies of paid invoices for the amounts requested; **(b)** on the date such request is received by Lender and on the date such payment is to be made, no default or Event of Default shall exist and remain uncured; **(c)** if applicable, Lender shall have reviewed and approved the Lease giving rise to the Capital Expenditures to be paid; and **(d)** Lender shall have received (i) a certificate from an officer of (A) stating that the items to be funded by the requested Disbursement are Capital Expenditures and a description thereof, (B) stating that all Capital Expenditures at the Mortgaged Property to be funded by the requested Disbursement have been completed in a good and workmanlike manner and in accordance with all applicable legal requirements and have been accepted by Borrower and any and all applicable tenant(s), (C) identifying each Person that supplied materials or labor relating to such Capital Expenditures to be funded by the requested Disbursement, (D) stating that each such Person has been paid in full or will be paid in full upon such Disbursement, (E) stating that the Capital Expenditures to be funded have not been the subject of a previous Disbursement, and (F) stating that all previous Disbursements of CapEx Reserve Funds have been used to pay the previously identified Capital Expenditures, (ii) a copy of the final certificate of occupancy, if applicable, and any license, permit or other approval by any Governmental Authority required in connection with the Capital Expenditures and not previously delivered to Lender, (iii) a written certification by an engineer, architect, or other qualified inspector acceptable to Lender, or by a construction progress inspector retained by Lender, at Borrower's expense, that such engineer, architect, other qualified inspector or construction progress inspector has inspected the Mortgaged Property, that the Capital Expenditures have been completed substantially in accordance with the Plans and Specifications and the Construction Contract and all required governmental permits and approvals, that all required approvals of such completion have been obtained, that direct connection has been made to all utilities set forth in the Plans and Specifications, and that the Project is ready for occupancy, (iv) lien waivers or other evidence of payment satisfactory to Lender and releases from all parties furnishing materials and/or services in connection with the requested payment, (v) photographs evidencing completion of the Project, (vi) an unconditional estoppel certificate from the tenant under the Lender-approved Lease giving rise to the Capital Expenditures to be paid, if applicable, (vii) at Lender's option, a title search for the Mortgaged Property indicating that the Mortgaged Property is free from all liens, claims and other encumbrances not previously approved by Lender, and, if required by Lender in its Permitted Discretion, issuance of a Form 122 Future Advances endorsement to the ALTA loan policy of title insurance following the posting of the completion notice, as provided under applicable law, or such other endorsements to the existing ALTA loan policy of title insurance, and (viii) such other evidence as Lender shall reasonably request to demonstrate that the Capital Expenditures to be funded by the requested Disbursement have been completed and are paid for or will be paid upon such Disbursement to Borrower. Upon satisfaction of the conditions set forth herein, Lender shall

**EXHIBIT L - Page 18 of 58**

disburse CapEx Reserve Funds in accordance with the terms and conditions set forth in Article 5 hereof.

**ARTICLE 5**
**DISBURSEMENTS FROM THE ACCOUNT**

**Section 5.1** <u>Application for Disbursements of Rollover Reserve Funds and CapEx Reserve Funds</u>. Each application for a Disbursement shall be made on a standard AIA payment request form or other form approved by Lender, executed by Borrower, delivered to Lender in accordance with the terms hereof, and supported by such evidence as Lender shall reasonably require. With regard to Rollover Improvements, such requests and Disbursements (a) shall be in increments of not less than $25,000.00 and (b) as to each Project, shall not exceed the lesser of (i) the actual total cost of Rollover Improvements for such Project or (ii) the aggregate amount for all such Projects calculated at $10.09 per square foot. With regard to Capital Expenditures, such requests and Disbursements (a) shall be in increments of not less than $25,000.00 and (b) as to each Project, shall not exceed the lesser of (i) the actual total cost for such Project or (ii) the amount set forth on <u>Exhibit A</u> for such Project. Unless otherwise approved by Lender in its sole and absolute discretion, Borrower shall apply only for a Disbursement with respect to work actually done by Contractor and for materials and fixtures actually incorporated into the Project. Each application for a Disbursement shall be deemed a certification of Borrower that as of the date of such application, Borrower is in compliance with all of the provisions of this Agreement and the Loan Documents. If Lender determines, in its Permitted Discretion, that all terms and conditions for the Disbursement are met, Lender shall make the Disbursement within seven (7) Business Days of approval of the request. Lender shall not be obligated to make more than one (1) Disbursement every thirty (30) days.

**Section 5.2** <u>Payments</u>. So long as no default or Event of Default has occurred and is continuing, Lender may either (x) reimburse Borrower for payments actually made by Borrower to Contractor and any subcontractors or other parties the sums due under the Construction Contract or (y) directly pay Contractor and any subcontractors or other parties the sums due under the Construction Contract. Upon the occurrence and continuation of a default or an Event of Default, at the sole option of Lender, Disbursements may be paid either (A) in the joint names of Borrower and Contractor, subcontractor(s), or supplier(s) in payment of sums due under the Construction Contract or (B) Lender may directly pay Contractor and any subcontractors or other parties the sums due under the Construction Contract; provided, however, nothing herein shall obligate Lender to make any Disbursements upon a default or an Event of Default and such Disbursements shall be at Lender's sole and absolute discretion. Upon the occurrence and continuation of a default or an Event of Default, Borrower appoints Lender as its attorney-in-fact to make such payments. This power shall be deemed coupled with an interest, shall be irrevocable, and shall survive a default or an Event of Default under this Agreement.

**Section 5.3** <u>General Project Provisions</u>. Borrower covenants and agrees with Lender that while this Agreement is in effect, Borrower shall comply with the following provisions relating to the construction and completion of each Project.

    **(a)** <u>Lender's Right of Entry and Inspection</u>. Lender and its agents shall have at all reasonable times upon prior notice to Borrower and during reasonable hours, the right of entry

**EXHIBIT L - Page 19 of 58**

Exhibit A
Page 74

and free access to the Mortgaged Property and the right to inspect all work done, labor performed, and materials furnished with respect to the Project and, in connection therewith, Lender shall use commercially reasonable efforts not to disturb any tenants on the Mortgaged Property; provided, however, that if Lender determines, in its sole and absolute discretion, that such failure to immediately inspect would be an imminent threat to the Mortgaged Property, Lender shall have immediate unrestricted access and right of entry to the Mortgaged Property. Lender shall have unrestricted access to and the right to copy all records, accounting books, contracts, subcontracts, bills, statements, vouchers, and supporting documents of Borrower relating in any way to the Project.

(b)     Lender's Right to Stop Work. If Lender in good faith determines that any work or materials do not conform to the approved Plans and Specifications or industry standard building practices, or otherwise depart from any of the requirements of this Agreement, Lender may require the work to be stopped and withhold Disbursements until the matter is corrected. In such event, Borrower shall promptly correct the work to Lender's satisfaction. No such action by Lender will affect Borrower's obligation to complete the Rollover Improvements or Capital Expenditures, as applicable, on or before the Completion Date. Lender is under no duty to supervise or inspect the construction or examine any books and records. Any inspection or examination by Lender is for the sole purpose of protecting Lender's security and preserving Lender's rights under this Agreement. No default of Borrower will be waived by any inspection by Lender. In no event will any inspection by Lender be a representation that there has been or will be compliance with the Plans and Specifications or that the construction is free from defective materials or workmanship.

(c)     Limitation of Responsibility. The making of any Disbursement by Lender shall not constitute or be interpreted as either (A) an approval or acceptance by Lender of the work done through the date of the Disbursement, or (B) a representation or indemnity by Lender to any party against any deficiency or defect in the work or against any breach of any contract. Inspections and approvals of the Plans and Specifications, the Rollover Improvements or Capital Expenditures, as applicable, the workmanship and materials used in the Rollover Improvements or Capital Expenditures, as applicable, and the exercise of any other right of inspection, approval, or inquiry granted to Lender in this Agreement are acknowledged to be solely for the protection of Lender's interests, and under no circumstances shall they be construed to impose any responsibility or liability of any nature whatsoever on Lender to any party. Neither Borrower nor any contractor, subcontractor, materialman, laborer, or any other person shall rely, or have any right to rely, upon Lender's determination of the appropriateness of any Disbursement. No Disbursement or approval by Lender shall constitute a representation by Lender as to the nature of the Project, its construction, or its intended use for Borrower or for any other person, nor shall it constitute an indemnity by Lender to Borrower or to any other person against any deficiency or defects in the Project or against any breach of any contract.

(d)     Construction Ceases. If construction ceases for a period of fifteen (15) or more consecutive days (absent Force Majeure) before completion of the Project regardless of the reason, Lender may, at its option and without thereby impairing any of its rights, power, or privileges, enter into possession of the Project's construction site and perform or cause to be performed any and all work and labor necessary to complete the Improvements substantially in

**EXHIBIT L - Page 20 of 58**

Exhibit A
Page 75

accordance with the Plans and Specifications, and seek reimbursement for all costs in accordance with the terms of the Loan Documents.

      (e)    Completion Date. Borrower shall complete the applicable Rollover Improvements and/or Capital Expenditures by the Completion Date and shall, at Lender's request, whether or not Borrower makes a request for a Disbursement with respect to the Project, deliver to Lender the items set forth in Article 4. Lender shall have no obligation to make any Disbursement unless the applicable Rollover Improvements and/or Capital Expenditures have been completed in a good and workmanlike manner on or before the Completion Date.

      **Section 5.4**    Disbursement of Tax Escrow Funds and Insurance Escrow Funds. Provided no Event of Default has occurred and is continuing, Lender shall disburse the Tax Escrow Funds and Insurance Escrow Funds for the payment of Real Property Taxes and Insurance Premiums required to be made by Borrower hereunder, such disbursement to be made to the party as described herein within five (5) Business Days after Lender's receipt and approval of (i) a written disbursement request from Borrower provided to Lender in accordance with the terms of this Agreement and (ii) a copy of Borrower's current real property tax statement or insurance premium invoice, as applicable. In addition, Borrower hereby agrees that it will deposit with Lender, concurrent with its written request for disbursement of Tax Escrow Funds and Insurance Escrow Funds in accordance with the terms of this Agreement, funds sufficient to cover the difference between the amount of available Tax Escrow Funds and Insurance Escrow Funds and the total amount due and payable as set forth on the then current real property tax statement and/or Insurance Premium invoice submitted with the disbursement request, as applicable. Borrower's request for disbursement shall inform Lender where the disbursed funds are to be sent; provided, however, Borrower acknowledges and agrees that regardless of the instructions set forth in such disbursement request, Lender will remit funds directly to the taxing authority or insurance agent, as applicable, unless satisfactory documentation is provided by such taxing authority or insurance agent, as applicable, evidencing receipt of payment in full from Borrower of the due and payable real property tax statement or insurance premium invoice, as applicable. Borrower agrees that Lender shall disburse the Tax Escrow Funds and Insurance Escrow Funds in accordance with the terms of this Agreement without any further instructions or consent from Borrower. Lender shall have no duty or obligation to disburse Tax Escrow Funds and Insurance Escrow Funds except in accordance with this Agreement and only upon satisfaction of all obligations of Borrower in connection herewith; provided, however, if the amount of the Tax Escrow Funds and Insurance Escrow Funds shall exceed the amounts due for Real Property Taxes and Insurance Premiums, Lender shall, in its sole discretion, return any excess to Borrower or credit such excess against future payments to be made for Real Property Taxes and Insurance Premiums. In no event shall Borrower be entitled to any disbursement from the Tax Escrow Funds and Insurance Escrow Funds; provided, however, upon satisfaction in full of all Obligations arising under the Loan Documents, Borrower shall be entitled to disbursement of any remaining Tax Escrow Funds and Insurance Escrow Funds held in the Account. If at any time Lender reasonably determines that the Tax Escrow Funds and Insurance Escrow Funds are not or will not be sufficient to pay Real Property Taxes and Insurance Premiums by the due dates thereof, Lender shall notify Borrower of such determination and Borrower shall increase its Monthly Tax Deposit and/or Monthly Insurance Deposit, as applicable, payable to Lender by the amount that Lender estimates is sufficient to make up the deficiency at least thirty (30) days prior to the due date of the Real Property Taxes and/or thirty (30) days prior to payment of the

**EXHIBIT L - Page 21 of 58**

Exhibit A
Page 76

Insurance Premiums, as the case may be. The insufficiency of any Tax Escrow Funds and/or Insurance Escrow Funds in the Account shall not relieve Borrower from the obligation to make any payments of Real Property Taxes or Insurance Premiums as and when due pursuant to the terms of this Agreement and the other Loan Documents.

## ARTICLE 6
## REPRESENTATIONS, WARRANTIES AND COVENANTS

Borrower hereby represents, warrants and covenants to Lender, as of the date of this Agreement, as of the date of each Disbursement, as of the date of any renewal, extension or modification of the Loan, and at all times any Indebtedness exists, all of the representations, warranties and covenants contained in the Mortgage and other Loan Documents as if fully set forth herein. Borrower further represents, warrants and covenants to Lender, as of the date of this Agreement, as of the date of each Disbursement, as of the date of any renewal, extension or modification of the Loan, and at all times any Indebtedness exists, as follows:

**Section 6.1** Inspection. Borrower shall permit Lender, and Lender's agents, representatives and employees, upon prior notice to Borrower, to inspect the Mortgaged Property and conduct such environmental, engineering and valuation studies as Lender may require, provided that such inspections and studies shall not materially interfere with the use and operation of the Mortgaged Property. Borrower acknowledges Lender's right to order an Appraisal from time to time. If the Appraisal is obtained to comply with this Agreement or any applicable law or lender policy promulgated to comply therewith, or if an Event of Default exists, Borrower shall pay for any such Appraisal upon Lender's request.

**Section 6.2** Material Changes. Borrower shall promptly notify Lender of the occurrence of any of the following: (a) fire or other casualty in excess of $50,000.00; (b) receipt of notice of condemnation; (c) receipt of notice of any violation of law; (d) commencement of any litigation involving a claim not fully covered by insurance and defended by the carrier in excess of $50,000.00; (e) a change in tax assessment or proposed assessment; (f) receipt of a claim from the holder of any lien or security interest; (g) Borrower's discovery of any spill, discharge, release or presence of any Hazardous Materials (as defined in the Indemnity) at, upon, under, within, contiguous to or otherwise affecting the Mortgaged Property; or (h) other material facts affecting the Mortgaged Property.

**Section 6.3** Commercial Loan Transaction; Use of Loan Proceeds. This Agreement is delivered in connection with a business or commercial loan transaction, and Borrower further warrants that the Loan proceeds shall be utilized for the purpose of working capital to Borrower, acquisition, refinance and/or rehabilitation of the Mortgaged Property, closing fees, closing costs, and pre-paid interest.

**Section 6.4** Taxes and Assessments. The Mortgaged Property is comprised of one or more parcels, each of which constitutes a separate tax lot and none of which constitutes a portion of any other tax lot. There are no pending or, to Borrower's best knowledge, proposed, special or other assessments for public improvements or otherwise affecting the Mortgaged Property, nor are there any contemplated improvements to the Mortgaged Property that may result in such

**EXHIBIT L - Page 22 of 58**

Exhibit A
Page 77

**EXHIBIT L - Page 23 of 58**

special or other assessments. There are no tax abatements or exceptions affecting the Mortgaged Property except as set forth on Exhibit B to the Mortgage.

**Section 6.5**    Taxes; Charges. Borrower shall pay, before any fine, penalty, interest or cost may be added thereto, and shall not enter into any agreement to defer, any real estate taxes and assessments, franchise taxes and charges, and other governmental charges that may become a Lien upon the Mortgaged Property or become payable during the Loan Term, and will promptly furnish Lender with evidence of such payment.

Borrower shall pay all taxes, charges, filing, registration and recording fees, excises and levies payable with respect to the Note, this Agreement or the Liens created or secured by the Loan Documents, other than income, franchise and doing business taxes imposed on Lender. If there shall be enacted any law (1) deducting the Loan from the value of the Mortgaged Property for the purpose of taxation, (2) affecting any Lien on the Mortgaged Property, or (3) changing existing laws of taxation of mortgages, deeds of trust, security deeds, or debts secured by real property, or changing the manner of collecting any such taxes, Borrower shall promptly pay to Lender, on demand, all taxes, costs and charges for which Lender is or may be liable as a result thereof; provided, however, if such payment would be prohibited by law or would render the Loan usurious, then instead of collecting such payment, Lender may declare all amounts owing under the Loan Documents to be immediately due and payable. Borrower shall pay when due all claims and demands of mechanics, materialmen, laborers and others which, if unpaid, might result in a Lien on the Mortgaged Property.

Notwithstanding anything to the contrary set forth herein, Borrower may contest the validity of any taxes, claims and demands described in this Section 6.5 so long as (1) Borrower notifies Lender that it intends to contest such claim or demand, (2) Borrower provides Lender with an indemnity, bond or other security satisfactory to Lender assuring the discharge of Borrower's obligations for such taxes, claims and demands, including interest and penalties, (3) Borrower is diligently contesting the same by appropriate legal proceedings in good faith and at its own expense, and (4) nonpayment of such taxes, claims and demands will not result in the loss or forfeiture of any of the Mortgaged Property or any interest of Lender therein.

**Section 6.6**    Control; Management. Without the prior written consent of Lender, there shall be no change in the day-to-day control and management of Borrower or Borrower Party, and no change in the respective organizational documents relating to control over Borrower, Borrower Party and/or the Mortgaged Property. Borrower shall not terminate, replace or appoint any such property manager or terminate or amend the property management agreement approved by Lender for the Mortgaged Property without Lender's prior written approval. Any change in ownership or control of the property manager shall be cause for Lender to re-approve such property manager and property management agreement. Each property manager shall hold and maintain all necessary licenses, certifications and permits required by law. Borrower shall fully perform all of its covenants, agreements and obligations under the property management agreement. Borrower covenants to deliver to Lender a collateral assignment and subordination of management agreement from each property manager within ten (10) days after Lender's request.

**Section 6.7**    Operation; Maintenance; Inspection; Defense. Borrower shall observe and comply with all legal requirements applicable to its existence and to the ownership, use and

**EXHIBIT L - Page 23 of 58**

Exhibit A
Page 78

operation of the Mortgaged Property and shall not commit or suffer any waste on the Mortgaged Property. Borrower shall maintain the Mortgaged Property in good condition and promptly repair any damage or casualty, including, without limitation, maintaining all Improvements on the Mortgaged Property free of any liquid water and/or water vapor intrusion into the Improvements in amounts that could support the growth of fungus and/or mold inside the Improvements and free of any sites of growing fungus and/or mold inside the Improvements. Borrower shall not, without the prior written consent of Lender, undertake any material alteration of the Mortgaged Property or permit any of the fixtures or personalty owned by Borrower to be removed at any time from the Mortgaged Property, unless the removed item is removed temporarily for maintenance and repair or, if removed permanently, is obsolete and is replaced by an article of equal or better suitability and value, owned by Borrower and free and clear of any Liens except those in favor of Lender. Borrower shall permit Lender and its agents, representatives and employees, upon reasonable prior notice to Borrower, to inspect the Mortgaged Property and conduct such Site Assessments and engineering studies as Lender may require, provided such Site Assessments and studies do not materially interfere with the use and operation of the Mortgaged Property.

     **Section 6.8**   <u>Reimbursement of Expenses</u>. Borrower shall pay all costs and expenses incurred by Lender in connection with the negotiation, documentation, closing, disbursement, administration, servicing and monitoring of the Loan and Loan Documents, including, without limitation: fees and expenses of Lender's attorneys, and Lender's environmental, engineering, valuation (including fees and costs associated with obtaining a new Appraisal subject to the terms and conditions set forth in Section 6.1 above), accounting and other consulting firms; fees, charges and taxes for the recording or filing of Loan Documents; financial investigation, audit, and site inspection fees and costs, lease review fees and costs, settlement of condemnation and casualty awards, title search costs, premiums for title insurance and endorsements thereto; and fees and costs for UCC and litigation searches and background checks; and, in the event Borrower (or any escrow agent or representative of Borrower) asks Lender to prepare a Loan payoff calculation more than two (2) times during the Loan Term, then, in connection with each such request thereafter, Borrower shall pay to Lender, at Lender's option and in its discretion, an amount equal to $500 in connection with each such request for a payoff calculation and/or an updated payoff calculation, such amount to be paid by Borrower to Lender in accordance with the terms and conditions set forth in Section 2.4(e) above. Borrower shall, upon request, promptly reimburse Lender for all amounts expended, advanced or incurred by Lender to collect the Note, or to enforce the rights of Lender under this Agreement or any other Loan Document, or to defend or assert the rights and claims of Lender under the Loan Documents or with respect to the Mortgaged Property (by litigation, in any bankruptcy proceeding, or other proceedings), which amounts will include all court costs, attorneys' fees and expenses (including attorneys' fees and expenses in connection with any bankruptcy proceedings), fees of auditors and accountants, and investigation expenses as may be incurred by Lender in connection with any such matters (whether or not litigation is instituted), together with interest at the Interest Rate *plus*, upon the occurrence of any Event of Default, the Default Rate, on each such amount from the date of disbursement until the date of reimbursement to Lender, all of which shall constitute part of the Loan and shall be secured by the Loan Documents.

     **Section 6.9**   <u>Organization and Power</u>. Borrower is a limited liability company, duly organized, validly existing, and in good standing under the laws of the State of Nevada.

EXHIBIT L - Page 24 of 58

Exhibit A
Page 79

Borrower is not a "foreign person" within the meaning of Section 1445(f)(3) of the Internal Revenue Code. Borrower shall remain a single-asset entity throughout the Loan Term.

**Section 6.10**   <u>Validity of Loan Documents</u>. Borrower has full and lawful authority and power to execute, acknowledge, deliver and perform this Agreement and the other Loan Documents. The execution, delivery and performance by Borrower and each Borrower Party of the Loan Documents: (1) are duly authorized and do not require the consent or approval of any other party or governmental authority which has not been obtained; and (2) will not violate any law or any contractual or other restriction binding on or affecting Borrower or any Borrower Party, or result in the imposition of any lien, charge or encumbrance upon the assets of any such party, except as contemplated by the Loan Documents. Borrower and each Borrower Party intends that the Loan Documents constitute the legal, valid and binding obligations of Borrower and each Borrower Party, enforceable in accordance with their respective terms, subject to applicable bankruptcy, insolvency or similar laws generally affecting the enforcement of creditors' rights.

**Section 6.11**   <u>Liabilities; Litigation; Other Secured Transactions</u>.

(1)   The financial statements previously delivered by Borrower and each Borrower Party to Lender are true and correct with no significant change since the date of preparation. Except as disclosed in such financial statements, there are no liabilities (fixed or contingent) affecting the Mortgaged Property, Borrower or any Borrower Party. Except as disclosed in such financial statements, there is no litigation, mediation, arbitration, dispute resolution, administrative proceeding, investigation or other legal action (including, without limitation, any proceeding under any state or federal bankruptcy or insolvency law) pending or, to the knowledge of Borrower, threatened, against the Mortgaged Property, Borrower or any Borrower Party.

(2)   Neither Borrower nor any Borrower Party is contemplating either the filing of a petition by it under state or federal bankruptcy or insolvency laws or the liquidation of all or a major portion of its assets or property, and neither Borrower nor any Borrower Party has knowledge of any Person contemplating the filing of any such petition against it.

(3)   Borrower has not within the last five (5) years become bound (whether as a result of a merger or otherwise) as a debtor under a pledge or security agreement entered into by another Person, which has not heretofore been terminated.

**Section 6.12**   <u>Other Agreements; Defaults</u>. Neither Borrower nor any Borrower Party is a party to any agreement or instrument or subject to any court order, injunction, permit, or restriction which might adversely affect the Mortgaged Property or the business, operations or condition (financial or otherwise) of Borrower or any Borrower Party. Neither Borrower nor any Borrower Party is in violation of any agreement, which violation would have an adverse effect on the Mortgaged Property, Borrower, or any Borrower Party or Borrower's or any Borrower Party's business, properties or assets, operations or condition, financial or otherwise.

**Section 6.13**   <u>Compliance with Law</u>.

**EXHIBIT L - Page 25 of 58**

Exhibit A
Page 80

**EXHIBIT L - Page 26 of 58**

(1)     To the extent required by applicable law, Borrower and each Borrower Party has all requisite licenses, permits, franchises, qualifications, certificates of occupancy or other governmental authorizations to own, lease and operate the Mortgaged Property and carry on its business, and all of such licenses, permits, franchises, qualifications, certificates of occupancy and other governmental authorizations are in full force and effect and have been fully paid for, and Borrower has made or will make application for renewals of any of the foregoing prior to the expiration thereof. The Mortgaged Property is in compliance with all applicable zoning, subdivision, building and other legal requirements and is free of structural defects. All of the Mortgaged Property's building systems are in good working order, subject to ordinary wear and tear. The Mortgaged Property does not constitute, in whole or in part, a legally non-conforming use under applicable legal requirements;

(2)     No condemnation has been commenced or, to Borrower's knowledge, is contemplated with respect to all or any portion of the Mortgaged Property or for the relocation of roadways providing access to the Mortgaged Property; and

(3)     The Mortgaged Property has adequate rights of access to public ways and is served by adequate water, sewer, sanitary sewer and storm drain facilities. All public utilities necessary or convenient to the full use and enjoyment of the Mortgaged Property are located in the public right-of-way abutting the Mortgaged Property, and all such utilities are connected so as to serve the Mortgaged Property without passing over other property, except to the extent such other property is subject to a perpetual easement for such utility benefiting the Mortgaged Property. All roads necessary for the full utilization of the Mortgaged Property for its current purpose have been completed and dedicated to public use and accepted by all governmental authorities.

(4)     Borrower has not received any notice from any governmental body having jurisdiction over the Mortgaged Property as to any violation of any applicable law, or any notice from any insurance company or inspection or rating bureau setting forth any requirements as a condition to the continuation of any insurance coverage on or with respect to the Mortgaged Property or the continuation thereof at premium rates existing at present which have not been remedied or satisfied.

**Section 6.14**   Location of Borrower. Borrower's principal place of business and chief executive office are located at 7343 El Fuerte Street, Carlsbad, California, and Borrower at all times has maintained its principal place of business and chief executive office at such location or at other locations within the same state. Borrower's exact legal name is correctly set out in the introductory paragraph of this Agreement.

**Section 6.15**   ERISA.

(1)     As of the Closing Date and throughout the Loan Term, (a) Borrower is not and will not be an "employee benefit plan" as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), which is subject to Title I of ERISA, and (b) the assets of Borrower do not and will not constitute "plan assets" of one or more such plans for purposes of Title I of ERISA; and

**EXHIBIT L - Page 26 of 58**

**EXHIBIT L - Page 27 of 58**

(2)    As of the Closing Date and throughout the Loan Term, (a) Borrower is not and will not be a "governmental plan" within the meaning of Section 3(3) of ERISA, and (b) transactions by or with Borrower are not and will not be subject to state statutes applicable to Borrower regulating investments of and fiduciary obligations with respect to governmental plans.

**Section 6.16**    Margin Stock. No part of proceeds of the Loan will be used for purchasing or acquiring any "margin stock" within the meaning of Regulations T, U or X of the Board of Governors of the Federal Reserve System.

**Section 6.17**    Tax Filings. Borrower and each Borrower Party has filed (or has obtained effective extensions for filing) all federal, state and local tax returns required to be filed and has paid or made adequate provision for the payment of all federal, state and local taxes, charges and assessments payable by Borrower and each Borrower Party, respectively.

**Section 6.18**    Solvency. Giving effect to the Loan, the fair saleable value of Borrower's assets exceeds and will, immediately following the making of the Loan, exceed Borrower's total liabilities, including, without limitation, subordinated, unliquidated, disputed and contingent liabilities. The fair saleable value of Borrower's assets is and will, immediately following the making of the Loan, be greater than Borrower's probable liabilities, including the maximum amount of its contingent liabilities on its Debt as such Debt becomes absolute and matures. Borrower's assets do not and, immediately following the making of the Loan, will not constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted. Borrower does not intend to, and does not believe that it will, incur Debt and liabilities (including contingent liabilities and other commitments) beyond its ability to pay such Debt and liabilities as they mature (taking into account the timing and amounts of cash to be received by Borrower and the amounts to be payable on or in respect of obligations of Borrower). Except as expressly disclosed to Lender in writing, no petition in bankruptcy has been filed by or against Borrower or any Borrower Party, and neither Borrower nor any Borrower Party has ever made an assignment for the benefit of creditors or taken advantage of any insolvency act for the benefit of debtors. No part of the Mortgaged Property is in the hands of a receiver, no application for a receiver is pending with respect to any portion of the Mortgaged Property, and no part of the Mortgaged Property is subject to any foreclosure or similar proceedings.

**Section 6.19**    Full and Accurate Disclosure. No statement of fact made by or on behalf of Borrower or any Borrower Party in this Agreement or in any of the other Loan Documents contains any untrue statement of a material fact or omits to state any material fact necessary to make statements contained herein or therein not misleading. There is no fact presently known to Borrower which has not been disclosed to Lender which adversely affects, nor as far as Borrower can foresee might adversely affect, the Mortgaged Property or the business, operations or condition (financial or otherwise) of Borrower or any Borrower Party. All information supplied by Borrower regarding the Mortgaged Property is accurate and complete in all material respects.

**Section 6.20**    Business Purpose. The Loan is intended for commercial purposes, and Borrower and each Borrower Party represent that the Mortgaged Property is income producing property and not the personal residence of Borrower or any Borrower Party.

**EXHIBIT L - Page 27 of 58**

**EXHIBIT L - Page 28 of 58**

**Section 6.21**   Single Purpose Entity. Borrower is, and during the Loan Term shall continue to be, organized solely for the purpose of (i) acquiring, developing, owning, managing or operating the Mortgaged Property, (ii) entering into this Agreement and the documents related hereto, and (iii) engaging in any activity that is incidental, necessary or appropriate to accomplish the foregoing. So long as any part of the Indebtedness and the Obligations secured hereby remain unpaid and undischarged, Borrower shall not (a) engage in any business or activity other than the ownership, operation and maintenance of the Mortgaged Property, and activities incidental thereto; (b) acquire or own any material assets other than the Mortgaged Property; (c) merge into or consolidate with any Person or dissolve, terminate or liquidate in whole or in part, transfer or otherwise dispose of all or substantially all of its assets or change its legal structure; (d) fail to maintain separate financial statements and accounting records, showing its assets and liabilities separate and apart from those of any other Person; (e) have its assets listed on the financial statement of any other entity; and (f) fail to maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person.

**Section 6.22**   Unlawful Use, Marijuana, Controlled Substances and Prohibited Activities. Borrower shall not use or occupy or permit the use or occupancy of the Mortgaged Property in any manner that would be a violation of federal, state or local law or regulation, regardless of whether such use or occupancy is lawful under any conflicting law, including, without limitation, any law relating to the use, sale, possession, cultivation manufacture, distribution or marketing of any controlled substances or other contraband or any law relating to the use or distribution of marijuana for any purpose.

**Section 6.23**   OFAC. Neither Borrower nor any Borrower Party is (a) an individual or entity, or (b) acting, directly or indirectly, for or on behalf of any person, group, entity or nation, in either the case of (a) or (b), designated on the "Specially Designated Nationals and Blocked Persons List" maintained by the U.S. Treasury Department's Office of Foreign Asset Control ("**OFAC**"), or is otherwise barred from engaging in transactions with U.S. entities under the programs administered by OFAC or under other laws and regulations.

**Section 6.24**   Due on Sale and Encumbrance; Transfers of Interests. Without the prior written consent of Lender,

     (1) no Transfer of the Mortgaged Property shall occur; and

     (2) no Transfer of any interest in Borrower or any Borrower Party shall occur.

Notwithstanding the foregoing, so long as no default or Event of Default exists under the Loan Documents, Lender shall not unreasonably withhold its consent to a one-time Transfer of the Mortgaged Property during the Loan Term, provided Lender receives sixty (60) days advance written request from Borrower and provided the following conditions are complied with in each instance:

**EXHIBIT L - Page 28 of 58**

      (i)      Prior review and approval of the proposed purchaser or other transferee ("*Transferee*") and Transferee's direct and indirect constituents (the "*Transferee Parties*") and the subject transaction by Lender, in its sole discretion. Review of the Transferee, Transferee Parties and the subject transaction shall encompass various factors, including, but not limited to, the proposed Transferee's and Transferee's Controlling parties' creditworthiness, financial strength, commercial real estate management and leasing expertise, history of owning, operating and leasing property similar to the Mortgaged Property, Lender's lending exposure to the proposed Transferee (and/or Transferee Parties) as well as the proposed transaction's effect on the Mortgaged Property, Borrower and other security for the Loan;

      (ii)      Payment to Lender of an assumption fee equal to (a) one percent (1%) of the then outstanding principal balance of the Loan; provided, however, that Lender will require $7,500.00 of such fee to be paid at the beginning of Lender's review process, and such sum shall be nonrefundable and deemed earned upon receipt by Lender whether or not the transaction is ultimately completed or Lender ultimately approves the proposed Transfer;

      (iii)      Receipt, at Borrower's expense, of an endorsement updating the existing loan policy of title insurance acceptable to Lender (or if an acceptable endorsement is not available, a new ALTA extended coverage loan policy of title insurance acceptable to Lender);

      (iv)      Receipt and approval by Lender of copies of all relevant information and documentation relating to or reasonably required by Lender in connection with the proposed Transfer, including, but not limited to, (a) the organizational documents of Transferee; (b) the deeds, bills of sale or such other instruments of transfer for the Mortgaged Property and documents relating to the assignment and assumption of Leases; (c) evidence of compliance with the insurance requirements contained in the Loan Documents; (d) compliance with such other closing requirements as are customarily imposed by Lender in connection with such transactions; (e) compliance with the representations and warranties herein regarding the Transferee's required entity status; and (f) compliance with the representations, warranties and covenants herein regarding anti-terrorism, money laundering, and economic sanctions;

      (v)      Execution, delivery, acknowledgment and recordation, as applicable, of new, revised and/or replacement assumption agreements, loan modification agreements, environmental indemnity agreements, security instruments, financing statements, UCCs and guaranties, in form and substance satisfactory to Lender in its sole discretion; such guaranties and environmental indemnities shall be executed by the applicable principals of the Transferee acceptable to Lender in its sole discretion;

      (vi)      Payment of Lender's actual out-of-pocket costs and expenses incurred by Lender in connection with such transfer (including, without limitation, attorney fees and costs, Appraisal and Appraisal review fees), an underwriting fee in the amount of $7,500.00, and any other fees and costs incurred by Borrower in connection

**EXHIBIT L - Page 29 of 58**

Exhibit A
Page 84

**EXHIBIT L - Page 30 of 58**

with such Transfer of the Mortgaged Property, whether or not such Transfer is actually consummated;

        (vii)    If applicable, receipt by Lender of a waiver from any tenant having a right or option to purchase the Mortgaged Property or any portion thereof, waiving such right or option, in form and substance acceptable to Lender;

        (viii)   The DSCR is not less than 1.70, and Lender receives satisfactory evidence that such ratio will be maintained for the succeeding twelve (12) months;

        (ix)    The Loan-to-Value Ratio does not exceed 46%; and

        (x)    Receipt of a written opinion of counsel for the Transferee and its principals satisfactory to Lender, including, without limitation, the existence, authority and due execution, and enforceability of the Loan Documents as assumed by the Transferee and enforceability of any and all documents executed by the Transferee and its principals, as applicable, in connection with such Transfer.

Lender agrees to release any Guarantor from any further obligations under the Guaranty and to release Borrower from any further obligations under the Loan Documents (excluding Borrower's and any Guarantor's obligations in the event of fraud or misrepresentation and under the Indemnity except as provided herein) in connection with a Transfer of the Mortgaged Property from and after the date of the Transfer provided: (a) Transferee executes an assumption agreement acceptable to Lender assuming all of Borrower's obligations under the Loan Documents and the Indemnity; (b) any Guarantor's obligations are assumed by a Person(s) acceptable to Lender in its reasonable discretion; (c) Borrower and any Guarantor shall be released from their obligations under the Indemnity only if said obligations are assumed in writing by a Person(s) acceptable to Lender which obligations shall specifically include all past environmental activity or condition regardless of causation; and (d) all Obligations of Borrower under the Loan Documents have been satisfied in full up to and including the date of the Transfer of the Mortgaged Property.

    **Section 6.25**  Legal Existence; Name, Etc. Borrower and each Borrower Party shall preserve and keep in full force and effect its entity status, franchises, rights and privileges under the laws of the state of its formation, and all qualifications, licenses and permits applicable to the ownership, use and operation of the Mortgaged Property. Neither Borrower nor any Borrower Party shall wind up, liquidate, dissolve, reorganize, merge, or consolidate with or into, or convey, sell, assign, transfer, lease, or otherwise dispose of all or substantially all of its assets, or acquire all or substantially all of the assets of the business of any Person, or permit any subsidiary or Affiliate of Borrower to do so. Without limiting the foregoing, Borrower shall not reincorporate or reorganize itself under the laws of any jurisdiction other than the jurisdiction in which it is incorporated or organized as of the Closing Date. Borrower and each Borrower Party shall conduct business only in its own name, and shall not change its name, identity, organizational structure, state of formation or the location of its chief executive office or principal place of business unless Borrower (1) shall have obtained the prior written consent of Lender to such change, and (2) shall have taken all actions necessary or requested by Lender to file or amend any financing statement or continuation statement to assure perfection and

**EXHIBIT L - Page 30 of 58**

continuation of perfection of security interests under the Loan Documents. Borrower and each Borrower Party shall maintain its separateness as an entity, including maintaining separate books, records and accounts and observing corporate, partnership or limited liability company formalities independent of any other entity, shall pay its obligations with its own funds, and shall not commingle funds or assets with those of any other entity. If Borrower does not have an organizational identification number and/or legal entity identifier and later obtains one, Borrower shall promptly notify Lender of its organizational identification number and/or legal entity identifier, as applicable.

**Section 6.26** Limitation on Other Debt. Borrower shall not, without the prior written consent of Lender, incur any Debt other than the Loan and customary trade payables which are payable, and shall be paid, within thirty (30) days of when incurred. Neither Borrower nor any Borrower Party shall incur secondary financing of any kind on the Mortgaged Property without the prior written consent of Lender, including, but not limited to, special financing or special tax assessments for energy-efficient improvements and renewable energy projects relating to the Mortgaged Property.

**Section 6.27** Further Assurances. Borrower and each Borrower Party shall promptly (1) cure any defects in the execution and delivery of the Loan Documents, and (2) execute and deliver, or cause to be executed and delivered, all such other documents, agreements and instruments as Lender may reasonably request to further evidence and more fully describe the Mortgaged Property, to correct any omissions in the Loan Documents, to perfect, protect or preserve any Liens created under any of the Loan Documents, or to make any recordings, file any notices, or obtain any consents as may be necessary or appropriate in connection therewith.

**Section 6.28** Estoppel Certificates. Borrower, within ten (10) days after Lender's request, shall furnish to Lender a written statement, duly acknowledged, setting forth the amount due on the Loan, the terms of payment of the Loan, the date to which interest has been paid, whether any offsets or defenses exist against the Loan and, if any are alleged to exist, the nature thereof in detail, and such other matters as Lender reasonably may request.

**Section 6.29** Notice of Certain Events. Borrower shall promptly notify Lender of (1) any Event of Default together with a detailed statement of the steps being taken to cure such Event of Default; (2) any notice of default received by Borrower under other obligations relating to the Mortgaged Property or otherwise material to Borrower's business; (3) any threatened or pending legal, judicial or regulatory proceedings, including any dispute between Borrower and any governmental authority, affecting Borrower or the Mortgaged Property; and (4) any termination of a Lease affecting the Mortgaged Property prior to the expiration date of said Lease.

**Section 6.30** Indemnification; Fees and Expenses. Borrower shall indemnify, defend and hold Lender harmless from and against any and all losses, liabilities, claims, damages, expenses, obligations, penalties, actions, judgments, suits, costs and disbursements (including reasonable fees and actual out of-pocket fees and expenses of Lender's counsel) of any kind or nature whatsoever, including those arising from the joint, concurrent or comparative negligence of Lender, directly or indirectly in connection with or arising out of the Loan, the Loan Documents, the Indebtedness and/or the Obligations, including, without limitation, (1) any

**EXHIBIT L - Page 31 of 58**

Exhibit A
Page 86

inspection, review or testing of or with respect to the Mortgaged Property, (2) any investigative, administrative, mediation, arbitration, or judicial proceeding, whether or not Lender is designated a party thereto, commenced or threatened at any time (including after the repayment of the Loan) in any way related to the execution, delivery or performance of any Loan Document or to the Mortgaged Property, (3) any proceeding instituted by any Person claiming a Lien, and (4) any brokerage commissions or finder's fees claimed by any broker or other party in connection with the Loan, the Mortgaged Property, or any of the transactions contemplated in the Loan Documents, except to the extent any of the foregoing is caused solely by Lender's gross negligence or willful misconduct. Borrower agrees to indemnify Lender and to hold Lender harmless from and against any and all actions, suits, claims, demands, liabilities, losses, damages, obligations and costs and expenses (including litigation costs and reasonable attorneys' fees and expenses) arising from or in any way connected with the holding or investment of the Reserve Funds. In addition to any other fees payable by Borrower to Lender in connection with the Loan and this Agreement, Borrower shall pay within ten (10) days of request from Lender all reasonable costs or expenses incurred by Lender in connection with collecting, holding and disbursing the Reserve Funds pursuant to this Agreement. Any transfer and/or assignment of the Loan shall not in any way affect or release the indemnification of the Lender or any assignees hereunder.

Section 6.31   Application of Operating Revenues. Borrower shall apply all Rents and other operating revenues to the payment of Debt Service and other payments due under the Loan Documents, taxes, assessments, water charges, sewer rents, and other governmental charges levied, assessed or imposed against the Mortgaged Property, insurance premiums, operations and maintenance charges relating to the Mortgaged Property, and other obligations of the lessor under leases of space at the Mortgaged Property, before using Rents and operating revenues for any other purpose.

Section 6.32   Collection of Rents. Borrower shall not receive or collect any Rents from any of the Leases for a period of more than one (1) month in advance, except last month's rent or a security deposit.

Section 6.33   Separate Tax Lots. Borrower shall not suffer or permit the joint assessment of the Mortgaged Property with any other real property.

Section 6.34   Options. There are no options, purchase contracts or other similar agreements of any type (written or oral) presently affecting any part of the Mortgaged Property.

Section 6.35   Brokerage Agreements. There exists no brokerage agreement with respect to any part of the Mortgaged Property except as set forth on the attached Exhibit C.

Section 6.36   Contracts. Except as otherwise disclosed to Lender in writing prior to the date hereof, (i) there are no contracts presently affecting the Mortgaged Property ("*Contracts*") having a term in excess of one hundred eighty (180) days or not terminable by Borrower (without penalty) on thirty (30) days' notice; (ii) Borrower has heretofore delivered to Lender true and correct copies of each of the Contracts together with all amendments thereto; (iii) Borrower is not in default of any obligations under any of the Contracts; and (iv) the Contracts represent the complete agreement between Borrower and such other parties as to the

**EXHIBIT L - Page 32 of 58**

Exhibit A
Page 87

services to be performed or materials to be provided thereunder and the compensation to be paid for such services or materials, as applicable, and except as otherwise disclosed herein, such other parties possess no unsatisfied claims against Borrower. Borrower is not in default under any of the Contracts and no event has occurred which, with the passing of time or the giving of notice, or both, would constitute a default under any of the Contracts.

**Section 6.37** Leases. Except as set forth on the Lease Certificate attached hereto as Exhibit D and incorporated herein by this reference, there are no occupancy rights (written or oral), Leases or tenancies presently affecting any part of the Mortgaged Property. The Lease Certificate contains a true and correct description of all Leases presently affecting the Mortgaged Property. No written or oral agreements or understandings exist between Borrower and the tenants under the Leases described in the Lease Certificate that grant such tenants any rights greater than those described therein or that are in any way inconsistent with the rights described therein. Borrower shall not enter into, modify, or take any other actions with respect to Leases affecting 10% or more of the net leasable floor area of the Mortgaged Property (a "*Major Lease*"), and shall not agree to terminate or settle with a tenant under any Lease affecting the Mortgaged Property, without the prior written consent of Lender. Borrower shall furnish to Lender proposed lease documentation, including, but not limited to, a copy of the proposed lease agreement or lease amendment (as applicable), current operating statements including operating revenues, operating expenses, and net operating income for Borrower and the Mortgaged Property, a current rent roll for the Mortgaged Property, current comprehensive financial statements of the proposed tenant and, if applicable, any guarantor of the proposed lease, including, but not limited to, a balance sheet, income statement, and statement of cash flows, proposed tenant's business plan, and such other information as Lender shall reasonably request (collectively, the "*Proposed Lease Documentation*"). Unless Lender delivers written notice to Borrower of its disapproval of the proposed action evidenced by the Proposed Lease Documentation, the proposed action shall be deemed approved ten (10) Business Days after Lender's receipt of the Proposed Lease Documentation. With regard to any new lease of all or any portion of the Mortgaged Property entered into after the date of this Agreement, Borrower shall execute and cause to be executed by any such new tenant a non-disturbance and attornment agreement in form acceptable to Lender in its Permitted Discretion.

**Section 6.38** No Construction Prior to Recording of Mortgage. Borrower shall not permit any work or materials to be furnished in connection with the Project until (A) the Loan Documents are fully executed; (B) the Mortgage has been duly recorded and the security interest of Lender in the Mortgaged Property has been duly perfected; and (C) Lender has been provided evidence, satisfactory to Lender, that Borrower has obtained all insurance required under the Mortgage and this Agreement and that Lender's liens on the Mortgaged Property are valid perfected first liens, subject only to such exceptions, if any, acceptable to Lender.

**Section 6.39** Financial Statements.

a. *Borrower's Financials.* So long as all or any portion of the Loan is outstanding, Borrower shall provide to Lender, in addition to any other financial statements required hereunder or under any of the other Loan Documents, the following financial statements and information:

EXHIBIT L - Page 33 of 58

Exhibit A
Page 88

        1) Copies of all tax returns filed by Borrower, within thirty (30) days after the date of filing;

        2) Quarterly operating statements for the Mortgaged Property, accompanied by a current rent roll, within thirty (30) days after the end of each calendar quarter;

        3) Annual balance sheets for the Mortgaged Property and annual financial statements for Borrower (setting forth Borrower's balance sheet, profit and loss statement, and operating statements for the Mortgaged Property) and each Guarantor in connection with the Loan, within ninety (90) days after the end of each calendar year;

        4) For the partial year period commencing on the date hereof, and for each fiscal year thereafter, an Annual Budget not later than sixty (60) days prior to the commencement of such period or fiscal year; and

        5) Such other information with respect to the Mortgaged Property, Borrower, the principals in Borrower, and each Guarantor which may be requested from time to time by Lender in its Permitted Discretion, within thirty (30) days after Lender's request therefor.

Each such tax return, financial statement and rent roll shall be in scope and detail satisfactory to Lender and certified as true, correct and complete by the chief financial representative of Borrower. Upon Lender's request after any default or Event of Default, Borrower shall provide Lender with the foregoing financial statements on such additional frequency as may be requested by Lender. Borrower grants to Lender, and shall cause each guarantor, indemnitor and other person or party associated or connected with the Loan or the Mortgaged Property therefor to grant to Lender, the right to distribute on a confidential basis financial and other information concerning Borrower, each such guarantor, indemnitor and other person or party and the Mortgaged Property encumbered by the Mortgage and other pertinent information with respect to the Loan to any rating agency reviewing the Loan, any investor or senior facility lender of Lender, or any party who has acquired, or who has expressed an interest in acquiring, a participation interest in the Loan or securities issued by Lender or its affiliates relating to the Loan.

        b. *Accounting Principles*. All financial statements shall be prepared in accordance with generally accepted accounting principles, consistently applied from year to year. If the financial statements are prepared on an accrual basis, such statements shall be accompanied by a reconciliation to cash basis accounting principles.

        c. *Other Information*. Borrower shall deliver to Lender such additional information regarding Borrower, its subsidiaries, its business, any Borrower Party and/or the Mortgaged Property within thirty (30) days after Lender's request therefor.

        d. *Audits*. Lender shall have the right to choose and appoint a certified public accountant to perform such financial audits of Borrower's books and records as Lender deems necessary, at Borrower's expense. Borrower shall permit Lender to examine such records, books and papers of Borrower which reflect upon its financial condition and the income and

**EXHIBIT L - Page 34 of 58**

Exhibit A
Page 89

expense relative to the Mortgaged Property. Borrower authorizes Lender to communicate directly with Borrower's independent certified public accountants, and authorizes such accountants to disclose to Lender any and all financial statements and other supporting financial documents and schedules, including copies of any management letter, with respect to the business, financial condition and other affairs of Borrower.

e. *Breach.* If Borrower fails to provide to Lender or its designee any of the financial statements, certificates, reports or information (the ***Required Records***") required by this Section 6.39 within the applicable time periods set forth in this Section 6.39, Borrower shall pay to Lender, at Lender's option and in its discretion, an amount equal to $1,000 for each Required Record that is not delivered within fifteen (15) days after written notice thereof. In addition, if Borrower fails to deliver any Required Records to Lender within the applicable time periods set forth in this Section 6.39, Lender shall have the option, upon fifteen (15) days' notice to Borrower, to gain access to Borrower's books and records and prepare or have prepared at Borrower's expense, any Required Records not delivered by Borrower. In addition, it shall be an Event of Default if any of the following shall occur: (i) any failure of Borrower to provide to Lender any of the Required Records within the applicable time periods set forth in this Section 6.39, if such failure continues for fifteen (15) days after written notice thereof, or (ii) in the event any Required Records shall be materially inaccurate or false, or (iii) in the event of the failure of Borrower to permit Lender or its representatives to inspect said books, records and accounts upon request of Lender as required by this Section 6.39.

**Section 6.40**   Bank Account. Borrower hereby represents and warrants to Lender that it maintains the following bank account as its sole operating and deposit account (other than deposit accounts maintained by the property manager for the Mortgaged Property on which account Borrower's name may appear and for which Borrower has control and/or signing authority): Account No._____ held at Bank of America, N.A. (the ***Deposit Account***"). Borrower hereby expressly grants Lender a security interest in such Deposit Account. Except as provided in the Cash Collateral Agreement, Borrower hereby agrees that all income, rents, revenues, proceeds, profits and other types of deposits generated from the Mortgaged Property will be received from the property manager for the Mortgaged Property in strict compliance with the property management agreement and will be immediately directly deposited into the Deposit Account and no other deposit account. Borrower hereby represents and warrants that it will not close the Deposit Account and, in the event Borrower opens any other deposit account after obtaining Lender's prior written consent, Borrower hereby grants Lender a security interest therein and will execute all necessary documentation to perfect Lender's security interest therein.

**Section 6.41**   Eminent Domain and Condemnation Awards.

a. *Eminent Domain.* As to any taking of the Mortgaged Property by the exercise of power of eminent domain or purchase under threat thereof:

(1) Borrower shall immediately notify Lender of the institution of any proceeding for the condemnation or other taking of the Mortgaged Property or any portion thereof;

EXHIBIT L - Page 35 of 58

Exhibit A
Page 90

(2) Borrower shall notify Lender promptly of all action taken and, to Borrower's knowledge, proposed to be taken with respect thereto;

(3) Borrower shall not exercise or waive any right with respect thereto, without the prior consent of Lender;

(4) Borrower shall not, without Lender's prior consent, (x) agree to any compensation or award, or (y) take any action or fail to take any action which would cause the compensation to be determined;

(5) Lender may participate in all negotiations and appear and participate in all judicial or arbitration proceedings concerning any award or payment that may be due as a result of any such taking and may, in Lender's Permitted Discretion, compromise or settle in the names of both Borrower and Lender, any claim for any eminent domain award or payment, and Borrower will deliver to Lender all instruments necessary or required by Lender to permit such participation; and

(6) Lender shall receive the award of proceeds, which proceeds shall be first applied to reimburse Lender for all costs and expenses, including attorneys' fees incurred by Lender in connection with the ascertainment and collection of such award or payment. The balance of such award, at Lender's sole option, may be applied by Lender to the Indebtedness (including to pay down the principal balance of the Loan whether or not then due, but remitting the balance after such application, if any, to Borrower) and/or to reimburse Borrower for the cost of the repair of the Mortgaged Property pursuant to this Section.

b. *Condemnation Awards.* Borrower assigns all awards and compensation for any condemnation or other taking, or any purchase in lieu thereof, to Lender, and authorizes Lender to collect and receive such awards and compensation and to give proper receipts and acquittances therefor, subject to the terms of the Loan Documents. Borrower, upon request by Lender, shall execute all instruments requested to confirm the assignment of the awards and compensation to Lender, free and clear of all liens, charges or encumbrances. Borrower hereby expressly agrees that Lender shall not be limited to the interest paid on the proceeds of any such awards or compensation, and further agrees to pay to Lender any applicable Prepayment Premium in accordance with the terms of the Loan Documents. The obligations and agreements of Borrower contained in this paragraph shall survive the payment to Lender of any awards or compensation for an appropriation, condemnation or other taking, and shall terminate only upon payment in full by Borrower to Lender of the sums referred to herein.

**Section 6.42** Insurance. Borrower shall maintain or cause to be maintained all insurance required under this Agreement and, not less than fifteen (15) days prior to the expiration date of each required insurance policy, Borrower will deliver to Lender an appropriate renewal policy (or a certified copy thereof), together with evidence satisfactory to Lender that the applicable premium has been prepaid.

a. *Property.* Borrower shall keep the Mortgaged Property insured against damage by fire and the other hazards and casualties covered by a standard extended coverage

EXHIBIT L - Page 36 of 58

Exhibit A
Page 91

property insurance policy with causes of loss – special form coverage (or the then industry equivalent) for the full insurable value thereof, but not less than the Loan Amount, on a replacement cost claim recovery basis (without reduction for depreciation or co-insurance and without any exclusions or reduction of policy limits for acts of terrorism or other specified action/inaction), and shall maintain such other casualty insurance as is reasonably required by Lender from time to time, including, without limitation, earthquake, flood and windstorm.

b. *Liability*. Borrower shall maintain commercial general and excess liability insurance, on an "occurrence policy form" including coverage for claims of bodily injury, disease, death, personal injury, contractual liability and property damage, with a minimum combined single limit of not less than $1,000,000 per occurrence, with an aggregate annual limit of $5,000,000, and shall maintain such other liability insurance or such other limits as is reasonably required by Lender from time to time. If liability coverage for the Mortgaged Property is included under Borrower's blanket policy written on an aggregate form, then the annual aggregate limit of insurance must be at least $10,000,000 or, at Lender's discretion, such other limits as may reasonably be determined to be usual and customary given the use, occupancy and location of the Mortgaged Property, and the number, value, use, type and location of all properties covered under such blanket policy. Borrower shall require all general contractors and subcontractors engaged on the Mortgaged Property to maintain commercial liability insurance, with extension to cover products or completed operations, with limits of not less than $1,000,000 per occurrence. In addition, Borrower will require vendors who will operate independently, or perform services for Borrower on the Mortgaged Property, to maintain commercial general liability coverage (including products or completed operations) with limits of not less than $1,000,000 per occurrence.

c. *Business Interruption and/or Loss of Rents*. Borrower shall maintain rental loss and/or business interruption insurance on an "Actual Loss Sustained" basis or, at Lender's sole option, in amounts sufficient to prevent Lender from being a co-insurer. Such insurance shall be for a period of 12 months in an amount equal to the greater of (A) estimated gross revenues from the operations of the Mortgaged Property over 12 months or (B) the projected operating expenses (including stabilized management fees, applicable reserve deposits, and debt service) for the maintenance and operation of the Mortgaged Property over 12 months. The amount of such rental loss insurance shall be increased from time to time during the Loan Term as and when new Leases and renewal Leases are entered into in accordance with the terms of this Agreement and the Mortgage, to reflect all increased rent and increased additional rent payable by all of the tenants under such Leases.

d. *Law and Ordinance*. If the Mortgaged Property is legally non-conforming under applicable zoning ordinances and codes, Borrower shall maintain ordinance or law coverage in amounts as required by Lender, including, but not limited to, "Demolition" and "Increased Cost of Construction" coverage.

e. *Flood*. Borrower shall keep the Mortgaged Property insured against loss by flood if the Mortgaged Property is located currently or at any time in the future in an area identified by the Federal Emergency Management Agency as an area having special flood hazards and in which flood insurance has been made available under the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973 or the National Flood

EXHIBIT L - Page 37 of 58

Exhibit A
Page 92

**EXHIBIT L - Page 38 of 58**

Insurance Reform Act of 1994 (as such acts may from time to time be amended) in an amount of at least 10% of the loan amount. In addition to such coverage, Borrower shall also maintain an NFIP policy with the maximum limit of coverage available under said acts. Any such flood insurance policy shall be issued in accordance with the requirements and current guidelines of the Federal Insurance Administration.

f. *Earthquake*. If the Mortgaged Property is in (i) Seismic Zone 4 or (ii) Seismic Zone 3, with a scenario expected loss over a 475 year return event ("**SEL 475**") of 20% or more, Borrower shall obtain earthquake insurance including (A) minimum coverage equivalent to the 1.0 x SEL (scenario expected loss) multiplied by the full replacement cost of the Mortgaged Property plus (B) 12 months of business income relating to the Mortgaged Property.

g. *Workers' Compensation and Employers' Liability*. Borrower will maintain workers' compensation and employer's liability insurance, or their equivalent, for all its employees, and will cause any of its agents, contractors and subcontractors of any tier, and vendors to maintain similar insurance for all their respective employees, to the fullest extent required under the laws of the state or country in which the Mortgaged Property is located.

h. *Leases*. Borrower will require on all leases signed after execution of this Agreement that each of its tenant's property insurance policy provide a standard waiver of subrogation clause and each liability policy include Lender as an additional insured.

i. *Form and Quality of Insurance*. All insurance policies shall be endorsed in form and substance acceptable to Lender to name Lender as an additional insured for liability insurance and Lender's loss payable and mortgagee thereunder for property insurance, as its interest may appear, with loss payable to Lender, without contribution, under a standard New York (or local equivalent) mortgagee clause, shall specify the Mortgaged Property as an insured location, and shall contain a standard waiver of subrogation provision. All such insurance policies and endorsements shall be fully paid for, shall be issued by appropriately licensed insurance companies acceptable to Lender with a rating of "A-:IX" or better as established by A.M. Best's Rating Guide, and shall be in such form, and shall contain such provisions, deductibles (with no increased deductible for acts of terrorism or other specified action/inaction) and expiration dates, as are acceptable to Lender. Each policy shall provide that such policy may not be canceled or materially changed except upon thirty (30) days' prior written notice of intention of non-renewal, cancellation or material change to Lender, and that no act or thing done by Borrower shall invalidate any policy as against Lender. For all policies for which the insurer has purchased reinsurance, Borrower shall, at Lender's sole option, request a "cut-through" clause (allowing recovery directly from the reinsurer in the event of the insurer's insolvency or cessation of insurance operations). Blanket policies shall be permitted only if Lender receives appropriate endorsements and/or duplicate policies containing Lender's right to continue coverage on a pro rata pass-through basis, and that coverage will not be affected by any loss on other properties covered by the policies; without limiting the foregoing, any blanket policy, if permitted, shall: (i) specify that the policy has dedicated limits in-line with the amount of the loan or (ii) be in an amount in excess of the loan amount that in Lender's reasonable judgment provides adequate assurance that losses at other locations will not adversely affect the limit for the Mortgaged Property. If Borrower fails to maintain insurance in compliance with this

**EXHIBIT L - Page 38 of 58**

**EXHIBIT L - Page 39 of 58**

Section 6.42, Lender may obtain such insurance and pay the premium therefor, and Borrower shall, on demand, reimburse Lender for all expenses incurred in connection therewith.

      j.  *Assignment of Insurance; Certificates of Insurance.* Borrower shall assign the policies or proofs of insurance to Lender, in such manner and form that Lender and its successors and assigns shall at all times have and hold the same as security for the payment of the Loan. Borrower shall deliver certificates of insurance and copies of all original policies, including renewal certificates of insurance at least five (5) days prior to expiration, certified to Lender by the insurance company or authorized agent as being true copies, together with the endorsements required hereunder. If Borrower elects to obtain any insurance which is not required under this Agreement, all related insurance policies shall be endorsed in compliance with Section 6.42(i), and such additional insurance shall not be canceled without prior notice to Lender. From time to time upon Lender's request, Borrower shall identify to Lender all insurance maintained by Borrower with respect to the Mortgaged Property. The proceeds of insurance policies coming into the possession of Lender shall not be deemed trust funds, and Lender shall be entitled to apply such proceeds as herein provided.

      k.  *Insurance Adjustment.* Borrower shall give immediate written notice of any loss to the insurance carrier and to Lender. Borrower hereby irrevocably authorizes and empowers Lender, as attorney-in-fact for Borrower coupled with an interest, to notify any of Borrower's insurance carriers to add Lender as a Lender's loss payable, mortgagee and additional insured, as the case may be, to any policy maintained by Borrower (regardless of whether such policy is required under this Agreement), to make proof of loss, to adjust and compromise any claim under insurance policies, to appear in and prosecute any action arising from such insurance policies, to collect and receive insurance proceeds, and to deduct therefrom Lender's expenses incurred in the collection of such proceeds; provided, however, nothing contained in this Section 6.42(k) shall require Lender to incur any expense or take any action hereunder.

      l.  *Additional Insurance.* Borrower shall not maintain any separate or additional insurance which is contributing in the event of loss unless it is properly endorsed and otherwise satisfactory to Lender in all respects. The proceeds of insurance paid on account of any damage or destruction to the Mortgaged Property shall be paid to Lender to be applied as provided in Section 6.42(o).

      m.  *Other Insurance.* The types and limits of coverage stipulated herein are the minimum insurance requirements. Lender retains the right to make any changes it deems necessary. Borrower shall also maintain all insurance, surety and fidelity bonds that Borrower is required to maintain as landlord under tenants' leases, if any. Borrower shall also maintain any other insurance and bonds, even if not specifically required herein, in amounts, and for such periods that are deemed to be prudent, or are customarily maintained by persons or entities operating properties of like kind, construction and occupancy in the locality of the Mortgaged Property, or as Lender may from time to time require and approve. Compliance with insurance requirements will not in itself be construed to be a limitation of Borrower's liability.

      n.  *Assignment of Insurance Proceeds.* Borrower assigns to Lender all proceeds of any insurance policies in excess of $50,000.00, insuring against loss or damage to

**EXHIBIT L - Page 39 of 58**

the Mortgaged Property. Borrower authorizes Lender to collect and receive such proceeds, and authorizes and directs the issuer of each of such insurance policies to make payment for all such losses directly to Lender as the sole loss payee, instead of to Borrower and Lender jointly.

o. *Use and Application of Insurance Proceeds.* With respect to any insurance proceeds retained by Borrower which amount shall not exceed $50,000.00, Borrower shall apply the insurance proceeds to the cost of restoration of the Mortgaged Property. With respect to any insurance proceeds in excess of $50,000.00, and so long as no Event of Default shall have occurred and be then continuing, Lender shall apply the insurance proceeds to the cost of restoration of the Mortgaged Property; provided, however, if, any one of the following occurs following the occurrence of such casualty, (1) damage to the Mortgaged Property exceeds 30% of the fair market value of the Mortgaged Property immediately prior to such casualty, (2) 30% or more of the rentable square feet of the Mortgaged Property is untenantable, (3) the Mortgaged Property cannot be fully restored prior to expiration of rental loss and/or business interruption insurance in effect, (4) the Mortgaged Property cannot be fully restored prior to July 1, 2028, (5) the fair market value of the Mortgaged Property following restoration will be less than the fair market value of the Mortgaged Property immediately prior to the occurrence of the casualty, (6) Leases relating to 65% or more of the rentable square feet of the Mortgaged Property will not remain in full force and effect following completion of such restoration, (7) the estimated cost of such restoration exceeds $250,000.00, or (8) the estimated cost of restoration exceeds, in Lender's reasonable judgment, the amount of insurance proceeds received, then Lender shall apply all or a portion of the insurance proceeds (i) to the cost of restoration of the Mortgaged Property or (ii) to the repayment of the Loan, as Lender shall determine in its sole discretion. Insurance proceeds applied to restoration will be disbursed on receipt of satisfactory plans and specifications, contracts and subcontracts, schedules, budgets, lien waivers and architects' certificates, and otherwise in accordance with prudent commercial construction lending practices for construction loan advances. Any insurance proceeds remaining after payment of all restoration costs shall be applied by Lender to the Loan balance or, at Lender's sole option, remitted to Borrower. Lender has no obligation to see to the proper application of any insurance proceeds paid over to Borrower, nor will any such proceeds received by Lender bear interest or be subject to any other charge for Borrower's benefit.

p. *Insurance in Full Force and Effect.* All insurance policies held by Borrower relating to or affecting the Mortgaged Property are in full force and effect and shall remain in full force and effect until the Indebtedness is fully satisfied. Borrower has not received any notice of default or notice terminating or threatening to terminate any such insurance policies. Borrower has made or will make application for renewals of any of such insurance policies prior to the expiration thereof.

**Section 6.43**   Environmental Matters.  All representations, warranties, covenants and indemnities relating to environmental matters set forth in the Indemnity are incorporated into this Agreement by reference thereto as if set forth in full herein.

**Section 6.44**   Rollover Improvements and Capital Expenditures. With regard to any Project, Borrower further represents, warrants and covenants to Lender as follows:

**EXHIBIT L - Page 40 of 58**

Exhibit A
Page 95

**EXHIBIT L - Page 41 of 58**

a.     *Project Costs.* The Project costs are true and accurate estimates of the costs necessary to complete the Rollover Improvements or Capital Expenditures, as applicable, in a good and workmanlike manner according to the Plans and Specifications presented by Borrower to Lender, and Borrower shall take all steps necessary to prevent the actual cost of the Rollover Improvements or Capital Expenditures, as applicable, from exceeding the Project costs.

b.     *Compliance with Governing Authorities.* Borrower has examined and is familiar with all the easements, covenants, conditions, restrictions, reservations, building laws, regulations, zoning ordinances, and federal, state, and local requirements affecting the Project. The Project will at all times and in all respects conform to and comply with the requirements of such easements, covenants, conditions, restrictions, reservations, building laws, regulations, zoning ordinances, and federal, state, and local requirements.

c.     *Insurance Reports.* Borrower shall furnish to Lender, upon Lender's request, reports on each existing insurance policy required pursuant to this Agreement and the Mortgage, showing such information as Lender may reasonably request, including, without limitation, the following: (i) the name of the insurer, (ii) the risks insured, (iii) the amount of the policy; (iv) the properties insured; (v) the then current property values on the basis of which insurance has been obtained, and the manner of determining those values; and (vi) the expiration date of the policy.

d.     *Construction of the Project.* Borrower shall cause the Rollover Improvements or Capital Expenditures, as applicable, to be constructed and equipped in a diligent and orderly manner and in strict accordance with the Plans and Specifications approved by Lender, the Construction Contract, and all applicable laws, ordinances, codes, regulations, and rights of adjoining or concurrent property owners.

e.     *Defects.* Upon demand by Lender, Borrower shall promptly correct any defect in the Rollover Improvements or Capital Expenditures, as applicable, or any departure from the Plans and Specifications not approved by Lender in writing before further work shall be done upon the portion of the Improvements affected.

f.     *Project Claims and Litigation.* Borrower shall promptly inform Lender of (a) all material adverse changes in the financial condition of Contractor; (b) any litigation and claims, actual or threatened, affecting the Project or Contractor, which could materially affect the successful completion of the Project or the ability of Contractor to complete the Project as agreed; (c) any condition or event which constitutes an Event of Default; and (d) any condition or event which constitutes a breach or default under any Project Documents related to the Project.

g.     *Payment of Claims and Removal of Liens.* Borrower shall (a) cause all claims for labor done and materials and services furnished in connection with the Rollover Improvements or Capital Expenditures, as applicable, to be fully paid and discharged in a timely manner, (b) diligently file or procure the filing of a valid notice of completion of the Rollover Improvements or Capital Expenditures, as applicable, or such comparable document as may be permitted under applicable lien laws, (c) diligently file or procure the filing of a notice of cessation, or such comparable document as may be permitted under applicable lien laws, upon

**EXHIBIT L - Page 41 of 58**

Exhibit A
Page 96

the happening of cessation of labor on the Rollover Improvements or Capital Expenditures, as applicable, for a continuous period of thirty (30) days or more (absent Force Majeure), and (d) cause all claims of liens against the Mortgaged Property or any part thereof, or any rights or interests appurtenant to the Mortgaged Property to be removed within sixty (60) days after the recording of such claims of liens. Upon Lender's request, Borrower shall make such demands or claims upon or against contractors, laborers, materialmen, subcontractors, or other persons who have furnished or claim to have furnished labor, services, or materials in connection with the Rollover Improvements or Capital Expenditures, as applicable, which demands or claims shall under the laws of the State of Nevada require diligent assertions of lien claims upon penalty of loss or waiver thereof. Borrower shall, within ten (10) days after the filing of any claim of lien that is disputed or contested by Borrower, provide Lender with a surety bond issued by a surety acceptable to Lender sufficient to release the claim of lien or deposit with Lender an amount satisfactory to Lender for the possibility that the contest will be unsuccessful. If Borrower fails to remove any lien on the Mortgaged Property within sixty (60) days after the recording thereof or provide a bond or deposit pursuant to this provision, Lender may pay such lien, or may contest the validity of the lien, and Borrower shall pay all costs and expenses of such contest, including Lender's reasonable attorneys' fees.

**Section 6.45** Excess Cash Reserve Funds.

**(a)** Deposits to Lockbox Account. Upon the first occurrence of a Reduced Performance Period, all Gross Income from Operations shall be deposited in the Lockbox Account in accordance with the terms of the Cash Collateral Agreement and all such amounts will be disbursed pursuant to the terms and conditions of the Cash Collateral Agreement.

**(b)** Release of Funds in Lockbox Account. At such time as any Reduced Performance Period shall end, Cash Flow (as defined in the Cash Collateral Agreement) and any funds in the Excess Cash Reserve (as defined in the Cash Collateral Agreement) shall be disbursed in accordance with Section 4(a)(i) of the Cash Collateral Agreement; provided, however, in connection with a Reduced Performance Period occurring as a result of the DSCR dropping below 65% of the Initial DSCR or below 1.15:1, Cash Flow held in the Lockbox Account as a result of such Reduced Performance Period shall continue to be disbursed in accordance with Section 4(a)(ii) of the Cash Collateral Agreement following the end of such Reduced Performance Period and shall not be disbursed in accordance with Section 4(a)(i) of the Cash Collateral Agreement until the DSCR meets or exceeds the Initial DSCR. Any undisbursed Cash Flow remaining in the Lockbox Account after payment in full of the Loan will be returned to Borrower.

**Section 6.46** Survival of Representations, Warranties and Covenants. Borrower understands and agrees that in extending the Loan and approving any Disbursements during the Loan Term, Lender is relying on all representations, warranties, and covenants made by Borrower in this Agreement, the Mortgage, or in any certificate or other instrument delivered by Borrower to Lender under this Agreement or the Loan Documents. Borrower further agrees that regardless of any investigation made by Lender, all such representations, warranties and covenants will survive during the Loan Term and delivery to Lender of the Loan Documents shall be continuing in nature and shall remain in full force and effect until such time as the

**EXHIBIT L - Page 42 of 58**

Exhibit A
Page 97

Indebtedness shall be paid in full, or until this Agreement shall be terminated in the manner provided above, whichever is the last to occur.

ARTICLE 7
EVENT OF DEFAULT; REMEDIES

**Section 7.1    Event of Default**. Each of the following shall constitute an *"Event of Default"* under the Note, this Agreement, the Mortgage, and all Loan Documents:

**(a)**    *Payments*. Borrower's failure to pay any regularly scheduled installment of principal, interest or other amount when due under the Note or any other Loan Document.

**(b)**    *Insurance*. Borrower's failure to maintain insurance as required under Section 6.42 of this Agreement or if, upon application by Lender to two (2) or more fire insurance companies which are lawfully doing business in the state in which the Mortgaged Property is located and which are issuing policies of fire insurance upon buildings situated within the area wherein the Mortgaged Property is situated, such companies shall refuse to issue such policies.

**(c)**    *Payment of Impositions*. Borrower's failure to pay when due and in any event before any penalty or interest attaches, all taxes, installments of assessments, governmental charges, water charges, sewer charges and other fees, taxes, charges and assessments of every kind and nature whatsoever assessed or charged against or constituting a lien on the Mortgaged Property or any interest therein or accruing by reason of the operation of the Mortgaged Property by Borrower, including sales, use, employment and other taxes based on such operations (the "*Impositions*"). In the event of a court decree or an enactment after the date hereof by any legislative authority of any law imposing upon Lender the payment of the whole or any part of the Impositions herein required to be paid by Borrower, or changing in any way the laws relating to the taxation of the Mortgage or the Indebtedness secured by the Mortgage or Lender's interest in the Mortgaged Property, so as to impose such Imposition on Lender or on the interest of Lender in the Mortgaged Property, then, in any such event, Borrower's failure to bear and pay the full amount of such Impositions when due and in any event before any penalty or interest attaches shall constitute an Event of Default hereunder; provided, however, that if for any reason payment by Borrower of any such Imposition would be unlawful, or if the payment thereof would constitute usury or render the Indebtedness secured hereby wholly or partially usurious, Lender, at its option, may declare the whole sum secured by the Mortgage with interest thereon to be immediately due and payable including payment of any applicable Prepayment Premium in accordance with the terms hereof, or Lender, at its option, may pay that amount or portion of such Imposition as renders the Indebtedness unlawful or usurious, in which event Borrower shall concurrently therewith pay the remaining lawful and non usurious portion or balance of said Imposition.

**(d)**    *Transfer*. Any Transfer occurs in violation of Section 6.24 hereof.

**(e)**    *Covenants*. Borrower's or any Borrower Party's failure to perform, observe or comply with any of the agreements, covenants or provisions contained in this Agreement or in any of the other Loan Documents (other than those agreements, covenants and

EXHIBIT L - Page 43 of 58

Exhibit A
Page 98

provisions constituting an Event of Default referred to elsewhere in this Article 7), and the continuance of such failure for thirty (30) days after notice by Lender to Borrower; provided, however, subject to any shorter period for curing any failure by Borrower as specified in any of the other Loan Documents, Borrower shall have an additional thirty (30) days to cure such failure if (1) such failure does not involve the failure to make payments on a monetary obligation; (2) such failure is curable but cannot reasonably be cured within thirty (30) days; (3) Borrower is diligently undertaking to cure such default, and (4) Borrower has provided Lender with security reasonably satisfactory to Lender against any interruption of payment or impairment of the Mortgaged Property as a result of such continuing failure. The notice and cure provisions of this Section 7.1(e) do not apply to the other Events of Default described in this Article 7.

(f)     *Representations and Warranties.* Any representation or warranty made in any Loan Document proves to be untrue or misleading in any material respect when made or deemed made.

(g)     *Other Encumbrances.* The occurrence of any default under any document or instrument, other than the Loan Documents, evidencing or creating a Lien on the Mortgaged Property or any part thereof.

(h)     *Involuntary Bankruptcy or Other Proceeding.* Commencement of an involuntary case or other proceeding against Borrower, any Borrower Party or any other Person having an ownership in the Mortgaged Property (each, a "***Bankruptcy Party***") which seeks liquidation, reorganization or other relief with respect to it or its debts or other liabilities under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeks the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any of its property, and such involuntary case or other proceeding shall remain undismissed or unstayed for a period of sixty (60) days; or an order for relief against a Bankruptcy Party shall be entered in any such case under the Federal Bankruptcy Code.

(i)     *Voluntary Petitions, Etc.* Commencement by a Bankruptcy Party of a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its Debt or other liabilities under any bankruptcy, insolvency or other similar law or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official for it or any of its property, or consent by a Bankruptcy Party to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it, or the making by a Bankruptcy Party of a general assignment for the benefit of creditors, or the failure by a Bankruptcy Party, or the admission by a Bankruptcy Party in writing of its inability to pay its debts generally as they become due, or any action by a Bankruptcy Party to authorize or effect any of the foregoing.

(j)     *Other Insolvency.* The occurrence of any of the following: (1) if Borrower becomes insolvent; (2) if Borrower generally does not pay its debts as they become due; (3) if Borrower makes an assignment for the benefit of creditors; (4) if Borrower or its agents contacts any creditor to advise of Borrower's inability to pay its debts as they become due; or (5) if Borrower calls or causes to be called a meeting of creditors for the composition of debts.

EXHIBIT L - Page 44 of 58

Exhibit A
Page 99

(k)   *Judgments.* Any judgment shall be obtained against Borrower which, together with all other outstanding unsatisfied judgments against Borrower, shall exceed the sum of $200,000.00 and shall remain unvacated, unbonded or unstayed for a period of thirty (30) days following the date of entry thereof.

(l)   *Other Defaults.* The occurrence of any default by Borrower under any other document or instrument evidencing or securing any other indebtedness incurred or owing by Borrower.

(m)   *Death or Dissolution of Guarantor.* The death or liquidation, termination or dissolution of any Guarantor, unless Lender is provided with additional collateral or a replacement guarantor that is reasonably acceptable to Lender within sixty (60) days after such death or dissolution.

(n)   *Dissolution of Borrower and Controlling Persons.* The liquidation, termination or dissolution of Borrower and any Controlling Person.

**Section 7.2      Remedies.** If an Event of Default (as defined in this Agreement) exists, Lender may, at Lender's election, exercise any or all remedies available at law or in equity, including, but not limited to, the following rights, remedies and recourses:

(a)   **Insolvency Events.** Upon the occurrence of any Event of Default described in Section 7.1(h), 7.1(i) or 7.1(j), the obligations of Lender to make Disbursements hereunder, if any, shall immediately terminate, and all amounts due under the Loan Documents immediately shall become due and payable, all without written notice and without presentment, demand, protest, notice of protest or dishonor, notice of intent to accelerate the maturity thereof, notice of acceleration of the maturity thereof, or any other notice of default of any kind, all of which are hereby expressly waived by Borrower; however, if the Bankruptcy Party under any of the foregoing specified sections is other than Borrower, then all amounts due under the Loan Documents shall become immediately due and payable at Lender's election, in Lender's sole discretion.

(b)   **Acceleration.** Declare the Indebtedness to be immediately due and payable, without further notice, presentment, protest, notice of intent to accelerate, notice of acceleration, demand or action of any nature whatsoever (each of which hereby is expressly waived by Borrower), whereupon the same shall become immediately due and payable.

(c)   **Setoff.** Setoff against and/or use the funds in the Account (or any portion thereof) for any purpose, including, without limitation (i) payment of any Indebtedness secured by the Note, this Agreement and any other Loan Documents, including, without limitation, principal prepayments and the Prepayment Premium applicable to such prepayment (as applicable); (ii) reimbursement of Lender for all losses and expenses (including, without limitation, reasonable legal fees and disbursements) suffered or incurred by Lender as a result of such default; or (iii) payment of any amount expended in exercising all rights and remedies available to Lender at law or in equity or under this Agreement or under the Loan Documents. Borrower consents to such actions by Lender without any further instructions or consents from Borrower. Borrower consents to, authorizes, and directs Lender to comply with any "entitlement

EXHIBIT L - Page 45 of 58

Exhibit A
Page 100

orders" within the meaning of Section 8-102(a)(8) of the UCC regarding any funds held in the Account, without any further action or consent by Borrower; provided, however, that a setoff by Lender or use of any funds in the Account by Lender shall not, under any circumstances, be deemed a cure of an Event of Default, and, after the occurrence of an Event of Default and a setoff by Lender or use of the funds in the Account by Lender, Borrower shall continue to be in default and Lender shall be entitled to exercise all rights and remedies available to Lender upon the occurrence of such Event of Default. Nothing in this Agreement or the other Loan Documents shall obligate Lender to apply all or any portion of the funds in the Account on account of any default by Borrower or to repayment of the Indebtedness secured by the Loan Documents or in any specific order of priority.

(d)  **Cessation of Disbursements.** Lender shall have no obligation to make any Disbursements or to disburse Loan proceeds under this Agreement or under any other Loan Documents.

(e)  **Completion of Improvements by Lender.** Lender has the right to take possession of the Mortgaged Property during any period of time that an Event of Default exists. In addition, Lender may take any and all actions necessary in its judgment to complete or cause to be completed the construction of the Rollover Improvements or Capital Expenditures, as applicable, including, but not limited to, making changes in the Plans and Specifications, work, or materials and entering into, modifying or terminating any Project Documents, subject to Lender's right at any time to discontinue any work without liability. If Lender elects to complete the Rollover Improvements or Capital Expenditures, as applicable, it will not assume any liability to Borrower or to any other Person for completing the Rollover Improvements or Capital Expenditures, as applicable, or for the manner or quality of construction of the Rollover Improvements or Capital Expenditures, as applicable, and Borrower expressly waives any such liability. Borrower irrevocably appoints Lender as its attorney-in-fact, with full power of substitution, to complete the Rollover Improvements or Capital Expenditures, as applicable, at Lender's option, either in Borrower's name or in its own name. In any event, all sums expended by Lender in completing construction of the Rollover Improvements or Capital Expenditures, as applicable, will be considered to have been disbursed to Borrower and will be secured by the Mortgaged Property. Any such sums that cause the principal amount of the Loan to exceed the face amount of the Note will be considered to be an additional Loan to Borrower, bearing interest at the rate set forth in the Note and being secured by the Mortgaged Property. For these purposes, Borrower assigns to Lender all of its right, title and interest in and to the Project Documents; provided, however, Lender will not have any obligation under the Project Documents unless Lender expressly hereafter agrees in writing to assume such obligations. Upon the occurrence of an Event of Default, Lender will have the right to exercise any rights of Borrower under the Project Documents.

(f)  **Other.** Exercise all other rights, remedies and recourses granted under the Mortgage or any other Loan Documents or otherwise available at law or in equity (including an action for specific performance of any covenant contained in the Loan Documents, or obtaining a judgment on the Note either before, during or after any proceeding to enforce this Agreement).

Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement or by any other writing, shall be cumulative and may be exercised

EXHIBIT L - Page 46 of 58

Exhibit A
Page 101

singularly or concurrently, and in such sequence or combination as Lender may determine in Lender's sole discretion.

## ARTICLE 8
## RECOURSE OBLIGATIONS

**Section 8.1**       Except as provided below in this Section 8.1, the liability of Borrower under the Loan Documents shall be limited to the interest of Borrower in the Mortgaged Property. Lender may bring a foreclosure action, an action for specific performance, or any other appropriate action or proceeding to enable the Lender to enforce and realize upon its interest under the Note, this Agreement and the other Loan Documents, or in the Mortgaged Property or any other collateral given to Lender pursuant to the Loan Documents; provided, however, that except as specifically provided herein, any judgment in any such action or proceeding shall not sue for, seek or demand a deficiency judgment against Borrower. The provisions of this Section 8.1 shall not, however, (a) constitute a waiver, release or impairment of any obligation evidenced or secured by any of the Loan Documents; (b) impair the right of Lender to name Borrower as a party defendant in any action or suit for foreclosure and sale under the Mortgage; (c) affect the validity or enforceability of any of the Loan Documents or any guaranty made in connection with the Loan or any of the rights and remedies of Lender thereunder, or impair the right of Lender to recover under any guaranty made in connection with the Loan, or impair the right of Lender to pursue any personal liability of Borrower and any Guarantor under the Indemnity; (d) impair the right of Lender to obtain the appointment of a receiver; (e) impair the enforcement of the assignment of Leases; (f) constitute a prohibition against Lender to seek a deficiency judgment against Borrower in order to fully realize the security granted by the Mortgage or to commence any other appropriate action or proceeding in order for Lender to exercise its remedies against the Mortgaged Property; or (g) constitute a waiver of the right of Lender to enforce the liability and obligation of Borrower, by money judgment or otherwise, to the extent of any loss, damage, cost, expense, liability, claim or other obligation incurred by Lender (including attorneys' fees and costs reasonably incurred) arising out of or in connection with the following (all such liability and obligation of Borrower for any or all of the following being referred to herein as "*Borrower's Recourse Liabilities*"):

(1)       the breach of any representation, warranty, covenant or indemnification provision in the Indemnity or in any other Loan Document concerning environmental laws, hazardous substances and/or asbestos and any indemnification of Lender with respect thereto in either document;

(2)       the breach of any representation, warranty or covenant in Section 6.15, Section 6.21 or Section 6.23 of this Agreement;

(3)       Borrower's commission of a criminal act other than a criminal act resulting in forfeiture of the Mortgaged Property, which constitutes a Springing Recourse Event;

(4)       any physical waste at the Mortgaged Property;

(5)       the misapplication, misappropriation or conversion by or on behalf of Borrower of (A) any insurance proceeds paid by reason of any loss, damage or destruction to

**EXHIBIT L - Page 47 of 58**

Exhibit A
Page 102

**EXHIBIT L - Page 48 of 58**

the Mortgaged Property, (B) any awards or other amounts received in connection with the condemnation of all or a portion of the Mortgaged Property, or (C) any Rents, security deposits, advance deposits or any other deposits and lease termination payments; for the purposes of the foregoing, and for the avoidance of doubt, misapplication shall include the failure to pay insurance proceeds or any eminent domain awards or Rents, security deposits, advance deposits or any other deposits, lease termination payments, and/or Cash Flow to Lender or to the Account to the extent required by this Agreement, the Cash Collateral Agreement or any other Loan Document;

(6)     failure to pay charges for labor or materials or other charges that can create Liens on any portion of the Mortgaged Property;

(7)     any security deposits, advance deposits or any other deposits collected with respect to the Mortgaged Property which are not delivered to Lender in accordance with the provisions of the Loan Documents or, to the extent not required to be delivered to Lender, are not applied in accordance with applicable leases;

(8)     the failure to pay real and personal property taxes to the extent that sufficient cash flow was available at that time from the Mortgaged Property to pay such real and personal property taxes;

(9)     failure to obtain and maintain all insurance required under the Loan Documents to the extent that sufficient cash flow was available at that time from the Mortgaged Property to pay the Insurance Premiums relating thereto;

(10)     the failure to provide financial information in the timeframes required by the terms and provisions of this Agreement and the Mortgage;

(11)     the failure to pay taxes, assessments and/or utility charges affecting the Mortgaged Property (whether or not the same have been billed to Borrower);

(12)     the failure to maintain the insurance required under the terms of this Agreement and any other Loan Document and/or to pay any deductible under any such insurance;

(13)     the failure of Borrower to fulfill the obligations of Borrower, as lessor, under any leases affecting the Mortgaged Property; and

(14)     any execution, amendment, modification, assignment or termination of any lease to any tenant that leases, together with its affiliates, an aggregate of 10% or more rentable square feet at the Mortgaged Property or execution of or subsequent amendment, modification, assignment or termination of any lease for any space currently occupied by any such tenant without Lender's prior written consent.

Borrower also shall be personally liable to Lender for any and all attorneys' fees and expenses and court costs incurred by Lender in enforcing this Section 8.1 or otherwise incurred by Lender in connection with any of the foregoing matters, regardless of whether such matters are legal or equitable in nature or arise under tort or contract law.

**EXHIBIT L - Page 48 of 58**

Notwithstanding anything to the contrary in this Agreement or any of the other Loan Documents, (A) Lender shall not be deemed to have waived any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other provisions of the Bankruptcy Code to file a claim for the full amount of the Obligations or to require that all collateral shall continue to secure all of the Obligations owing to Lender in accordance with the Loan Documents, and (B) the Obligations shall be fully recourse to Borrower in the event that any of the following occur (each, a "*Springing Recourse Event*"): (i) Borrower obtains any subordinate financing secured by the Mortgaged Property or other voluntary Liens encumbering the Mortgaged Property; (ii) Borrower fails to obtain Lender's prior consent to any Transfer in violation of the Loan Documents; (iii) Borrower files a voluntary petition under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law; (iv) the filing of an involuntary petition against Borrower and/or under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law by any other Person in which Borrower and/or Guarantor colludes with or otherwise assists such Person, and/or Borrower and/or Guarantor solicits or causes to be solicited petitioning creditors for any involuntary petition against Borrower by any Person and/or Borrower and/or Guarantor consents to such involuntary petition; (v) Borrower and/or Guarantor files an answer consenting to, or otherwise acquiescing in, or joining in, any involuntary petition filed against it by any other Person under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law; (vi) Borrower or any Affiliate, officer, director or representative which controls Borrower consents to, or acquiesces in, or joins in, an application for the appointment of a custodian, receiver (other than a receiver in a mortgage foreclosure action under the Mortgage), trustee or examiner for Borrower or any portion of the Mortgaged Property, or a receiver, trustee or liquidator is appointed (other than by Lender) with respect to Borrower or the Mortgaged Property or any part thereof; (vii) Borrower and/or Guarantor makes an assignment for the benefit of creditors or admits, in writing or in any legal proceeding, its insolvency or inability to pay its debts as they become due; (viii) upon the occurrence of an Event of Default which results in Lender accelerating the Indebtedness, after any applicable notice or cure periods, and exercising its remedies against the Mortgaged Property, Borrower and/or any Borrower Party intentionally interferes with or hinders solely for the sake of delay Lender's exercise of its remedies under the Mortgage, or Borrower Transfers (as defined in the Mortgage), removes, disposes or converts the Mortgaged Property; (ix) any fraud, gross negligence, willful misconduct, willful misrepresentation or failure to disclose a material fact by or on behalf of Borrower, Guarantor, or any Borrower Party, or any of their respective agents or representatives in connection with the Loan, including by reason of any claim under the Racketeer Influenced and Corrupt Organizations Act ("*RICO*"); (x) wrongful removal or destruction of any portion of the Mortgaged Property or damage to the Mortgaged Property caused by willful misconduct or gross negligence; or (xi) forfeiture of all or any portion of the Mortgaged Property due to criminal activity.

Section 8.2    No obligation or liability shall be personally binding upon, nor shall resort for the enforcement thereof be had to, the property of any of Borrower's shareholders, members, directors, officers, employees, attorneys or agents, regardless of whether such obligation or liability is in the nature of contract, tort or otherwise.

EXHIBIT L - Page 49 of 58

Exhibit A
Page 104

**EXHIBIT L - Page 50 of 58**

### ARTICLE 9
### MISCELLANEOUS

**Section 9.1** <u>Notices</u>. Any notice required or permitted to be given under any Loan Document shall be in writing and either shall be mailed by certified mail, postage prepaid, return receipt requested, or sent by overnight air courier service, or personally delivered to a representative of the receiving party. All such notices shall be mailed, sent or delivered, addressed to the party for whom it is intended, at its address set forth below.

If to Borrower (debtor):

> Cheyenne LV Capital, LLC
> Attn: Tony Baihaghy
> 7343 E. Fuerte Street
> Carlsbad, California 92009
> Telephone:_____

If to Lender (secured party):

> A10 Capital, LLC
> Attn: Jacqueline C. Cox, EVP
> 800 W. Main Street, Suite 1100
> Boise, Idaho 83702
> Telephone: (208) 577-5000

With a copy to:

> Perkins Coie LLP
> Attn: Stephen C. Hardesty
> 1111 West Jefferson Street, Suite 500
> Boise, Idaho 83702-5391
> Telephone: (208) 343-3434

Any notice so addressed and sent by United States mail or overnight courier shall be deemed to be given on the earliest of (1) when actually delivered, (2) on the first Business Day after deposit with an overnight air courier service, or (3) on the third Business Day after deposit in the United States mail, postage prepaid, in each case to the address of the intended addressee. Any notice so delivered in person shall be deemed to be given when receipted for by, or actually received by Lender or Borrower, as the case may be. No notice hereunder shall be effective if sent or delivered only by electronic means. Either party may designate a change of address by written notice to the other by giving at least ten (10) days prior written notice of such change of address.

**Section 9.2** <u>Final Expression; Amendments and Waivers; References</u>. This Agreement and the other Loan Documents are final expressions of the agreement between Borrower and Lender and may not be contradicted by evidence of any alleged oral agreement. No amendment or waiver of any provision of this Agreement shall be effective unless in writing and signed by

**EXHIBIT L - Page 50 of 58**

the party against whom enforcement is sought. This Agreement and the other Loan Documents shall not be executed, entered into, altered, amended or modified by electronic means. Any reference to a Loan Document, whether in this Agreement or in any other Loan Document, shall be deemed to be a reference to such Loan Document as it may hereafter from time to time be amended, modified, supplemented and restated in accordance with the terms hereof.

Section 9.3    Attorneys' Fees; Expenses. Borrower agrees to pay upon demand all of Lender's reasonable costs and expenses, including Lender's attorneys' fees and legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Borrower shall pay the reasonable costs and expenses (i) in connection with each Disbursement and (ii) with any enforcement of this Agreement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Borrower also shall pay all court costs and such additional fees as may be directed by the court.

Section 9.4    Authority to File Notices. Borrower appoints and designates Lender as its attorney-in-fact to file for record any notice that Lender deems necessary to protect its interest under this Agreement. This power shall be deemed coupled with an interest and shall be irrevocable while any sum or performance remains due and owing under any of the Loan Documents.

Section 9.5    Caption Headings. The article and section titles set forth in this Agreement are inserted for convenience of reference only and shall in no way alter, modify or define, or be used in construing, the text of such articles or sections.

Section 9.6    Governing Law. This Agreement and all other Loan Documents are being executed and delivered, and are intended to be performed, in the State of Nevada, and the laws of the State of Nevada shall govern the rights and duties of the parties hereto and the validity, construction, enforcement and interpretation of this Agreement and the Loan Documents (without giving effect to principles of conflicts of law), except to the extent otherwise specified in this Agreement or any of the Loan Documents.

Section 9.7    No Waiver by Lender. Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Borrower, shall constitute a waiver of any of Lender's rights or of any of Borrower's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the Permitted Discretion of Lender.

EXHIBIT L - Page 51 of 58

Exhibit A
Page 106

Section 9.8    Severability. If any provision of this Agreement is held to be illegal, invalid or unenforceable, such provision shall be fully severable; this Agreement shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part thereof; the remaining provisions thereof shall remain in full effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance therefrom; and in lieu of such illegal, invalid or unenforceable provision, there shall be added automatically as a part of this Agreement a provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible to be legal, valid and enforceable.

Section 9.9    Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of Lender and Borrower and their respective successors and assigns. Borrower shall not, without the prior written consent of Lender, assign any rights, duties or obligations hereunder.

Section 9.10    Time is of the Essence. Time is of the essence in the performance of this Agreement.

Section 9.11    Counterparts. This Agreement may be executed in one or more counterparts, each of which shall for all purposes be deemed to be one and the same Agreement. Only one such counterpart need be produced to evidence the existence of this Agreement.

Section 9.12    Jury Waiver. TO THE MAXIMUM EXTENT PERMITTED BY LAW, BORROWER AND LENDER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENT (WHETHER VERBAL OR WRITTEN) OR ACTION OF EITHER PARTY OR ANY EXERCISE BY ANY PARTY OF THEIR RESPECTIVE RIGHTS UNDER THE LOAN DOCUMENTS OR IN ANY WAY RELATING TO THE LOAN OR THE MORTGAGED PROPERTY (INCLUDING, WITHOUT LIMITATION, ANY ACTION TO RESCIND OR CANCEL THE NOTE, THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, AND ANY CLAIM OR DEFENSE ASSERTING THAT THE NOTE, THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT WAS FRAUDULENTLY INDUCED OR IS OTHERWISE VOID OR VOIDABLE). THIS WAIVER IS A MATERIAL INDUCEMENT FOR LENDER TO ENTER INTO THE NOTE, THIS AGREEMENT AND THE LOAN DOCUMENTS.

Section 9.13    Acceptance of Cures for Events of Default. Notwithstanding anything to the contrary contained in this Agreement or the other Loan Documents, Lender shall in no event or under any circumstance be obligated or required to accept a cure by Borrower or by any other person of an Event of Default, after the expiration of any cure period granted to Borrower pursuant to the Loan Documents, unless Lender agrees to do so in the exercise of its sole and absolute discretion, it being agreed that once an Event of Default has occurred, Lender shall be absolutely and unconditionally entitled to pursue all rights and remedies available to it under the Loan Documents or otherwise at law or in equity.

[The remainder of this page is intentionally left blank.]

**EXHIBIT L - Page 52 of 58**

EXHIBIT L - Page 53 of 58

BORROWER ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS AGREEMENT AND BORROWER AGREES TO ITS TERMS. THIS AGREEMENT IS DATED AS OF THE DATE FIRST WRITTEN ABOVE.

**BORROWER:**

**Cheyenne LV Capital, LLC,**
a Nevada limited liability company
By:  E-Z Living, LLC,
       a California limited liability company
       its Sole Member

By: _____
       Tony Baihaghy
       Chief Executive Manager

**LENDER:**

**A10 Capital, LLC,**
a Delaware limited liability company

By: _____
Jacqueline J. Cox
Executive Vice President

EXHIBIT L - Page 53 of 58

**EXHIBIT L - Page 54 of 58**

## EXHIBIT A

### Capital Expenditures

| Project | Estimated Hold Back Per Item |
|---|---|
| **Immediate Repairs:** | |
| Replace flashings and repair exposed parapet walls | $2,500.00 |
| Replace BUR roofing at building 7450 | $120,000.00 |
| Repair or replace evaporative coolers | $4,800.00 |
| Repair leaks from HVAC units, and drainage features | $2,500.00 |
| | |
| **Other Capital Expenditures:** | |
| Asphalt seal, coat & striping | $15,000.00 |
| Exterior cleaning, painting, sealing | $39,000.00 |
| Roof replacement - BUR | $25,000.00 |
| Replace unit water heater | $4,500.00 |
| Replace HVAC unit (RTU) | $100,000.00 |
| **TOTAL:** | **$313,300.00** |

**EXHIBIT L - Page 54 of 58**

Exhibit A
Page 109

**EXHIBIT L - Page 55 of 58**

## EXHIBIT B

### Legal Description of Real Property

PARCEL ONE (1):
LOT 3 OF FINAL MAP CHEYENNE FOUNTAINS (A COMMERCIAL SUBDIVISION) AS
SHOWN BY MAP THEREOF ON FILE IN BOOK 74 OF PLATS, PAGE 66, IN THE OFFICE
OF THE COUNTY RECORDER OF CLARK COUNTY, NEVADA.

EXCEPTING THAT PORTION BEGINNING AT THE SOUTHWEST CORNER OF SAID
LOT 3; THENCE NORTH 00°50'00" WEST ALONG THE WEST LINE OF SAID LOT 3 A
DISTANCE OF 180.35 FEET; THENCE NORTH 89°10'04" EAST A DISTANCE OF 88.00
FEET; THENCE SOUTH 00°50'00" EAST A DISTANCE OF 181.78 FEET TO THE SOUTH
LINE OF SAID LOT 3; THENCE NORTH 89°54'05" WEST ALONG SAID SOUTH LINE A
DISTANCE OF 88.01 FEET TO THE POINT OF BEGINNING.

NOTE: THE ABOVE METES AND BOUNDS LEGAL DESCRIPTION APPEARED
PREVIOUSLY IN THAT CERTAIN DOCUMENT RECORDED MAY 26, 2016 IN BOOK
20160526 AS INSTRUMENT NO. 03036.

PARCEL TWO (2):

A RECIPROCAL EASEMENT FOR INGRESS AND EGRESS RECORDED JULY 22, 1994
IN BOOK 940722 AS INSTRUMENT NO. 00490, OFFICIAL RECORDS CLARK COUNTY,
NEVADA, AS AFFECTED BY AMENDED RECIPROCAL EASEMENT RECORDED JULY
19, 1995 IN BOOK 950719 AS INSTRUMENT NO. 00622, OFFICIAL RECORDS CLARK
COUNTY, NEVADA.

Tax Parcel ID: 138-10-413-005 and 138-10-413-006

7440 and 7450 West Cheyenne Avenue
Las Vegas, Nevada 89129

**EXHIBIT L - Page 55 of 58**

Exhibit A
Page 110

**EXHIBIT L - Page 56 of 58**

## EXHIBIT C

**Brokerage Agreements**

1.    None

**EXHIBIT L - Page 56 of 58**

**EXHIBIT L - Page 57 of 58**

**EXHIBIT D**

**Form of Lease Certificate**

**LEASE CERTIFICATE**

Effective as of December ___, 2018 (the "*Closing Date*"), Cheyenne LV Capital, LLC, a Nevada limited liability company ("*Borrower*") certifies, represents and warrants to A10 Capital, LLC, a Delaware limited liability company (together with its successors and assigns, collectively, "*Lender*"), that the Rent Roll attached hereto as Exhibit "A" is true, complete and accurate as of the date set forth thereon and as of the Closing Date and that the undersigned has no information that would indicate that the foregoing statements are not true and correct. Borrower has delivered to Lender a true and complete copy of the lease for each of the tenants identified on the Rent Roll. Except as otherwise noted on the Rent Roll, each tenant identified on the Rent Roll is in actual occupancy of, and is conducting its normal business operations from, its leased premises. Nothing has come to the attention of Borrower which would lead Borrower to believe that any tenant identified on the Rent Roll currently intends to vacate or abandon actual occupancy of its leased premises or to cease conducting its normal business operations therefrom except as expressly set forth on the Rent Roll.

To the best knowledge of Borrower, no bankruptcy or insolvency proceedings are pending or contemplated by or against any tenant reflected on the Rent Roll relating to that certain property commonly known as 7440 & 7450 West Cheyenne Avenue, Las Vegas, Nevada.

Executed effective as of the Closing Date set forth in the first paragraph hereof.

**BORROWER:**

Cheyenne LV Capital, LLC,
a Nevada limited liability company

By:_____
    Name: _____
    Title: _____

**EXHIBIT L - Page 57 of 58**

EXHIBIT L - Page 58 of 58

Exhibit "A"
to
Lease Certificate

[See attached 1-page Rent Roll]

EXHIBIT L - Page 58 of 58

# EXHIBIT "M"

**EXHIBIT M - Page 1 of 2**



Loan No. AP-NV-AK-18-049-0359-001

## SECOND AMENDMENT TO AGREEMENT REGARDING POST-CLOSING ITEM

Borrower:  Cheyenne LV Capital, LLC
               7343 El Fuerte Street
               Carlsbad, California 92009

Lender:  A10 Permanent Asset Financing 2017-II, LLC
           800 W. Main Street, Suite 1100
           Boise, Idaho 83702

THIS SECOND AMENDMENT TO AGREEMENT REGARDING POST-CLOSING ITEM (this "*Amendment*") is made effective as of February 21, 2019, by and among **Cheyenne LV Capital, LLC**, a Nevada limited liability company ("Borrower"), and **A10 Permanent Asset Financing 2017-II, LLC**, a Delaware limited liability company ("*Lender*").

### R E C I T A L S

A.     On or about December 21, 2018, A10 Capital, LLC, a Delaware limited liability company ("*A10 Capital*"), made a loan (the "*Loan*") to Borrower evidenced by that certain Promissory Note dated December 21, 2018, executed by Borrower and payable to A10 Capital, in the maximum principal amount of $3,150,000.00 (the "*Note*").

B.     As a condition to closing of the Loan, Borrower and A10 Capital entered into that certain Agreement Regarding Post-Closing Item dated December 21, 2018 (the "*Agreement*").

C.     A10 Capital has assigned its right, title and interest in the Note, the Agreement and all other Loan Documents (as defined in the Note) to Lender.

D.     Borrower and Lender now desire to amend the Agreement in order to grant the Borrower additional time to satisfy the requirements of the Agreement.

### A G R E E M E N T :

NOW, THEREFORE, in consideration of the mutual promises contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and upon the recitals set forth above, which are incorporated herein by this reference, the parties hereto mutually agree as follows:

1.     **Recitals; Definitions.**  The parties hereby acknowledge the accuracy of the above Recitals and such Recitals are incorporated herein by this reference.  Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the Agreement.

2.     **Amendment.**
     a.  Section 2 of the Agreement is amended to provide that the following items have been received and approved by Lender:
         i)  Evidence of Commercial Property Insurance and General Liability Insurance in form acceptable to Lender, in Lender's sole discretion; and
         ii)  Federal Employee Identification Number (FEIN) letter from the IRS providing the FEIN.

SECOND AMENDMENT TO AGREEMENT REGARDING POST-CLOSING ITEM - 1

**EXHIBIT M - Page 1 of 2**

EXHIBIT "N"

**Subject:** Fwd: Cheyenne: Leasing Commissions - General Ledger
**From:** "Patty Balhaghy" <pattyann007@gmail.com>
**Date:** Fri, May 01, 2020 8:59 am
**To:** Tony Balhaghy <tonyzre@gmail.com>
**Attach:** Perm Draw Request Process Summary Form.xlsx
Officer's Certificate (Cheyenne Fountains).doc

**EXHIBIT N - Page 1 of 1**

---------- Forwarded message ----------
From: **Victoria Fitzgerald** <vfitzgerald@a10capital.com>
Date: Thu, Apr 30, 2020, 9:23 AM
Subject: RE: Cheyenne: Leasing Commissions - General Ledger
To: Patty Balhaghy <pattyann007@gmail.com>

Patty,

Thank you for sending over.

Since this is your first draw with A10 Capital, I've attached our submission form and Officer's Certificate.

I do want to point out that per Section 5.1 of the Loan Agreement, advance are not to be less than $25,000. However, during these times, we are making exceptions.

Please let me know if you have any questions.

Best,

Victoria

**From:** Patty Balhaghy <pattyann007@gmail.com>
**Sent:** Tuesday, April 28, 2020 4:17 PM
**To:** Victoria Fitzgerald <vfitzgerald@A10Capital.com>
**Subject:** Cheyenne: Leasing Commissions - General Ledger

Hi Victoria,

As per our conference call yesterday, attached is the Leasing Expense - General Ledger from SVN property management, it contains commissions paid to-date. Please forward a check payable to;

Cheyenne LV Capital, LLC

PO Box 131446

Carlsbad, CA 92013

Regards, Patty

Copyright © 2003-2021. All rights reserved.

**EXHIBIT N - Page 1 of 1**

# EXHIBIT "O"

Print | Close Window

<strong>EXHIBIT O - Page 1 of 1</strong>

Subject: yield maintenance calculator
From: Alisha Hill Koontz <ahill@a10capital.com>
Date: Mon, Jan 06, 2020 2:40 pm
To: tonyzre@gmail.com
Attach: image001.jpg

---

From: **Alisha Hill Koontz** <ahill@a10capital.com>
Date: Mon, Jan 6, 2020 at 2:40 PM
Subject: yield maintenance calculator
To: Tony Balhaghy <Tonyzro@gmail.com>

https://www.chathamfinancial.com/expertise/defeasance-prepayment-expertise/yield-maintenance-calculator/

**Alisha Hill Koontz**

*Executive Vice President*



800 W. Main St., Suite 1100 | Boise, ID 83702

Office: 208.577.5052

website | email | vCard | linkedin | twitter |

---

Copyright © 2003-2021. All rights reserved.

<strong>EXHIBIT O - Page 1 of 1</strong>

# EXHIBIT "P"

**EXHIBIT P - Page 1 of 2**

Subject: RE: Cheyenne Fountain Roof Repair
From: "Victoria Fitzgerald" <vfitzgerald@a10Capital.com>
Date: Tue, Jul 14, 2020 9:46 am
To: Tony Baihaghy <tonyzre@gmail.com>, Alisha Hill Koontz <ahill@A10Capital.com>
Attach: image001.jpg

Tony,
Per Section 5.1 of the Loan Agreement, we only disburse funds for work completed.
Please let me know when the work has been completed and we'll get funds out for you.

Best,
Victoria

**From:** Tony Baihaghy <tonyzre@gmail.com>
**Sent:** Monday, July 13, 2020 1:36 PM
**To:** Victoria Fitzgerald <vfitzgerald@A10Capital.com>; Alisha Hill Koontz <ahill@A10Capital.com>
**Subject:** Re: Cheyenne Fountain Roof Repair

Hello,
We have received bids for Immediate Repairs and need our monies to undertake the work.
Attached is the signed request form.
Regards,
Tony

On Mon, Jun 8, 2020 at 9:08 AM Victoria Fitzgerald <vfitzgerald@a10capital.com> wrote:

Tony,
Se attached our Draw Request form for your submission.
Please let me know if you have any questions.

Best,
Victoria

**From:** Alisha Hill Koontz <ahill@A10Capital.com>
**Sent:** Monday, June 8, 2020 9:49 AM
**To:** Tony Baihaghy <tonyzre@gmail.com>; Victoria Fitzgerald <vfitzgerald@A10Capital.com>
**Subject:** RE: Cheyenne Fountain Roof Repair

Looping Vicky in here who will work with you on getting the funds released to pay contractors.

Best,

**Alisha Hill Koontz**
*Executive Vice President*



800 W. Main St., Suite 1100 | Boise, ID 83702
Office: 208.577.5052
website | email | vCard | linkedin | twitter |

**From:** Tony Baihaghy <tonyzre@gmail.com>
**Sent:** Monday, June 8, 2020 9:46 AM
**To:** Alisha Hill Koontz <ahill@A10Capital.com>

**EXHIBIT P - Page 1 of 2**

**EXHIBIT P – Page 2 of 2**

Hello Alisha,
We intend to complete all the roof repairs of Exhibit A  shortly, as we received considerably lower bids than the previous estimate.
We will need funds to be released to pay the contractor.
Thank you,
Tony

Copyright © 2003-2021. All rights reserved.

**EXHIBIT P – Page 2 of 2**

EXHIBIT "Q"

Print  |  Close Window

**EXHIBIT Q - Page 1 of 2**

Subject: yield maintenance calculator
From: Alisha Hill Koontz <ahill@a10capital.com>
Date: Mon, Sep 21, 2020 2:55 pm
To: tonyzre@gmail.com
Attach: image001.jpg

---

From: **Alisha Hill Koontz** <ahill@a10capital.com>
Date: Mon, Sep 21, 2020 at 2:55 PM
Subject: RE: yield maintenance calculator
To: Tony Baihaghy <tonyzre@gmail.com>

Hello Tony,

Our capital markets came back with the below estimate assuming the loan was paid off in a week. As rates are lower than when we originated the loan, the yield maintenance calculation is quite high. If rates go up between now and when you pay it off, it would be lower.

It would be roughly $1,028,917 (or 33.82% of the outstanding balance).

Please let me  know if you have other questions.

-Alisha

From: Tony Baihaghy <tonyzre@gmail.com>
Sent: Monday, September 21, 2020 12:59 PM
To: Alisha Hill Koontz <ahill@A10Capital.com>
Subject: Re: yield maintenance calculator

Hi Alisha

The link you sent in your June 6 email for calculation of Yield Maintenance requires inputs which are not clear. I have not been able to make an accurate assessment of our loan prepayment penalty (Yield Maintenance). If we were to pay off the loan in March 2021, how much is the prepayment penalty. Please advise.

Thank you,

Tony

On Mon, Jan 6, 2020 at 2:40 PM Alisha Hill Koontz <ahill@a10capital.com> wrote:

https://www.chathamfinancial.com/expertise/defeasance-prepayment-expertise/yield-maintenance-calculator/

**Alisha Hill Koontz**

**EXHIBIT Q - Page 1 of 2**

*Executive Vice President*



800 W. Main St., Suite 1100 | Boise, ID 83702

Office:  208.577.5052

website | email | vCard | linkedin | twitter |

Copyright © 2003-2021. All rights reserved.

**EXHIBIT Q - Page 2 of 2**

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO | |
|---|---|
| STREET ADDRESS: | 330 W Broadway |
| MAILING ADDRESS: | 330 W Broadway |
| CITY AND ZIP CODE: | San Diego, CA 92101-3827 |
| DIVISION: | Central |
| TELEPHONE NUMBER: | (619) 450-7071 |

| PLAINTIFF(S) / PETITIONER(S):   E-Z Living LLC |
|---|
| DEFENDANT(S) / RESPONDENT(S):  A10 Capital LLC et.al. |
| E-Z LIVING LLC VS A10 CAPITAL LLC [IMAGED] |

| NOTICE OF CASE ASSIGNMENT AND CASE MANAGEMENT CONFERENCE (CIVIL) | CASE NUMBER: 37-2021-00023914-CU-BT-CTL |
|---|---|

**CASE ASSIGNED FOR ALL PURPOSES TO:**

Judge:  Gregory W Pollack                                                  Department: C-71

**COMPLAINT/PETITION FILED:** 06/01/2021

| TYPE OF HEARING SCHEDULED | DATE | TIME | DEPT | JUDGE |
|---|---|---|---|---|
| Civil Case Management Conference | 11/05/2021 | 01:30 pm | C-71 | Gregory W Pollack |

Due to the COVID-19 pandemic, all Case Management Conferences (CMCs) are being conducted virtually unless there is a court order stating otherwise. Prior to the hearing date, visit the "virtual hearings" page for the most current instructions on how to appear for the applicable case-type/department on the court's website at www.sdcourt.ca.gov.

A Case Management Statement (JC Form #CM-110) must be completed by counsel for all parties and by all self-represented litigants and timely filed with the court at least 15 days prior to the initial CMC. (San Diego Superior Court (SDSC) Local Rules, rule 2.1.9; Cal. Rules of Court, rule 3.725).

All counsel of record and self-represented litigants must appear at the CMC, be familiar with the case, and be fully prepared to participate effectively in the hearing, including discussions of Alternative Dispute Resolution (ADR) options.

It is the duty of each plaintiff (and cross-complainant) to serve a copy of this Notice of Case Assignment and Case Management Conference (SDSC Form #CIV-721) with the complaint (and cross-complaint), the Alternative Dispute Resolution (ADR) Information Form (SDSC Form # CIV-730), a Stipulation to Use Alternative Dispute Resolution (ADR) (SDSC Form # CIV-359), and other documents on all parties to the action as set out in SDSC Local Rules, rule 2.1.5.

**TIME FOR SERVICE AND RESPONSE:** The following rules apply to civil cases except for collections cases under California Rules of Court, rule 3.740(a), unlawful detainer actions, proceedings under the Family Code, and other proceedings for which different service requirements are prescribed by law (Cal. Rules of Court, rule 3.110; SDSC Local Rules, rule 2.1.5):
- **Service:** The complaint must be served on all named defendants, and proof of service filed with the court within 60 days after filing the complaint.  An amended complaint adding a defendant must be served on the added defendant and proof of service filed within 30 days after filing of the amended complaint.  A cross-complaint against a party who has appeared in the action must be accompanied by proof of service on that party at the time it is filed.  If it adds a new party, the cross-complaint must be served on all parties and proof of service on the new party must be filed within 30 days of the filing of the cross-complaint.
- **Defendant's appearance:** Unless a special appearance is made, each defendant served must generally appear (as defined in Code of Civ. Proc. § 1014) within 30 days of service of the complaint/cross-complaint.
- **Extensions:** The parties may stipulate without leave of court to one 15-day extension beyond the 30-day time period prescribed for the response after service of the initial complaint (SDSC Local Rules, rule 2.1.6).  If a party fails to serve and file pleadings as required under this rule, and has not obtained an order extending time to serve its pleadings, the court may issue an order to show cause why sanctions shall not be imposed.

**JURY FEES:** In order to preserve the right to a jury trial, one party for each side demanding a jury trial shall pay an advance jury fee in the amount of one hundred fifty dollars ($150) on or before the date scheduled for the initial case management conference in the action.

**COURT REPORTERS:** Official Court Reporters are not normally available in civil matters, but may be requested in certain situations no later than 10 days before the hearing date.  See SDSC Local Rules, rule 1.2.3 and Policy Regarding Normal Availability and Unavailability of Official Court Reporters (SDSC Form #ADM-317) for further information.

**ALTERNATIVE DISPUTE RESOLUTION (ADR):** The court discourages any unnecessary delay in civil actions; therefore, continuances are discouraged and timely resolution of all actions, including submitting to any form of ADR is encouraged.  The court encourages and expects the parties to consider using ADR options prior to the CMC.  The use of ADR will be discussed at the CMC.  Prior to the CMC, parties stipulating to the ADR process may file the Stipulation to Use Alternative Dispute Resolution (SDSC Form #CIV-359).

| SDSC CIV-721 (Rev. 04-21) | NOTICE OF CASE ASSIGNMENT AND CASE MANAGEMENT CONFERENCE (CIVIL) | Page: 1 |
|---|---|---|

## NOTICE OF E-FILING REQUIREMENTS
## AND IMAGED DOCUMENTS

Effective April 15, 2021, e-filing is required for attorneys in represented cases in all limited and unlimited civil cases, pursuant to the San Diego Superior Court General Order: In Re Procedures Regarding Electronically Imaged Court Records, Electronic Filing and Access to Electronic Court Records in Civil and Probate Cases.  Additionally, you are encouraged to review CIV-409 for a listing of documents that are not eligible for e-filing.  E-filing is also encouraged, but not mandated, for self-represented litigants, unless otherwise ordered by the court.  All e-filers are required to comply with the e-filing requirements set forth in Electronic Filing Requirements (Civil) (SDSC Form #CIV-409) and Cal. Rules of Court, rules 2.250-2.261.

All Civil cases are assigned to departments that are part of the court's "Imaging Program."  This means that original documents filed with the court will be imaged, held for 30 days, and then destroyed, with the exception of those original documents the court is statutorily required to maintain.  The electronic copy of the filed document(s) will be the official court record, pursuant to Government Code § 68150.  Thus, original documents should not be attached to pleadings filed with the San Diego Superior Court, unless it is a document for which the law requires an original be filed.  Any original documents necessary for a motion hearing or trial shall be lodged in advance of the hearing pursuant to California Rules of Court, rule 3.1302(b).

It is the duty of each plaintiff, cross-complainant, or petitioner to serve a copy of this Notice of Case Assignment and Case Management Conference (Civil) (SDSC Form #CIV-721) with the complaint, cross-complaint, or petition on all parties to the action.

On all pleadings filed after the initial case originating filing, all parties must, to the extent it is feasible to do so, place the words "IMAGED FILE" in all caps immediately under the title of the pleading on all subsequent pleadings filed in the action.

The official court file will be electronic and accessible at one of the kiosks located in the Civil Business Office and may be found on the court's website at www.sdcourt.ca.gov.

Page: 2

Exhibit A
Page 127

# EXHIBIT B

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*
F. Bari Nejadpour, Esq. (SBN 216925)
L.A. Law Inc., APC
8383 Wilshire Blvd., Ste 630, Beverly Hills, CA 90211

TELEPHONE NO.: 310-954-9595   FAX NO. *(Optional):* 800-760-1107
ATTORNEY FOR *(Name):* Plaintiff, E-Z LIVING LLC

| FOR COURT USE ONLY |
|---|
| **ELECTRONICALLY FILED** |
| Superior Court of California, |
| County of San Diego |
| **06/01/2021** at 03:10:09 PM |
| Clerk of the Superior Court |
| By Emily Schilawski, Deputy Clerk |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO
STREET ADDRESS: 330 West Broadway
MAILING ADDRESS:
CITY AND ZIP CODE: San Diego, California 92101
BRANCH NAME:

CASE NAME: E-Z LIVING LLC v A10 CAPITAL, LLC, A10 CAPITAL HOLDING COMPANY, LLC, A10 REIT, LLC, A10 PERMANENT ASSET FINANCING 2017-II, LLC, and DOES 1-20

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: |
|---|---|---|---|---|
| [X] Unlimited (Amount demanded exceeds $25,000) | [ ] Limited (Amount demanded is $25,000) | [ ] Counter  [ ] Joinder  Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | | 37-2021-00023914-CU-BT-CTL |
| | | | JUDGE: Judge Gregory W Pollack  DEPT.: | |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
- [ ] Auto (22)
- [ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- [ ] Asbestos (04)
- [ ] Product liability (24)
- [ ] Medical malpractice (45)
- [ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- [X] Business tort/unfair business practice (07)
- [ ] Civil rights (08)
- [ ] Defamation (13)
- [ ] Fraud (16)
- [ ] Intellectual property (19)
- [ ] Professional negligence (25)
- [ ] Other non-PI/PD/WD tort (35)

**Employment**
- [ ] Wrongful termination (36)
- [ ] Other employment (15)

**Contract**
- [ ] Breach of contract/warranty (06)
- [ ] Rule 3.740 collections (09)
- [ ] Other collections (09)
- [ ] Insurance coverage (18)
- [ ] Other contract (37)

**Real Property**
- [ ] Eminent domain/Inverse condemnation (14)
- [ ] Wrongful eviction (33)
- [ ] Other real property (26)

**Unlawful Detainer**
- [ ] Commercial (31)
- [ ] Residential (32)
- [ ] Drugs (38)

**Judicial Review**
- [ ] Asset forfeiture (05)
- [ ] Petition re: arbitration award (11)
- [ ] Writ of mandate (02)
- [ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
- [ ] Antitrust/Trade regulation (03)
- [ ] Construction defect (10)
- [ ] Mass tort (40)
- [ ] Securities litigation (28)
- [ ] Environmental/Toxic tort (30)
- [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- [ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- [ ] RICO (27)
- [ ] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
- [ ] Partnership and corporate governance (21)
- [ ] Other petition *(not specified above)* (43)

2. This case [ ] is [X] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties.   d. [ ] Large number of witnesses
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   c. [ ] Substantial amount of documentary evidence   f. [ ] Substantial postjudgment judicial supervision
3. Remedies sought *(check all that apply)*: a. [X] monetary b. [X] nonmonetary; declaratory or injunctive relief c. [X] punitive
4. Number of causes of action *(specify)*: FIVE
5. This case [ ] is [X] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*
Date:   05/14/2021
F. Bari Nejadpour, Esq.
(TYPE OR PRINT NAME)   (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET
CM-010

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the *primary* cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
  Asbestos Property Damage
  Asbestos Personal Injury/ Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
  Medical Malpractice– Physicians & Surgeons
  Other Professional Health Care Malpractice
Other PI/PD/WD (23)
  Premises Liability (e.g., slip and fall)
  Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
  Intentional Infliction of Emotional Distress
  Negligent Infliction of Emotional Distress
  Other PI/PD/WD
**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
  Legal Malpractice
  Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)
**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
  Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
  Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
  Negligent Breach of Contract/ Warranty
  Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
  Collection Case–Seller Plaintiff
  Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
  Auto Subrogation
  Other Coverage
Other Contract (37)
  Contractual Fraud
  Other Contract Dispute
**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
  Writ of Possession of Real Property
  Mortgage Foreclosure
  Quiet Title
  Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*
**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*
**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
  Writ–Administrative Mandamus
  Writ–Mandamus on Limited Court Case Matter
  Writ–Other Limited Court Case Review
Other Judicial Review (39)
  Review of Health Officer Order
  Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)
**Enforcement of Judgment**
Enforcement of Judgment (20)
  Abstract of Judgment (Out of County)
  Confession of Judgment *(non-domestic relations)*
  Sister State Judgment
  Administrative Agency Award *(not unpaid taxes)*
  Petition/Certification of Entry of Judgment on Unpaid Taxes
  Other Enforcement of Judgment Case
**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
  Declaratory Relief Only
  Injunctive Relief Only *(non-harassment)*
  Mechanics Lien
  Other Commercial Complaint Case *(non-tort/non-complex)*
  Other Civil Complaint *(non-tort/non-complex)*
**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
  Civil Harassment
  Workplace Violence
  Elder/Dependent Adult Abuse
  Election Contest
  Petition for Name Change
  Petition for Relief From Late Claim
  Other Civil Petition

**CIVIL CASE COVER SHEET**

Exhibit B
Page 129

# EXHIBIT C

1  Ronald A. McIntire, Bar No. 127407
   RMcIntire@perkinscoie.com
2  Carrie Akinaka, Bar No. 324284
   CAkinaka@perkinscoie.com
3  PERKINS COIE LLP
   1888 Century Park E., Suite 1700
4  Los Angeles, CA  90067-1721
   Telephone:  310.788.9900
5  Facsimile:  310.788.3399

6  Attorneys for Defendants
7  A10 Capital, LLC; A10 Capital Holding Company,
   LLC; A10 Permanent Asset Financing 2017-II,
8  LLC; and A10 REIT Holdings, LLC

**ELECTRONICALLY FILED**
Superior Court of California,
County of San Diego

**07/13/2021** at 04:06:00 PM
Clerk of the Superior Court
By Melinda McClure, Deputy Clerk

9           **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

10              **FOR THE COUNTY OF SAN DIEGO**

11  E-Z LIVING, LLC,                          Case No. 37-2021-00023914-CU-BT-CTL

12              Plaintiff,

13      v.                                     [Honorable Judge Gregory W. Pollack, Dept.
                                               C-71]
14
15  A10 CAPITAL, LLC; A10 CAPITAL             **DEFENDANTS A10 CAPITAL, LLC; A10**
    HOLDING COMPANY, LLC; A10                 **CAPITAL HOLDING COMPANY, LLC;**
16  PERMANENT ASSET FINANCING 2017-           **A10 PERMANENT ASSET FINANCING**
    II, LLC; A10 REIT HOLDINGS, LLC; and      **2017-II, LLC; A10 REIT HOLDINGS,**
    DOES 1-20,                                **LLC'S ANSWER AND AFFIRMATIVE**
17                                            **DEFENSES TO PLAINTIFF E-Z LIVING,**
              Defendants,                     **LLC'S COMPLAINT AND DEMAND**
18                                            **FOR JURY TRIAL**
19
20                                            Action Filed:  June 1, 2021
                                             Trial Date:  Not Set
21

22        **TO THE COURT AND ALL PARTIES AND THEIR RESPECTIVE ATTORNEYS**

23  **OF RECORD:**

24        Defendants A10 Capital, LLC; A10 Capital Holding Company, LLC; A10 Permanent

25  Asset Financing 2017-II, LLC; and A10 REIT Holdings, LLC (collectively, "Defendants"),

26  hereby answer Plaintiff E-Z Living LLC's ("Plaintiff") Complaint filed on June 1, 2021 (the

27  "Complaint") as follows:

28

-1-

1

**GENERAL DENIAL**

2    Pursuant to California Code of Civil Procedure section 431.30(d), Defendants deny

3    generally each and every allegation of the Complaint, and the whole thereof, including each and

4    every purported cause of action set forth therein, and specifically deny that Plaintiff has sustained

5    injury or damage in the sum alleged or in any other sum or sums or at all, and that Plaintiff is

6    entitled to any relief as a result of any act, conduct, or omission of Defendants.

7

**AFFIRMATIVE DEFENSES**

8    Defendants allege the following affirmative defenses.  Defendants reserve the right to

9    assert any and all additional affirmative defenses in the event discovery demonstrates that any

10   such defense is appropriate or applicable.

11

**FIRST AFFIRMATIVE DEFENSE**

12

(Failure to State a Cause of Action)

13   Each and every allegation and claim for relief contained in the Complaint fails to allege

14   facts sufficient to constitute a claim upon which relief can be granted or state a cause of action

15   against Defendants.

16

**SECOND AFFIRMATIVE DEFENSE**

17

(Statute of Limitations)

18   The Complaint is barred in whole in part by the applicable statutes of limitations.

19

**THIRD AFFIRMATIVE DEFENSE**

20

(Laches)

21   The Complaint is barred in whole in part by the doctrine of laches.

22

**FOURTH AFFIRMATIVE DEFENSE**

23

(Estoppel and Waiver)

24   The Complaint is barred in whole in part by the doctrines of estoppel and waiver.

25

**FIFTH AFFIRMATIVE DEFENSE**

26

(Unclean Hands)

27   The Complaint is barred in whole or in part by reason of Plaintiff's unclean hands.

28

-2-

ANSWER TO COMPLAINT

1  **SIXTH AFFIRMATIVE DEFENSE**

2  (Failure to Mitigate Damages)

3      Plaintiff has failed to mitigate damages or losses, if any, and is therefore barred from any

4  recovery against Defendants.

5  **SEVENTH AFFIRMATIVE DEFENSE**

6  (Impossibility and/or Impracticability and/or Inequity)

7      The Complaint is barred in whole or in part by the doctrines of impossibility,

8  impracticability, and/or inequity.

9  **EIGHTH AFFIRMATIVE DEFENSE**

10  (Contributory or Comparative Negligence)

11      Plaintiff's losses, if any, were caused by the negligence and/or conduct and/or omissions

12  of Plaintiff or other persons and/or entities other than Defendants and for whose acts Defendants

13  has no legal responsibility.

14  **NINTH AFFIRMATIVE DEFENSE**

15  (Ratification and Excuse)

16      The Complaint is barred in whole or in part because any mistakes, errors, or omissions by

17  Defendants have been knowingly excused and/or ratified by Plaintiff.

18  **TENTH AFFIRMATIVE DEFENSE**

19  (Intervening/Superseding Cause)

20      Plaintiff's losses, if any, were caused by events, occurrences or conduct constituting an

21  intervening or superseding cause.

22  **ELEVENTH AFFIRMATIVE DEFENSE**

23  (Ripeness)

24      Plaintiff's claims against Defendants are not ripe for adjudication as there is no actual

25  controversy between the parties.

26

27

28

ANSWER TO COMPLAINT

152959867 1

Exhibit C
Page 132

1

**TWELFTH AFFIRMATIVE DEFENSE**

2

(Not the Result of Act or Omission of Defendants)

3

Plaintiff's losses, if any, are not the result of or caused by any act or omission of

4

Defendants, or its employees, agents, or officers, at any material time alleged in the Complaint.

5

**THIRTEENTH AFFIRMATIVE DEFENSE**

6

(Result of Act or Omission of Others)

7

Defendants is informed and on that basis allege that any and all acts or omissions which

8

allegedly caused Plaintiff's losses, if any, were caused by third parties not controlled or employed

9

by Defendants, and therefore, Defendants are not liable for the alleged losses, if any.

10

**FOURTEENTH AFFIRMATIVE DEFENSE**

11

(No Recovery of Attorneys' Fees)

12

Each and every allegation and claim for relief contained in the Complaint fails to allege

13

facts sufficient to support Plaintiff's claim for attorneys' fees.

14

**FIFTEENTH AFFIRMATIVE DEFENSE**

15

(No Injury)

16

Plaintiff has not sustained the losses alleged in the Cross-Complaint, or any other losses,

17

damages, or injuries.  Therefore, no recovery may be had from Defendants.

18

**SIXTEENTH AFFIRMATIVE DEFENSE**

19

(Vague/Uncertain)

20

The Complaint and each cause of action alleged therein is vague and uncertain.

21

**SEVENTEENTH AFFIRMATIVE DEFENSE**

22

(Improper Measure of Damages)

23

Plaintiff alleges and/or seeks to recover an improper measure of damages.

24

**EIGHTEENTH AFFIRMATIVE DEFENSE**

25

(Consent)

26

The claims in the Complaint are barred in whole or in part by the doctrines of consent,

27

acquiescence and/or ratification.

28

-4-

ANSWER TO COMPLAINT

152959867 1

Exhibit C
Page 133

1                                     **NINETEENTH AFFIRMATIVE DEFENSE**

2                                       (Mistake of Fact/Law)

3        Plaintiff's claims are barred by mistake of fact or mistake of law.

4                                      **TWENTIETH AFFIRMATIVE DEFENSE**

5                            (Failure to Take Adequate Precautions)

6        Plaintiff failed to take precautions which would have avoided and/or diminished losses, if

7 any.

8                               **TWENTY-FIRST AFFIRMATIVE DEFENSE**

9                              (Unreasonable Conduct)

10       Plaintiff should be denied recovery under the Complaint, and for each cause of action

11 thereof, because Defendants are informed and on that basis allege that Plaintiff's conduct was

12 manifestly unreasonable.

13                         **TWENTY-SECOND AFFIRMATIVE DEFENSE**

14                            (No Punitive Damages)

15       Plaintiff's claims against Defendants for punitive damages are barred because Plaintiff

16 fails to allege facts or conduct by Defendants sufficient to establish a claim for exemplary or

17 punitive damages.

18                        **TWENTY-THIRD AFFIRMATIVE DEFENSE**

19                               (Good Faith)

20       Plaintiff is not entitled to the relief alleged in the Complaint because Defendants acted in

21 good faith.

22                       **TWENTY-FOURTH AFFIRMATIVE DEFENSE**

23                           (Unjust Enrichment)

24       Plaintiff's Complaint, and each purported claim or cause of action therein, is barred to the

25 extent that any award to Plaintiff in this action would constitute unjust enrichment.

26

27

28

ANSWER TO COMPLAINT

152959867 1

Exhibit C
Page 134

**TWENTY-FIFTH AFFIRMATIVE DEFENSE**

(Speculative Damages)

Plaintiff cannot recover any of the alleged damages in the Complaint because such damages, if any, are too speculative to be recovered at law.

**PRAYER FOR RELIEF AND JURY DEMAND**

WHEREFORE, Defendants pray for a jury trial and for other relief as follows:

1. That Plaintiff takes nothing against Defendants;

2. That the Complaint against Defendants be dismissed with prejudice;

3. That judgment be entered in favor of Defendants;

4. That Defendants recover all costs of suit incurred herein, including reasonable attorneys' fees to the fullest extent allowed; and

5. That the Court orders such other relief as is just and appropriate in the circumstances.

DATED:  July 13, 2021

**PERKINS COIE LLP**

By: _/s/ Ronald A. McIntire_
Ronald A. McIntire, Bar No. 127407
RMcIntire@perkinscoie.com
Carrie Akinaka, Bar No. 324284
CAkinaka@perkinscoie.com
*Attorneys for Defendants A10 Capital,
LLC; A10 Capital Holding Company,
LLC; A10 Permanent Asset Financing
2017-II, LLC; and A10 REIT Holdings,
LLC*

-6-

## **PROOF OF SERVICE**

I, Jenna DeRosier, declare:  I am a citizen of the United States and employed in Los Angeles County, California.  I am over the age of eighteen years and not a party to the within-entitled action.  My business address is 1888 Century Park E., Suite 1700, Los Angeles, California 90067-1721.  On July 13, 2021, I served a copy of the within document(s):

**DEFENDANTS A10 CAPITAL, LLC; A10 CAPITAL HOLDING COMPANY, LLC; A10 PERMANENT ASSET FINANCING 2017-II, LLC; A10 REIT HOLDINGS, LLC'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF E-Z LIVING, LLC'S COMPLAINT AND DEMAND FOR JURY TRIAL**

☐ by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, the United States mail at Los Angeles, California addressed as set forth below.

☐ by placing the document(s) listed above in a sealed Federal Express envelope and affixing a pre-paid air bill, and causing the envelope to be delivered to a Federal Express agent for delivery.

☐ by personally delivering the document(s) listed above to the person(s) at the address(es) set forth below.

☒ by transmitting via my electronic service address (*JDeRosier@perkinscoie.com*) the document(s) listed above to the person(s) at the e-mail address(es) set forth below.

F. Bari Nejadpour
LA LAW INC APC
8383 Wilshire Blvd., Suite 630
Beverly Hills, CA 90211
admin@lalawinc.com

*Attorneys for Plaintiff E-Z Living LLC*

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on July 13, 2021 at Los Angeles, California.

*/s/ Jenna DeRosier*
Jenna DeRosier

-1-

# EXHIBIT D

### SUPERIOR COURT OF CALIFORNIA
# County of SAN DIEGO

**Register of Actions Notice**

| | | | |
|---|---|---|---|
| Case Number: | 37-2021-00023914-CU-BT-CTL | Filing Date: | 06/01/2021 |
| Case Title: | E-Z Living LLC vs A10 Capital LLC [IMAGED] | Case Age: | 43 days |
| Case Status: | Pending | Location: | Central |
| Case Category: | Civil - Unlimited | Judicial Officer: | Gregory W Pollack |
| Case Type: | Business Tort | Department: | C-71 |

## Future Events

| Date | Time | Department | Event |
|---|---|---|---|
| 11/05/2021 | 01:30 PM | C-71 | Civil Case Management Conference - Complaint |

## Participants

| Name | Role | Representation |
|---|---|---|
| A10 Capital Holding Company LLC | Defendant | McIntire, Ronald A |
| A10 Capital LLC | Defendant | McIntire, Ronald A |
| A10 Permanent Asset Financing 2017-II LLC | Defendant | McIntire, Ronald A |
| A10 REIT HOLDINGS LLC | Defendant | McIntire, Ronald A |
| E-Z Living LLC | Plaintiff | NEJADPOUR, F BARI |

## Representation

| Name | Address | Phone Number |
|---|---|---|
| MCINTIRE, RONALD  A | PERKINS COLE LLP 1888 Century Park East Suite 1700 Los Angeles CA 90067 | (310) 788-9900, (310) 778-3399 |
| NEJADPOUR, F  B | LA LAW INC APC 8383 Wilshire Boulevard Suite 649 Beverly Hills CA 90211 | (310) 954-9595 |

| ROA# | Entry Date | Short/Long Entry | Filed By |
|---|---|---|---|
| 1 | 06/01/2021 | Complaint filed by E-Z Living LLC. Refers to: A10 Capital LLC; A10 Capital Holding Company LLC; A10 REIT HOLDINGS LLC; A10 Permanent Asset Financing 2017-II LLC | E-Z Living LLC (Plaintiff) |
| 2 | 06/01/2021 | Civil Case Cover Sheet filed by E-Z Living LLC. Refers to: A10 Capital LLC; A10 Capital Holding Company LLC; A10 REIT HOLDINGS LLC; A10 Permanent Asset Financing 2017-II LLC | E-Z Living LLC (Plaintiff) |
| 3 | 06/01/2021 | Original Summons filed by E-Z Living LLC. Refers to: A10 Capital LLC; A10 Capital Holding Company LLC; A10 REIT HOLDINGS LLC; A10 Permanent Asset Financing 2017-II LLC | E-Z Living LLC (Plaintiff) |
| 4 | 06/02/2021 | Summons issued. | |
| 5 | 06/01/2021 | Case assigned to Judicial Officer Pollack, Gregory. | |
| 6 | 06/02/2021 | Civil Case Management Conference scheduled for 11/05/2021 at 01:30:00 PM at Central in C-71 Gregory W Pollack. | |
| 7 | 06/02/2021 | Case initiation form printed. | |
| 8 | 06/16/2021 | Proof of Service of Summons & Complaint - Unnamed Occupants filed by E-Z Living LLC. | E-Z Living LLC (Plaintiff) |
| 9 | 06/16/2021 | Proof of Service of Summons & Complaint - Unnamed Occupants filed by E-Z Living LLC. | E-Z Living LLC (Plaintiff) |
| 10 | 06/16/2021 | Proof of Service of Summons & Complaint - Unnamed Occupants filed by E-Z Living LLC. | E-Z Living LLC (Plaintiff) |
| 11 | 06/17/2021 | Proof of Service of Summons & Complaint - Unnamed Occupants filed by E-Z Living LLC. | E-Z Living LLC (Plaintiff) |

Exhibit D
Page 137

| 12 | 07/13/2021 | Answer filed by A10 Capital LLC; A10 Capital Holding Company LLC; A10 REIT HOLDINGS LLC; A10 Permanent Asset Financing 2017-II LLC. | A10 Capital LLC (Defendant); A10 Capital Holding Company LLC (Defendant); A10 REIT HOLDINGS LLC (Defendant); A10 Permanent Asset Financing 2017-II LLC (Defendant) |

# EXHIBIT E

**Secretary of State**
Statement of No Change
(Limited Liability Company)

**LLC-12NC**

19-C48106

# FILED

In the office of the Secretary of State
of the State of California

JUN 27, 2019

*This Space For Office Use Only*

**IMPORTANT — Read instructions** before completing this form.  This form may be used only if a complete Statement of Information has been filed previously and there has been no change.

**Filing Fee – $20.00**

**Copy Fee –** $1.00;
Certification Fee - $5.00 plus copy fee

1. **Limited Liability Company Name** (Enter the **exact** name of the LLC as it is recorded with the California Secretary of State.  Note: If you registered in California using an alternate name, see instructions.)

E-Z LIVING LLC

2. **12-Digit Secretary of State File Number**

200327610021

3. **State, Foreign Country or Place of Organization**  (only if formed outside of California)

CALIFORNIA

4. **No Change Statement** (Do not alter the No Change Statement.  If there has been any change, please complete a Statement of Information (Form LLC-12).)

*There has been no change in any of the information contained in the previous complete Statement of Information filed with the California Secretary of State.*

5. The information contained herein is true and correct.

| 06/27/2019 | Tony Baihaghy | Managing Member | |
|---|---|---|---|
| Date | Type or Print Name of Person Completing the Form | Title | Signature |

**Return Address (Optional)**  (For communication from the Secretary of State related to this document, or if purchasing a copy of the filed document, enter the name of a person or company and the mailing address. This information will become public when filed. (SEE INSTRUCTIONS BEFORE COMPLETING.)

Name:

Company:

Address:

City/State/Zip:

LLC-12NC (REV 01/2017)

2017 California Secretary of State
www.sos.ca.gov/business/be

Exhibit E
Page 139